**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| |
|---|
| IN RE NORFOLK SOUTHERN CORPORATION BOND/NOTE SECURITIES LITIGATION |

Case No. 1:23-cv-04068-LAK-SLC

CLASS ACTION

DEMAND FOR JURY TRIAL

**AMENDED CLASS ACTION COMPLAINT FOR VIOLATION**
**OF THE FEDERAL SECURITIES LAWS**

## TABLE OF CONTENTS

I.      NATURE AND SUMMARY OF THE ACTION ................................................................. 1

II.     JURISDICTION AND VENUE .................................................................................... 6

III.    THE PARTIES ........................................................................................................... 7

    A.      Lead Plaintiffs ................................................................................................ 7

    B.      Defendants ...................................................................................................... 8

        1.      Corporate Defendant ........................................................................... 8

        2.      Individual Defendants ......................................................................... 8

        3.      Underwriter Defendants ..................................................................... 12

IV.     BACKGROUND ..................................................................................................... 20

    A.      Company Information .................................................................................... 20

        1.      The Safety Risks Posed by Norfolk Southern's PSR Strategy ................. 22

        2.      Norfolk Southern's Cost Reduction Incentives for Management
              Rewarded the Ends with Zero Regard as to the Means .......................... 24

    B.      Former Norfolk Southern Employees Corroborate the Allegations Herein ........ 25

        1.      FE-1: Former Locomotive Engineer and Conductor ............................... 25

        2.      FE-2: Former Director of Internodal Operations .................................... 30

        3.      FE-3: Former Terminal Train Master .................................................. 33

        4.      FE-4: Former Freight Conductor ....................................................... 35

        5.      FE-5: Former Track Supervisor ......................................................... 40

        6.      FE-6: Former Supervisory Gang Leader ............................................. 46

        7.      FE-7: Former Senior Operations Road Supervisor ................................ 50

V.      DEFENDANTS' VIOLATIONS OF THE SECURITIES ACT ....................................... 53

    A.      The Offerings .............................................................................................. 53

        1.      The May 2021 Senior Note Offerings ................................................. 53

2. The August 2021 Senior Note Offering ...................................................... 54

3. The February 2022 Senior Note Offerings ................................................ 55

4. The June 2022 Senior Note Offering ......................................................... 56

5. The January 2023 Senior Note Offering ..................................................... 56

B. The Offerings Documents Contained Materially False Statements and Omissions ........................................................................................................... 57

1. Norfolk Southern's 2020 Annual Report .................................................... 61

2. Norfolk Southern's 2021 Proxy Statement ................................................ 64

3. Norfolk Southern's Q1 2021 10-Q ............................................................. 67

4. Norfolk Southern's Q2 2021 10-Q ............................................................. 69

5. Norfolk Southern's 2021 Annual Report .................................................... 71

6. Norfolk Southern's 2022 Proxy Statement ................................................ 74

7. Norfolk Southern's Q1 2022 10-Q ............................................................. 77

8. Norfolk Southern's Q2 2022 10-Q ............................................................. 79

9. The Materially False and Misleading Statements Are Incorporated by Reference in the Offering Documents ................................................. 81

C. Post-Offering Events ......................................................................................... 84

1. The East Palestine, Ohio Train Derailment and Other Train Related Accidents ...................................................................................................... 84

    a. Regulators Begin Investigating the East Palestine Incident and File Suit ..................................................................................... 89

    b. FRA's Safety Assessment of Norfolk Southern .......................... 92

    c. Norfolk Southern Announces a Six-Part Plan to Improve Operational Safety ...................................................................... 95

2. Testimony from Congressional and NTSB Hearings Confirm that Norfolk Southern's Safety Practices Were Deficient .............................. 96

3. Norfolk Southern's Operating Ratio Balloons Following Derailment................................................................................................... 99

VI.      CLASS ACTION ALLEGATIONS ................................................................. 100

VII.     CLAIMS FOR RELIEF UNDER THE SECURITIES ACT .......................... 102

         COUNT I For Violation of Section 11 of the Securities Act Against Norfolk
         Southern, the Individual Defendants, and the Underwriter Defendants ......................... 102

         COUNT II For Violation of Section 15 of the Securities Act Against the
         Individual Defendants ..................................................................................... 105

VIII.    PRAYER FOR RELIEF ............................................................................. 107

IX.      JURY DEMAND ....................................................................................... 107

Lead Plaintiffs, Ohio Carpenters' Pension Fund ("Ohio Carpenters") and City of Pontiac Reestablished General Employees' Retirement System ("Pontiac General," together with Ohio Carpenters, "Lead Plaintiffs"), individually and on behalf of all other persons similarly situated, by Lead Plaintiffs' undersigned attorneys, allege the following against Defendants (as defined herein).[1]

The allegations herein are based on Lead Plaintiffs' personal knowledge as to their own acts, and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of Lead Counsel, Labaton Sucharow LLP, which includes a review of: (i) U.S. Securities and Exchange Commission ("SEC") filings by Norfolk Southern Corporation ("Norfolk Southern" or the "Company"); (ii) securities analysts' reports and advisories about the Company; (iii) press releases and other public statements issued by the Company; (iv) media reports about the Company; (v) interviews with former employees of Norfolk Southern with knowledge of the matters alleged herein;[2] and (vi) other publicly available information.  Lead Counsel's investigation into the matters alleged herein is ongoing and many relevant facts are known only to, or are exclusively within the custody or control of, the Defendants.  Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.      NATURE AND SUMMARY OF THE ACTION

1.      This action asserts strict liability and negligence claims for violations of Section 11 and 15 of the Securities Act of 1933 (the "Securities Act") relating to the following offerings of senior notes (the "Senior Notes") by Norfolk Southern issued pursuant to the February 4, 2021

---

[1] Unless otherwise noted, emphasis had been added and all quotation marks omitted throughout.

[2] Former employees ("FEs") will be identified herein by number (*e.g.*, FE-1, FE-2.  All FEs will be described in the masculine to protect their identities.

shelf registration statement on SEC Form S-3 ASR (the "Registration Statement") (the "Offerings"):

| Offering Date | Security | CUSIP | Total Offering Amount |
|---|---|---|---|
| May 3, 2021 | 2.300% Senior Notes due 2031 | 655844CK2 | $500,000,000 |
| May 3, 2021 | 4.100% Senior Notes due 2121 | 655844CJ5 | $600,000,000 |
| August 16, 2021 | 2.900% Senior Notes due 2051 | 655844CL0 | $600,000,000 |
| February 15, 2022 | 3.000% Senior Notes due 2032 | 655844CM8 | $600,000,000 |
| February 15, 2022 | 3.700% Senior Notes due 2053 | 655844CN6 | $400,000,000 |
| June 2, 2022 | 4.550% Senior Notes due 2053 | 655844CP1 | $750,000,000 |
| January 26, 2023 | 4.450% Senior Notes due 2033 | 655844CQ9 | $500,000,000 |

2.     The Securities Act claims are brought on behalf of a "Class" of all persons and entities that purchased or otherwise acquired Norfolk Southern Senior Notes pursuant and/or traceable to the Offering Documents[3] prepared by Defendants and issued in connection with the Offerings, who were damaged thereby.

3.     Congress passed the Securities Act in the hopes of restoring investor confidence after corporate scandals and the stock market crash of 1929, which imposes liability for false, misleading, and incomplete statements made in connection with public securities offerings. Thus, for nearly a century, the Securities Act has required that those who sell securities to the investing public do so on the basis of full and accurate disclosures.

4.     The core of the claims herein is simple: where the goal of increasing profit by any means necessary crosses the threshold of legality. The quest for profit is not boundless under the Securities Act, and as is often a cautionary tale in the public markets, those who focus blindly on

---

[3] The "Offering Documents" referred to herein includes the Registration Statement, the related prospectus supplements, and all documents incorporated by inclusion or reference as defined in Section V.A, *infra*.

the ends versus the means at the expense of fulsome disclosure and sustainable operations frequently find themselves at odds with the federal securities laws. Indeed, in the wake of Black Monday, Congress determined that issuers of securities must be put to a higher bar than *caveat emptor*, instead demanding a strict liability regime of transparency and accountability, even for innocent misstatements.

5.      In 2019, Norfolk Southern, a major rail transportation company, unveiled a new business strategy to be fully implemented in 2021, referred to as TOP21, which would purportedly allow the Company to significantly decrease its operating expenses.[4] By implementing what the industry refers to as precision scheduled railroading ("PSR"), Norfolk Southern touted that it would materially reduce operating costs through purportedly hyper-efficient operational changes including by running longer trains on tighter schedules to move more cargo in fewer trips. Critically, such reductions in overhead also included major personnel cuts.[5]

6.      As presented to investors, TOP21 appeared strategically sound, yet Norfolk Southern's implementation was anything but. In an effort to eliminate any perceived redundancy, the Company's miles long trains were being run by a single hand-count's worth of over-levered, exhausted employees—a skeleton's skeleton crew. As further explained herein, Norfolk Southern abused regulatory loopholes to avoid inspecting trains mid-journey and advanced a toxic culture of mandatory corner cutting and rug sweeping. Due to this, any lauded decrease in Norfolk Southern's Operating Ratio, which was plastered throughout the Offering Documents, came with an equal, yet undisclosed increased risk of derailments and train accidents.

---

[4] The Company explained that TOP is an acronym for Thoroughbred Operation Plan.

[5] Beginning in 2022, Norfolk Southern announced the next generation of the Company's PSR-based operating plan, which it referred to as "TOP SPG."   Any reference herein to Norfolk Southern's "TOP Initiative" should be read to include TOP21, TOP SPG, or any similar PSR-based operating plan that was adopted by the Company at the time of the Offerings.

7.      Examples of Norfolk Southern's systematic pre-Offering elimination of safeguards are numerous, yet equally egregious. For example, the Company's monitoring and research segment responsible for not only monitoring and prioritizing hundreds of urgent alerts in real time, but also for conducting preventative research on derailments, was sheared to a single on duty employee who worked without breaks. Relying on a regulatory loophole, checkpoint inspections, which historically took several minutes per 180-point inspection per car, were reduced to an outlandish single minute or less per car by non-qualified inspectors. Additionally, the strain of the TOP Initiative resulted in significant employee churn at Norfolk Southern, meaning many conductors were armed with zero experience outside of the Company's meager six-week training program.

8.      Norfolk Southern's lopsided priorities were also reflected in compensation incentives for management. Indeed, executive compensation was equally skewed towards reaching an operating ratio (net income divided by operating expenses) of 60%.

9.      It is no surprise, therefore, that when issuing billions of dollars' worth of Senior Notes, the Offering Documents incorporated Company filings boasting an operating ratio within striking distance of 60%. The Offering Documents further lauded Norfolk Southern's ability to operate safely and efficiently while delivering strong financial results as a result of the TOP Initiative—all while maintaining adequate employee headcount and providing sufficient employee training. All told, the Offering Documents misleadingly painted the picture of sustainable cost savings under the watch of vigilant management.

10.     The corroborative accounts of the Company's FEs dovetail on the above, further illuminating that Norfolk Southern's companywide directive that trains run on time for the lowest cost possible with zero regard to risk. Indeed, as detailed herein, FEs speak of an exhausted,

untrained workforce, ordered by management (or threatened) to merely check boxes through cursory inspections to keep the trains moving instead of fulfilling their duties. This, according to FEs, was a challenge in and of itself considering the Company was running trains longer than the width of Manhattan (approximately 2.3 miles). As a result, trains were routinely shoved off to the next station with myriad undiscovered, undisclosed, and unremedied issues. According to FEs, *whether Norfolk Southern would suffer a catastrophic accident was not an if, but a when*.

11.  On February 3, 2023, a Norfolk Southern train derailed 38 railcars in East Palestine, Ohio, leaving behind what the Associated Press called "a mangled and charred mass of boxcars and flames." Making matters worse, 11 of the beached railcars were transporting hazardous chemicals, which after derailment turned into a toxic inferno.  Due to fear of explosion, responders were unable to combat the blaze for days as a blanket of toxic smoke covered East Palestine. Three long days after the derailment, responders engaged in a controlled detonation and burn which spewed massive volumes of chemicals into East Palestine and surrounding areas—resulting in substantial environmental damage to the air, water, and soil.

12.  Amidst nationwide outrage at the derailment, regulators sprang into action. For example, the Environmental Protection Agency ("EPA") ordered that Norfolk Southern suffer all costs associated with the aftermath, causing the Company's operating ratio to balloon to 77.3%, a year-over-year increase of 23%. Further, after inquiry into the TOP Initiative by the Federal Railroad Administration ("FRA"), the agency found that between 2018 and 2022, Norfolk Southern's rate of accidents per million train miles rose faster than any other Class I railroad, calling into question the Company's practices.

13.  Company executives were eventually brought to bear by Congress and the National Transportation Safety Board ("NTSB"). After being labeled as "one of the worst offenders"

regarding safety during testimony by Transportation Communications Union ("TCU"), the Company's CEO admitted under oath that "[i]t is clear the safety mechanisms in place were not enough," and adding that "*[w]e're going to move away from a near-term focus solely on profits and take a long-term view*."

14.     Following the East Palestine derailment, Norfolk Southern's operating ratio has sky rocketed, unmasking the unsustainability of the Company's "hyper-efficient" cost cutting measures. For the first three quarters of 2023, the Company reported operating ratios of 77.3%, 80.7%, and 74.6%, representing year-over-year increases of 23%, 33%, and 20%, respectively.

15.     In sum, the Senior Notes were issued to the investing public on the basis of material misstatements and omissions, namely Norfolk Southern's unsustainable business practices and total disregard to compliance and safety in a self-admitted quest for short-term profit. As a result of the Offering Documents' material misstatements and omissions, the value of the Senior Notes has fallen precipitously from the Offerings through the commencement of this action, causing significant statutory damages to the members of the Class.

## II.     JURISDICTION AND VENUE

16.     The claims asserted arise under Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o).

17.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and Section 22 of the Securities Act (15 U.S.C. § 77v).

18.     Personal jurisdiction and venue are proper in this District pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v(c)) and 28 U.S.C. § 1391(b). Substantial acts in furtherance of the alleged violations of the securities laws or their effects have occurred in this District. Norfolk Southern conducts significant operations within this District and a substantial part of the events giving rise to these claims occurred in this District.   The statements alleged to be materially false

and misleading were disseminated into this District, and given the size of the Senior Note
Offerings, there are presumably hundreds, if not thousands, of investors in Senior Notes, some of
whom undoubtedly reside in this District. Further, many of the Defendants named herein reside in
this District. Finally, as set forth in the Registration Statement, which was prepared and endorsed
by Defendants, the Senior Notes are governed by, and construed in accordance with, the laws of
the state of New York.

19.     In connection with the acts alleged in this complaint, Defendants (as defined
herein), directly or indirectly, used the means and instrumentalities of interstate commerce,
including, but not limited to, the mails, interstate telephone communications, and the facilities of
the national securities markets.

## III.   THE PARTIES

### A.   Lead Plaintiffs

20.     As set forth in the Certification previously filed with the Court ("Certification")
(ECF No. 86-1) and the below table, Ohio Carpenters purchased 891,000 4.100% Senior Notes
due 2121 (CUSIP 655844CJ5) on the May 3, 2021 Offering pursuant and traceable to the Offering
Documents for a transaction price of 99.737% of par value and were damaged thereby:

| Transaction | Date | Senior Notes Purchased | Transaction Price | Cost/Proceeds |
|---|---|---|---|---|
| Purchase | 5/3/2021 | 891,000 | 99.737% of Par Value | ($88,865,667.00) |
| Sale | 8/4/2022 | -891,000 | 80.050% of Par Value | $71,324,550.00 |

21.     As set forth in the Certification and the table below, Pontiac General purchased
230,000 2.9% Senior Notes due 2051 (CUSIP 655844CL0) on the August 16, 2021 Offering
pursuant and traceable to the Offering Documents for a transaction price of 99.206% of par value
and was damaged thereby:

| Transaction | Date | Senior Notes Purchased | Transaction Price | Cost/Proceeds |
|---|---|---|---|---|
| Purchase | 8/16/2021 | 230,000 | 99.206% of Par Value | ($22,817,380.00) |
| Sale | 2/1/2022 | -60,000 | 91.675% of Par Value | $5,500,554.00 |

**B.    Defendants**

**1.    Corporate Defendant**

22.    Defendant Norfolk Southern is incorporated under the laws of the Commonwealth of Virginia and headquartered in Atlanta, Georgia. The Company operates across the United Sates, including in New York, Ohio, Illinois, Pennsylvania, and Tennessee.

**2.    Individual Defendants**

23.    Defendant Alan H. Shaw ("Shaw") has been Chief Executive Officer ("CEO") of Norfolk Southern since May 1, 2022 and President since December 1, 2021. Shaw has been a Director since May 2022. Shaw previously served as Norfolk Southern's Executive Vice President and Chief Marketing Officer, Vice President Intermodal Operations, and in various other positions since joining the Company in 1994. Shaw was a Director of the Company at the time of the May 2021 Offerings, the August 2021 Offering, the February 2022 Offerings, the June 2022 Offering, and the January 2023 Offering, which makes him liable under Section 11(a)(2) for each of the Offerings.

24.    Defendant James A. Squires ("Squires") has been a Director since 2014 and served as Chairman of the Board of Directors (the "Board") and CEO of Norfolk Southern from 2015 to May 2022. Squires served as the Company's President from June 2013 until December 2021. Defendant Squires signed the 2021 Registration Statement, which makes him liable under Section 11(a)(1) for each of the Offerings, and was a Director of the Company at the time of the May 2021 Offerings, the August 2021 Offering, the February 2022 Offerings, the June 2022 Offering, and

the January 2023 Offering, which makes him liable under Section 11(a)(2) for each of the Offerings.

25.     Defendant Mark R. George ("George") has served as Executive Vice President and Chief Financial Officer ("CFO") of Norfolk Southern since November 2019.  Defendant George signed the 2021 Registration Statement, which makes him liable under Section 11(a)(1) for each of the Offerings.

26.     Defendant Clyde H. Allison, Jr. ("Allison") served as Vice President and Controller (Principal Accounting Officer) of Norfolk Southern from June of 2020 to February of 2022. Allison signed the 2021 Registration Statement, which makes him liable under Section 11(a)(1) for each of the Offerings.

27.     Defendant Thomas D. Bell, Jr. ("Bell") has been a Director since 2010.  Defendant Bell signed the 2021 Registration Statement, which makes him liable under Section 11(a)(1) for each of the Offerings, and was a Director of the Company at the time of the May 2021 Offerings, the August 2021 Offering, the February 2022 Offerings, the June 2022 Offering, and the January 2023 Offering, which makes him liable under Section 11(a)(2) for each of the Offerings.

28.     Defendant Mitchell E. Daniels, Jr. ("Daniels") has been a Director since 2016. Defendant Daniels signed the 2021 Registration Statement, which makes him liable under Section 11(a)(1) for each of the Offerings, and was a Director of the Company at the time of the May 2021 Offerings, the August 2021 Offering, the February 2022 Offerings, the June 2022 Offering, and the January 2023 Offering, which makes him liable under Section 11(a)(2) for each of the Offerings.

29.     Defendant Marcela E. Donadio ("Donadio") has been a Director since 2016. Defendant Donadio signed the 2021 Registration Statement, which makes her liable under Section

11(a)(1) for each of the Offerings, and was a Director of the Company at the time of the May 2021 Offerings, the August 2021 Offering, the February 2022 Offerings, the June 2022 Offering, and the January 2023 Offering, which makes her liable under Section 11(a)(2) for each of the Offerings.

30.     Defendant John C. Huffard, Jr. ("Huffard") has been a Director since 2020. Defendant Huffard signed the 2021 Registration Statement, which makes him liable under Section 11(a)(1) for each of the Offerings, and was a Director of the Company at the time of the May 2021 Offerings, the August 2021 Offering, the February 2022 Offerings, the June 2022 Offering, and the January 2023 Offering, which makes him liable under Section 11(a)(2) for each of the Offerings.

31.     Defendant Christopher T. Jones ("Jones") has been a Director since 2020. Defendant Jones signed the 2021 Registration Statement, which makes him liable under Section 11(a)(1) for each of the Offerings, and was a Director of the Company at the time of the May 2021 Offerings, the August 2021 Offering, the February 2022 Offerings, the June 2022 Offering, and the January 2023 Offering, which makes him liable under Section 11(a)(2) for each of the Offerings.

32.     Defendant Thomas C. Kelleher ("Kelleher") has been a Director since 2019. Defendant Kelleher signed the 2021 Registration Statement, which makes him liable under Section 11(a)(1) for each of the Offerings, and was a Director of the Company at the time of the May 2021 Offerings, the August 2021 Offering, the February 2022 Offerings, the June 2022 Offering, and the January 2023 Offering, which makes him liable under Section 11(a)(2) for each of the Offerings.

33.     Defendant Steven F. Leer ("Leer") has been a Director since 1999.  Defendant Leer signed the 2021 Registration Statement, which makes him liable under Section 11(a)(1) for each of the Offerings, and was a Director of the Company at the time of the May 2021 Offerings, the August 2021 Offering, the February 2022 Offerings, the June 2022 Offering, and the January 2023 Offering, which makes him liable under Section 11(a)(2) for each of the Offerings.

34.     Defendant Michael D. Lockhart ("Lockhart") has been a Director since 2008. Defendant Lockhart signed the 2021 Registration Statement, which makes him liable under Section 11(a)(1) for each of the Offerings, and was a Director of the Company at the time of the May 2021 Offerings, the August 2021 Offering, the February 2022 Offerings, the June 2022 Offering, and the January 2023 Offering, which makes him liable under Section 11(a)(2) for each of the Offerings.

35.     Defendant Amy E. Miles ("Miles") has been a Director since 2014. Defendant Miles signed the 2021 Registration Statement, which makes her liable under Section 11(a)(1) for each of the Offerings, and was a Director of the Company at the time of the May 2021 Offerings, the August 2021 Offering, the February 2022 Offerings, the June 2022 Offering, and the January 2023 Offering, which makes her liable under Section 11(a)(2) for each of the Offerings.

36.     Defendant Claude Mongeau ("Mongeau") has been a Director since 2019. Defendant Mongeau signed the 2021 Registration Statement, which makes him liable under Section 11(a)(1) for each of the Offerings, and was a Director of the Company at the time of the May 2021 Offerings, the August 2021 Offering, the February 2022 Offerings, the June 2022 Offering, and the January 2023 Offering, which makes him liable under Section 11(a)(2) for each of the Offerings.

37.    Defendant Jennifer F. Scanlon ("Scanlon") has been a member of Norfolk Southern's Board since 2018.  Defendant Scanlon signed the 2021 Registration Statement, which makes her liable under Section 11(a)(1) for each of the Offerings, and was a Director of the Company at the time of the May 2021 Offerings, the August 2021 Offering, the February 2022 Offerings, the June 2022 Offering, and the January 2023 Offering, which makes her liable under Section 11(a)(2) for each of the Offerings.

38.    Defendant John R. Thompson ("Thompson") has been a Director since 2013. Defendant Thompson signed the 2021 Registration Statement, which makes him liable under Section 11(a)(1) for each of the Offerings, and was a Director of the Company at the time of the May 2021 Offerings, the August 2021 Offering, the February 2022 Offerings, the June 2022 Offering, and the January 2023 Offering, which makes him liable under Section 11(a)(2) for each of the Offerings.

39.    Defendants referenced above in ¶¶23-38 are referred to herein as the "Individual Defendants."

40.    Each of the Individual Defendants participated in the preparation of the Offering Documents and in the making of the materially inaccurate, misleading, and incomplete statements alleged herein.  The Individual Defendants signed the Offering Documents and/or were a director of Norfolk Southern at the time of the filing of the part of the Offering Documents with respect to which their liability is being asserted. The Individual Defendants, in their capacity as senior executives and/or directors of Norfolk Southern, reviewed, edited, and approved the Offering Documents.

### 3.    Underwriter Defendants

41.    Defendant BofA Securities, Inc. served as an underwriter for the May 2021 Senior Notes Offerings and the June 2022 Senior Note Offering, and is liable under Section 11(a)(5) for

each of those Offerings. Specifically, BofA Securities, Inc. sold $125 million worth of the 2.300%
Senior Notes due 2031 and $150 million worth of the 4.100% Senior Notes due 2121 in the May
2021 Senior Note Offerings and $187.5 million worth of the 4.550% Senior Notes due 2053 in the
June 2022 Senior Note Offering. BofA Securities, Inc. maintains its corporate headquarters in
Charlotte, North Carolina, and conducts business operations in this District.

42.     Defendant Morgan Stanley & Co. LLC served as an underwriter for the May 2021
Senior Note Offerings and the June 2022 Senior Note Offering, and is liable under Section 11(a)(5)
for each of those Offerings.  Specifically, Morgan Stanley & Co. LLC sold $125 million worth of
the 2.300% Senior Notes due 2031 and $150 million worth of the 4.100% Senior Notes due 2121
in the May 2021 Senior Note Offerings and $187.5 million worth of the 4.550% Senior Notes due
2053 in the June 2022 Senior Note Offering. Morgan Stanley & Co. LLC maintains its corporate
headquarters in this District and conducts business operations in this District.

43.     Defendant Wells Fargo Securities, LLC served as an underwriter for the May 2021
Senior Note Offerings and the June 2022 Senior Note Offering, and is liable under Section 11(a)(5)
for each of those Offerings. Specifically, Wells Fargo Securities, LLC sold $125 million worth of
the 2.300% Senior Notes due 2031 and $150 million worth of the 4.100% Senior Notes due 2121
in the May 2021 Senior Note Offerings and $187.5 million worth of the 4.550% Senior Notes due
2053 in the June 2022 Senior Note Offering. Wells Fargo Securities, LLC maintains its corporate
headquarters in San Francisco, California, and conducts business operations in this District.

44.     Defendant Capital One Securities, Inc. served as an underwriter for the May 2021
Senior Note Offerings, the August 2021 Senior Note Offering, the February 2022 Senior Note
Offerings, the June 2022 Senior Note Offering, and the January 2023 Senior Note Offering, and is
liable under Section 11(a)(5) for each of the Offerings.  Specifically, Capital One Securities, Inc.

13

sold $20.834 million worth of the 2.300% Senior Notes due 2031 and $25 million worth of the

4.100% Senior Notes due 2121 in the May 2021 Senior Note Offerings; $25 million worth of the

2.900% Senior Notes due 2051 in the August 2021 Senior Note Offering; $25 million worth of the

3.000% Senior Notes due 2032 and $16.667 million worth of the 3.700% Senior Notes due 2053

in the February 2022 Senior Note Offerings; $31.25 million worth of the 4.550% Senior Notes due

2053 in the June 2022 Senior Note Offering; and $20.834 million worth of the 4.450% Senior

Notes due 2033 in the January 2023 Senior Note Offering. Capital One Securities, Inc. maintains

its corporate headquarters in McLean, Virginia, and conducts business operations in this District.

      45.    Defendant Fifth Third Securities, Inc. served as an underwriter for the May 2021

Senior Note Offerings, the August 2021 Senior Note Offering, the February 2022 Senior Note

Offerings, the June 2022 Senior Note Offering, and the January 2023 Senior Note Offering, and is

liable under Section 11(a)(5) for each of the Offerings.  Specifically, Fifth Third Securities, Inc.

sold $20.834 million worth of the 2.300% Senior Notes due 2031 and $25 million worth of the

4.100% Senior Notes due 2121 in the May 2021 Senior Note Offerings; $25 million worth of the

2.900% Senior Notes due 2051 in the August 2021 Senior Note Offering; $25 million worth of the

3.000% Senior Notes due 2032 and $16.667 million worth of the 3.700% Senior Notes due 2053

in the February 2022 Senior Note Offerings; $31.25 million worth of the 4.550% Senior Notes due

2053 in the June 2022 Senior Note Offering; and $20.834 million worth of the 4.450% Senior

Notes due 2033 in the January 2023 Senior Note Offering. Fifth Third Securities, Inc. maintains

its corporate headquarters in Cincinnati, Ohio and conducts business operations in this District.

      46.    Defendant MUFG Securities Americas Inc. served as an underwriter for the May

2021 Senior Note Offerings, the August 2021 Senior Note Offering, the February 2022 Senior

Note Offerings, the June 2022 Senior Note Offering, and the January 2023 Senior Note Offering,

and is liable under Section 11(a)(5) for each of the Offerings.  Specifically, MUFG Securities Americas Inc. sold $20.833 million worth of the 2.300% Senior Notes due 2031 and $25 million worth of the 4.100% Senior Notes due 2121 in the May 2021 Senior Note Offerings; $25 million worth of the 2.900% Senior Notes due 2051 in the August 2021 Senior Note Offering; $25 million worth of the 3.000% Senior Notes due 2032 and $16.667 million worth of the 3.700% Senior Notes due 2053 in the February 2022 Senior Note Offerings; $31.25 million worth of the 4.550% Senior Notes due 2053 in the June 2022 Senior Note Offering; and $20.833 million worth of the 4.450% Senior Notes due 2033 in the January 2023 Senior Note Offering. MUFG Securities Americas Inc. maintains its corporate headquarters in this District and conducts business operations in this District.

47.     Defendant PNC Capital Markets LLC served as an underwriter for the May 2021 Senior Note Offerings, the August 2021 Senior Note Offering, the February 2022 Senior Note Offerings, the June 2022 Senior Note Offering, and the January 2023 Senior Note Offering, and is liable under Section 11(a)(5) for each of the Offerings.  Specifically, PNC Capital Markets LLC sold $20.833 million worth of the 2.300% Senior Notes due 2031 and $25 million worth of the 4.100% Senior Notes due 2121 in the May 2021 Senior Note Offerings; $25 million worth of the 2.900% Senior Notes due 2051 in the August 2021 Senior Note Offering; $25 million worth of the 3.000% Senior Notes due 2032 and $16.667 million worth of the 3.700% Senior Notes due 2053 in the February 2022 Senior Note Offerings; $31.25 million worth of the 4.550% Senior Notes due 2053 in the June 2022 Senior Note Offering; and $20.833 million worth of the 4.450% Senior Notes due 2033 in the January 2023 Senior Note Offering. PNC Capital Markets LLC maintains its corporate headquarters in Pittsburgh, Pennsylvania, and conducts business operations in this District.

48.     Defendant Siebert Williams Shank & Co., LLC served as an underwriter for the May 2021 Senior Note Offerings, the August 2021 Senior Note Offering, the February 2022 Senior Note Offerings, the June 2022 Senior Note Offering, and the January 2023 Senior Note Offering, and is liable under Section 11(a)(5) for each of the Offerings.  Specifically, Siebert Williams Shank & Co., LLC sold $20.833 million worth of the 2.300% Senior Notes due 2031 and $25 million worth of the 4.100% Senior Notes due 2121 in the May 2021 Senior Note Offerings; $25 million worth of the 2.900% Senior Notes due 2051 in the August 2021 Senior Note Offering; $25 million worth of the 3.000% Senior Notes due 2032 and $16.666 million worth of the 3.700% Senior Notes due 2053 in the February 2022 Senior Note Offerings; $31.25 million worth of the 4.550% Senior Notes due 2053 in the June 2022 Senior Note Offering; and $20.833 million worth of the 4.450% Senior Notes due 2033 in the January 2023 Senior Note Offering. Siebert Williams Shank & Co., LLC maintains its corporate headquarters in this District and conducts business operations in this District.

49.     Defendant SMBC Nikko Securities America, Inc. served as an underwriter for the May 2021 Senior Note Offerings, the August 2021 Senior Note Offering, the February 2022 Senior Note Offerings, the June 2022 Senior Note Offering, and the January 2023 Senior Note Offering, and is liable under Section 11(a)(5) for each of those Offerings. Specifically, SMBC Nikko Securities America, Inc. sold $20.833 million worth of the 2.300% Senior Notes due 2031 and $25 million worth of the 4.100% Senior Notes due 2121 in the May 2021 Senior Note Offerings; $25 million worth of the 2.900% Senior Notes due 2051 in the August 2021 Senior Note Offering; $25 million worth of the 3.000% Senior Notes due 2032 and $16.666 million worth of the 3.700% Senior Notes due 2053 in the February 2022 Senior Note Offerings; $31.25 million worth of the 4.550% Senior Notes due 2053 in the June 2022 Senior Note Offering; and $20.833 million worth

of the 4.450% Senior Notes due 2033 in the January 2023 Senior Note Offering. SMBC Nikko Securities America, Inc. maintains its corporate headquarters in Tokyo, Japan, and conducts business operations in this District.

50.     Defendant Citigroup Global Markets Inc. served as an underwriter for the August 2021 Senior Note Offering, the February 2022 Senior Note Offerings, and the January 2023 Senior Note Offering, and is liable under Section 11(a)(5) for each of those Offerings. Specifically, Citigroup Global Markets Inc. sold $150 million worth of 2.900% Senior Notes due 2051 in the August 2021 Senior Note Offering; $150 million worth of the 3.000% Senior Notes due 2032 and $100 million worth of the 3.700% Senior Notes due 2053 in the February 2022 Senior Note Offerings; and $125 million worth of the 4.450% Senior Notes due 2033 in the January 2023 Senior Note Offering. Citigroup Global Markets Inc. maintains its corporate headquarters in this District and conducts business operations in this District.

51.     Defendant Goldman Sachs & Co. LLC served as an underwriter for the August 2021 Senior Note Offering, the February 2022 Senior Note Offerings, and the January 2023 Senior Note Offering, and is liable under Section 11(a)(5) for each of those Offerings. Specifically, Goldman Sachs & Co. LLC sold $150 million worth of 2.900% Senior Notes due 2051 in the August 2021 Senior Note Offering; $150 million worth of the 3.000% Senior Notes due 2032 and $100 million worth of the 3.700% Senior Notes due 2053 in the February 2022 Senior Note Offerings; and $125 million worth of the 4.450% Senior Notes due 2033 in the January 2023 Senior Note Offering. Goldman Sachs & Co. LLC maintains its corporate headquarters in this District and conducts business operations in this District.

52.     Defendant U.S. Bancorp Investments, Inc. served as an underwriter for the August 2021 Senior Note Offering, the February 2022 Senior Note Offerings, and the January 2023 Senior

Note Offering, and is liable under Section 11(a)(5) for each of those Offerings. Specifically, U.S. Bancorp Investments, Inc. sold $150 million worth of 2.900% Senior Notes due 2051 in the August 2021 Senior Note Offering; $150 million worth of the 3.000% Senior Notes due 2032 and $100 million worth of the 3.700% Senior Notes due 2053 in the February 2022 Senior Note Offerings; and $125 million worth of the 4.450% Senior Notes due 2033 in the January 2023 Senior Note Offering. U.S. Bancorp Investments, Inc. maintains its corporate headquarters in Minneapolis, Minnesota and conducts business operations in this District.

53.     Defendants referenced above in ¶¶41-52 are referred to herein as the "Underwriter Defendants." The Underwriter Defendants' failure to conduct adequate due diligence in connection with the Offerings and the preparation of the Offering Documents was a substantial factor leading to the harm complained of herein.

54.     The Underwriter Defendants are investment banking houses which specialize, among other things, in underwriting public offerings of securities. Collectively, the Underwriter Defendants received millions of dollars in fees and commissions in connection with their sale of Norfolk Southern Senior Notes.

55.     The Underwriter Defendants determined that in return for their share of the Offerings' proceeds, they were willing to merchandise Senior Notes in the Offerings.

56.     The Underwriter Defendants also demanded and obtained an agreement from Norfolk Southern that the Company would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws. They also made certain that Norfolk Southern had purchased millions of dollars of directors' and officers' liability insurance.

57.     The Underwriter Defendants assisted Norfolk Southern and the Individual Defendants in planning the Offerings, and purportedly conducted an adequate and reasonable

investigation into the business and operations of Norfolk Southern, an undertaking known as a "due diligence" investigation. The due diligence investigation was required of the Underwriter Defendants in order to engage in the Offerings. During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning Norfolk Southern's operations and financial prospects.

58.     In addition to availing themselves of virtually unbridled access to internal corporate documents, the Underwriter Defendants had access to the Company's lawyers, management, and directors and top executives (including the Individual Defendants) to determine: (i) the strategy to best accomplish the Offerings; (ii) the terms of the Offerings, including the terms of the Senior Notes; (iii) the language to be used in the Offering Documents; (iv) what disclosures about the Company would be made in the Offering Documents; and (v) what responses would be made to the SEC in connection with its review of the Offering Documents. As a result of those constant contacts and communications between the Underwriter Defendants and the Company's lawyers, management, directors, and top executives (including the Individual Defendants), at a minimum, the Underwriter Defendants were negligent in not knowing of the materially untrue statements and omissions contained in the Offering Documents as detailed herein.

59.     The Underwriter Defendants caused the Offering Documents to be filed with the SEC and to be declared effective in connection with offers and sales of Senior Notes pursuant and/or traceable to the Offerings and the Offering Documents, including to Lead Plaintiffs and other members of the Class.

60.     Norfolk Southern, the Individual Defendants, and Underwriters Defendants are collectively referred to herein as "Defendants."

## IV.     BACKGROUND

### A.     Company Information

61.     Norfolk Southern is a holding company that conducts substantially all of its operations through subsidiaries, including Norfolk Southern Properties, Inc. and Norfolk Southern Railway Company.

62.     Defendant Norfolk Southern is a Class I railroad[6] and one of the largest freight railroad companies in the United States, operating the Norfolk Southern Railway, a freight railroad located in the Eastern United States that spans over 19,000 route miles in 22 U.S. states and the District of Columbia. The Company is a major transporter of industrial products, including agriculture, forest and consumer products, chemicals, and metals and construction materials. Specifically, the following is the general percentage of Norfolk Southern's operating revenues that the raw materials, intermediate products, and finished goods generally constitute per commodity group between 2020 and 2023: intermodal (~28%); agriculture, forest and consumer products (~20%); chemicals (~18%); metals and construction (~14%); coal (~12%); and automotive (~8%).

63.     Norfolk Southern was incorporated under the laws of the Commonwealth of Virginia on July 23, 1980.  Norfolk Southern and its subsidiaries are primarily engaged in the rail transportation of raw materials, intermediate products, and finished goods in the Southeast, East, and Midwest and, via interchange with rail carriers, to and from the rest of the United States.  The Company also transports overseas freight through several Atlantic and Gulf Coast ports.  Norfolk Southern's footprint reaches numerous manufacturing plants, electric generating facilities, mines,

---

[6] A Class I railroad is considered one of the largest in the industry and has an operating revenue of $490 million or more, which is adjusted for inflation each year. There are seven Class I freight railroads: BNSF Railway Co. ("BNSF"), Canadian National Railway (Grand Trunk Corporation), Canadian Pacific (Soo Line Corporation), CSX Transportation, Kansas City Southern Railway Co., Norfolk Southern Combined Railroad Subsidiaries, and Union Pacific Railroad Co.

distribution centers, transload facilities, and other businesses located in the Company's service area.

64.     Norfolk Southern operates on over 30,000 total miles of track, of which it is responsible for maintaining over 28,000 miles of track.

65.     On February 11, 2019, Norfolk Southern announced a multi-year transformation plan under which it would shift to a PSR operating regime by 2021, which it referred to as the TOP21 strategic plan. This strategic plan was based upon purportedly hyper-efficient operational changes designed to increase revenues and decrease costs for railroad operators.  These operational changes include: (i) reductions in staff; (ii) longer and heavier trains; and (iii) reductions in costly assets such as locomotives.

66.     Dovetailing on the preceding Paragraph, Norfolk Southern's "Operating Ratio" (operating expenses as a percentage of revenue) was a key metric to gauge the progress of the implementation of the TOP Initiative, which analysts and investors used to gauge the efficiency of the business. In connection with the TOP Initiative, Norfolk Southern set a goal of reducing its Operating Ratio to 60% by 2021 (at the time of this announcement, the Company's Operating Ratio was about 65%).

67.     On or around June 27, 2022, Norfolk Southern announced the next generation of the Company's PSR-based operating plan, which it referred to as "TOP SPG."[7] This strategy was designed to be a continuation of TOP21 that focused on efficiency and productivity (*i.e.*, reducing the Company's Operating Ratio). However, the Company explained that TOP SPG was also designed to focus on customer service and growth.

---

[7] Norfolk Southern explained that SPG is an acronym for service, productivity, and growth.

### 1.   The Safety Risks Posed by Norfolk Southern's PSR Strategy

68.   As a result of the implementation of Norfolk Southern's TOP Initiative, unbeknownst to investors, the risk of derailments and other safety related accidents rose as trains grew longer, heavier, and operated at higher speeds.  Moreover, Norfolk Southern increased efforts to reduce costs and headcount which meant that the Company would have less personnel to inspect, maintain, and operate each train—which only increased the risk of derailments and safety related accidents.

69.   As part of its cost savings approach, Norfolk Southern slashed employee headcount by 30%. Specifically, in 2022 Norfolk Southern's headcount hit a low of approximately 19,000 people whereas it had employed an average of 27,000 people 5 years earlier. The largest drop in employee headcount occurred after the implementation of TOP21.

70.   These cuts including positions critical to ensure the proper monitoring of operating trains.  For example, according to post-Offering U.S. Senate testimony by Gary Rambo, an Analyst for the Advanced Train Control Desk ("ATC Desk") at Norfolk Southern, prior to the Offerings Norfolk Southern sheared the headcount to the integral ATC Desk to a single employee. The ATC Desk is responsible for monitoring and prioritizing, on a daily basis and in real time, hundreds of urgent alerts. This position is critical to the early detection of potential train derailments, including overheated bearings or dragging equipment mid-transit. The ATC Desk is also responsible for conducting inspections and research to prevent future derailments, including inspecting stick and brake railcars, checking equipment, and issues associated with train cars. After the implementation of the TOP Initiative, a lone employee was responsible for the entirety of these duties, lacking any dedicated backup to provide a second set of eyes should they need to step away from the desk, even momentarily.

71.     As Mr. Rambo explained, the ATC Desk was previously staffed by multiple people, including at least one researcher in addition to an analyst.  Prior to the cutbacks, the researcher was tasked with conducting research to prevent future derailments.  This allowed the analyst to focus on monitoring the incoming alerts for moving trains.  Further, the researcher provided critical support to the analyst by acting as a second set of eyes to assist when numerous train alerts were coming in at once.

72.     Without the assistance of a researcher, the responsibility for the safety of Norfolk Southern's operating trains fell to one, single employee.  Specifically, the ATC Desk analyst was now required to both monitor hundreds of urgent alerts relating to moving trains and prioritize those that appeared to be more critical than others, all while conducting research into previous train incidents.

73.     The consolidation of such responsibilities resulted in less oversight for trains in movement and research that was crucial for preventing future derailments or other safety related incidents.

74.     But Norfolk Southern's TOP Initiative and its strategy of trimming headcount and cutting costs was not limited to the Company's ATC Desk. Layoffs, cost cutting measures, and cutting corners was rampant throughout Norfolk's operations.  This placed more responsibility on the Company's remaining employees who were forced to work longer hours with less rest.

75.     In turn, this resulted in larger turnover for remaining employees who were unwilling to bear this burden. As employees departed, certain positions needed to be refilled by new employees who would need extensive training. However, Norfolk Southern's training programs were inadequate.

76.     Norfolk Southern's conductor training program was a six-week cram course where trainees with no railroad experience were expected to learn and retain an expansive amount of information related to operating the Company's trains and equipment in a safe and efficient manner.   This conductor training program was inadequate for various reasons, including its deficient testing procedures that should have been used to determine whether individuals had the necessary knowledge and skills to safely discharge their duties as conductors.

77.     As a result of this inadequate conductor training program, Norfolk Southern received a letter from the FRA on September 9, 2021 informing the Company that it had conducted a review of the training program.   Upon this review, the FRA found that Norfolk Southern's training program for engineers and conductors "was not in conformance with 49 CFR Part 242." Specifically, the review noted deficiencies in the Norfolk Southern's knowledge testing procedures to determine whether individuals had the necessary knowledge and skills to safely discharge their duties as conductors.

78.     Thus, the increased risk of safety issues and accidents also stemmed from a combination of inadequate safety training and exhaustion faced by employees.

### 2.     Norfolk Southern's Cost Reduction Incentives for Management Rewarded the Ends with Zero Regard as to the Means

79.     In 2019, Norfolk Southern began tying executive compensation to the Company's PSR objectives.   In doing so, the Company's Operating Ratio became a key metric, with its importance to executive compensation growing over time.

80.    As set forth in the Company's March 29, 2019 annual proxy statement, pursuant to the Company's 2018 Executive Compensation Program,[8] executives were to receive a base salary in a fixed-cash amount along with an annual incentive award (performance-based cash) ("Annual Incentive"). The Annual Incentive was "[d]esigned to compensate executives based on achievement of annual corporate performance goals."

81.    The amount of the Annual Incentive was based on the achievement of certain performance metrics that were "chosen to encourage employees to do all they can individually and as a team to increase revenue, reduce expenses, and improve operating performance[.]" The performance metrics for the Company's 2018 Annual Incentives were allocated as follows: (i) Operating Ratio (35%); (ii) operating income (50%); and (iii) composite service measure[9] (15%). However, the performance metrics for the Company's 2021 Annual Incentives placed an increased emphasis on the importance of the Company's Operating Ratio. Specifically, the Company's 2021 Annual Incentives were allocated as follows: (i) Operating Ratio (60%); (ii) operating income (20%); and (iii) strategic objectives[10] (20%).

**B.    Former Norfolk Southern Employees Corroborate the Allegations Herein**

**1.    FE-1: Former Locomotive Engineer and Conductor**

82.    FE-1 was formerly a Locomotive Engineer and a Conductor at Norfolk Southern from September 2005 until February 2022.

---

[8] Norfolk Southern's 2018 Executive Compensation Program was developed by the Compensation Committee. Defendants Bell, Daniels, Leer, and Scanlon were all members of the Company's Compensation Committee at this time.

[9] Composite service measure is the weighted average of adherence to operating plan (30%), connection performance (30%), and train performance (40%).

[10] The "strategic objectives" were also linked to Norfolk Southern's PSR objectives, as "the earnout of the 20% of annual incentive opportunity would be based on the Committee's evaluation of the Corporation's progress in continuing our transformation into a more productive and efficient organization; efforts to achieve operational excellence and propel smart growth."

83.     FE-1 explained that the biggest issue at Norfolk Southern was that "they wanted you to be safe until it became an inconvenience."  According to FE-1, the rules and regulations were only mentioned for liability purposes, but in practice if an employee followed all of the rules they were punished. FE-1 explained that these issues "definitely got worse" following Norfolk Southern's implementation of its Precision Scheduled Railroading ("PSR") strategy.

84.     FE-1 continued to say that "following the rules is associated with purposely wanting to slow down production."  According to FE-1, he was an employee who tried to follow all of the rules and regulations and as a result he was then watched by superiors to monitor his work rate, waiting for him to make a mistake.[11] FE-1 explained that these issues worsened following Norfolk Southern's implementation of its PSR strategy.

85.     FE-1 stated that the goal was to "get these trains out as soon as possible" and given the decreased time allotted to Carmen for inspections, many just walked the length of the cars, just so that they could say that they had looked at them. FE-1 explained that these issues got worse following Norfolk Southern's implementation of its PSR strategy. According to FE-1, jobs were "cut across the board" and cut back so thin that you could not do your job properly.

86.     FE-1 recalled pressure to look the other way on issues to keep things moving and then if an issue was identified later on and your name was on it, you were held responsible. FE-1 continued to say that everything was "all good until you're not on time." FE-1 explained that Norfolk Southern was a "really bad environment to work in" and he suspected that this was the result of the tone at the top that trickled down to the Yardmasters and Trainmasters who were pressuring employees on site.

---

[11] For ease of comprehension and readability, the Amended Complaint uses the pronoun "he" and possessive "his" in connection with the former Norfolk Southern employees.  This convention, however, is not meant to identify the actual gender of any of the former employees.

87.     FE-1 recalled feeling worried when he was on a train due to the chance it had not been inspected properly and these feelings heightened following the introduction of PSR in 2018 or 2019.  FE-1 continued to say that in conversations with Carmen, he was told that they were being disciplined if they did not complete their inspections in the allotted amount of time and some were even threatened with termination.

88.     FE-1 explained that the issues were with Norfolk Southern's PSR strategy and noted that he now works at a competing Tier 1 railroad company that has a different approach and different atmosphere. FE-1 continued to say that he did not realize how bad it was at Norfolk Southern until he worked at a different railroad and "got away from it." FE-1 explained that he had been "brainwashed" at Norfolk Southern to believe this was how all railroad companies operated.

89.     FE-1 recalled pressure to get things done and to meet deadlines even at the expense of safety. FE-1 further recalled instances of trains not having enough air and being instructed to pull the train out anyway.

90.     According to FE-1, there was one instance where he derailed a car that had a faulty break that was not properly checked. FE-1 explained that he was switching cars, and a knuckle was "stuck up" on a cut lever, which happens, and "jiggled" it to get into place. FE-1 continued to say that he was unaware of the other preexisting issue and the car derailed causing injury as he had to get off a rolling car. FE-1 recalled that Norfolk Southern was more concerned with finding something he had done wrong than ensuring he was ok. FE-1 explained that Norfolk Southern then fixed the faulty break so that issue would not be present in an investigation into the incident.

91.     FE-1 explained that this was common practice and other employees had been injured and made reports and Norfolk Southern fixed the issues after the fact to conceal them. FE-

27

1 continued to say that it was always a "pissing match" about what department the Company ultimately wanted to blame for the issue. FE-1 explained that he worked at a different Tier 1 railroad company after Norfolk Southern and they did not operate in the same manner as Norfolk Southern.

92.    FE-1 recalled a common issue of being told to prematurely depart a terminal. According to FE-1, as trains grew longer and longer, it started to take longer to get adequate air pressure for departure.  FE-1 continued to say that there were several instances of air pressure not being completely adequate and being told to depart anyway.  FE-1 explained that he would confirm with the Yardmaster, who was typically instructed by the Train Master, that it was okay to leave early.  FE-1 explained that this was the case at all of the locations he had worked at while employed by Norfolk Southern, including Louisville, Danville, and Somerset. FE-1 continued to say that this worsened following the implementation of Norfolk Southern's PSR strategy. FE-1 explained that Norfolk Southern's PSR strategy "exaggerated" and "amplified" all issues as departments were "cut to bare bones" and the same volume of work was expected.

93.    According to FE-1, this was done so the train passed the required point to signify it had departed for scheduling purposes.  FE-1 explained that inadequate air pressure can negatively impact a train's ability to stop or it could be a sign of another underlying problem. FE-1 explained that employees check the air pressure because that it is required to stop a train, but recalled how trains were moved on despite inadequate pressure to meet deadlines.

94.    FE-1 noted that there was always a double standard when it came to safety. According to FE-1, if an employee disobeyed an order, even one that they deemed to be unsafe, they could be marked as insubordinate or displaying conduct unbecoming, which goes on an employee's record and then they are "pulled out of service," or suspended, without pay while the

investigation is completed.  FE-1 described Norfolk Southern as having a "very hostile, very adversarial" environment. FE-1 described Norfolk Southern as the "most adversarial environment" he had ever worked in. FE-1 explained that this worsened following the implementation of Norfolk Southern's PSR strategy as managers faced mounting pressure. According to FE-1, managers were being fired "left and right" for failing to fall in line with the Company's PSR strategy.

95.     FE-1 recalled other issues, including being held at Away From Home Terminals ("AFHT") for more than 24 hours, which was a common occurrence. FE-1 explained that this was "more common than not" and contributed to fatigue and exhaustion.  According to FE-1, rest at a location different from your home is not the same and another issue being that you rush to get your sleep when your shift ends, but you do not know when your next one will begin.  FE-1 continued to say that you might get eight hours of rest, but then you do not get called in for another 10-12 hours and by then you are ready to go to bed again.  FE-1 noted another issue being the lack of experienced employees left at the Company, so those instructing new hires do not have enough experience themselves.

96.     FE-1 explained that losing experienced employees and having inexperienced personnel instructing new hires was "a recipe for disaster." FE-1 recalled an instance where a new hire, who had been trained by inexperienced employees, died during a routine event.

97.     FE-1 explained that experienced employees are electing to leave Norfolk Southern because they know there are other railroads they can work for with "less BS."

98.     FE-1 explained that the conductor program is now much shorter than when he participated in it. FE-1 recalled that during his time in the conductor training program, it was six months long and following its completion, he still did not feel like he knew what he was doing.

## 2.    FE-2: Former Director of Internodal Operations

99.    FE-2 was formerly employed by Norfolk Southern in a variety of roles, such as a Carman and Terminal Operations Manager, for over a decade.  FE-2 served most recently as the Director of Internodal Operations for over five years until his departure from the Company in October 2021.  FE-2 worked out of St. Louis, Missouri for the duration of his career.

100.    According to FE-2, during his time as a Carman, he did inspections on the interchange, the area where trains switch to another track.  FE-2 explained that two Carmen inspected the train and then Airmen performed other duties related to break functionality.  FE-2 recalled that there were over 100 Carmen employed by the Company at this time, but having regular conversations in his most recent role with Carmen and other laborers that that number has been cut to a figure less than 20.

101.    FE-2 explained that the decrease in personnel was attributable to staff reductions caused by Norfolk Southern's implementation of PSR. FE-2 continued to say that the Company did not hire new employees to fill the roles of those who had departed the Company due to injury, retirement, or otherwise.

102.    According to FE-2, it was a "cocktail of disasters" at Norfolk Southern, with the introduction PSR, including the closing of three yards, injuries, and retirements that contributed to the decline in available Carmen. FE-2 recalled that this decline occurred from 2019 through the end of his tenure.

103.    FE-2 recalled that there was no time limit to inspect cars when he was a Carman, and that doing a thorough job and identifying issues was most important. FE-2 continued to say that this thorough approach still took less than five minutes per car.  According to FE-2, with the introduction of PSR, Carmen at the end of his tenure were not only given less time to conduct inspections, but everything was meticulously timed and now there were no longer Airmen, so

Carmen had to fulfill those additional duties as well. FE-2 explained that PSR made a "big change." According to FE-2, "dwell times," or how long a train was in a yard, decreased as the Company wanted to "keep the stock of cars rolling" and caused certain processes to be "expedite[d]" meaning that employees could no longer do a "thorough" job on inspections.

104.   FE-2 continued to say that he has heard about things being missed because given the time constraints inspections were now more of a "cursory inspection." FE-2 explained that he had seen Carmen "hot footin' it [moving very quickly] a little bit" in order to complete their inspections on time. According to FE-2, Norfolk Southern's introduction of PSR "changed everything" and there was an increased emphasis on reducing dwell times and keeping trains "rolling."

105.   FE-2 explained that there was an attrition of employees, Carmen in particular, from layoffs instituted by PSR and not replacing those who have been injured and retired. FE-2 explained that with PSR came a mentality of "pushing and pushing" and "all work, work, work." FE-2 recalled that during his time as a Carman, he worked five days a week and could request an additional day as overtime if he wished. FE-2 continued to say that when he left Norfolk Southern, Carmen were required to work six or even seven days per week and lost any work-life balance.

106.   FE-2 recalled that during his tenure as a Carman, there were 100 to 120 Carmen and overtime was optional if an employee wished to take the opportunity to work beyond their standard hours. FE-2 continued to say that when he departed from Norfolk Southern that Carmen were now forced to work overtime to accommodate the lack of Carmen that resulted from the introduction of Norfolk Southern's PSR strategy.

107.   According to FE-2, when conducting an inspection, he was required to write his identifying number and the date in white pencil on each car that he inspected and then if he

identified an issue, he stapled a 3x7 inch orange "bad order" tag to the car to signify that it needed to be sent to the "rip track" so it could be moved inside for repairs. FE-2 recalled situation where the General Foreman removed bad order tags, so that the car would not need to be moved to the rip track and instead the train was sent on its way. FE-2 continued to say that this often occurred when there were "air leaks," which impacted the functionality of breaks, and this was done under the assumption that it was not a big issue given that the cars in front and behind the bad order car still had breaks that were functioning fine.

108.    FE-2 explained that the brake test or leakage test involved an Engineer at the front of the train and then Carmen walked around the train to identify leaks. According to FE-2, there was a threshold for how many pounds of air could be leaking, but even in instances where that threshold was exceeded, the bad order tags were ripped off if this only impacted a few cars. FE-2 continued to say that an air leak signifies that something is defective in the brakes.

109.    According to FE-2, Carmen "always" kept notes of their inspections and bad order tags regardless of whether the tags were removed. FE-2 continued to say that the "car shop" wanted tags removed because it went against their matrix, meaning that they did not want higher numbers reported because it could create issues with upper management. FE-2 explained that this practice was still ongoing throughout his tenure, and he was still seeing and hearing about it when he departed in 2021. FE-2 added that he was at the Luther Yard Terminal, the main terminal in St. Louis, throughout his tenure, but did have additional experience at other yards when he would fill in for employees who were on vacation.

110.    FE-2 recalled instances where the Foreman told him to remove the tags himself, which he refused to do.  According to FE-2, he was still hearing about instances of this type of behavior occurring from Carmen as late as 2020.

111.    FE-2 explained that during his tenure, Norfolk Southern had won the Harriman Award, presented in recognition of outstanding safety for approximately 25 years in a row and that safety was number one on the Company's list of priorities and goals.  FE-2 recalled that in approximately 2018 or 2019, his Division Manager informed him that during a meeting with the VP and AVP of Intermodal that safety had now been moved to approximately fifth on Norfolk Southern's list of priorities with items such as customer service and shareholder service supplanting safety.  According to FE-2, this change came from higher up and was distilled down the chain of command.

112.    According to FE-2, the introduction of Norfolk Southern's PSR program moved shareholders to the number one priority, while safety slipped to fifth or sixth. FE-2 continued to say that valuing shareholders first contributed to cost cutting, while customer service at number two placed an increased emphasis on trains running on time.

113.    FE-2 recalled this list of priorities was distributed internally and that he was "dumbfounded" by the fact safety had moved down the list.  FE-2 continued to say that in conversations with co-workers after the change that they "couldn't believe it" and that this feeling was universal amongst employees.

### 3.    FE-3: Former Terminal Train Master

114.    FE-3 was employed as a Terminal Train Master at Norfolk Southern in Chattanooga, Tennessee from May 2008 until February 2022. FE-3 explained that Engineers and Conductors reported to him, and he reported to an Assistant Superintendent, who reported to the Superintendent for his territory and then the chain of command continued to an Assistant Superintendent, Superintendent, and General Manager for the region.

115.    FE-3 explained that the safety issues and accidents at Norfolk Southern stemmed from a combination of the level of training and exhaustion faced by employees. FE-3 continued to

say that exhaustion was created on the "management side" where there was "no structure" regarding off days. According to FE-3, the tone around rest and exhaustion came "from the top all the way down" and that everyone was overworked and had no sympathy for those who reported to them. FE-3 explained that "bottom scale management" had more respect for employees, but that there was none from upper management. FE-3 explained that the "bean counters" wanted to cut employees and cut costs and did so without fully considering the ramifications on the ground.

116.    FE-3 recalled seeing "a lot" of derailments during his tenure, but even in situations as severe as this, employees would not admit to exhaustion being a factor to avoid getting in trouble, so it was difficult to get the truth as to what happened. FE-3 continued to say that employees "neglected themselves for the Company," working until they could not physically work any longer. According to FE-3, there was no incentive for employees to say that exhaustion contributed to an accident because it would just count as a point against them. FE-3 explained that it was very much "us against them," referring to union employees against management.

117.    FE-3 explained that there were monthly "Saturation Checks" or "SAT Checks," where the Terminal Train Masters traveled to different territories to be an unbiased employee for local employees to speak with. According to FE-3, there were also SAT checks following derailments, so theoretically employees would feel more comfortable telling someone not from their terminal about what happened. FE-3 continued to say that following a SAT check, employees were instructed to pay "special attention" to the FRA (Federal Railroad Administration) regulations and procedures to promote safety, but after a short while this would cease.

118.    According to FE-3, no adjustments were made to processes and procedures following a derailment to address specific causes and employees were only ever told to refer to

and adhere to rules regulated by the FRA. FE-3 continued to say that it was a "forbidden rule" not to bring issues of exhaustion and suggestions for altering practices.

119.    FE-3 recalled that the training program at Norfolk Southern is a "cram course" where in six weeks employees with no railroading experience are expected to learn a ton of information. FE-3 continued to say that they take all this information and "cram it down your throat."

### 4.    FE-4: Former Freight Conductor

120.    FE-4 was formerly employed as a Freight Conductor at Norfolk Southern from June 2022 until January 2023 in the Allentown Yard, Pennsylvania.  FE-4 continued to say that he came from a "family of railroaders" and working at Norfolk Southern was a "dream job," until he experienced working there firsthand and how the railroad industry had changed since his family had been part of it.

121.    FE-4 explained that he witnessed instances of Federal Railroad Administration ("FRA") violations and the covering up of violations that he characterized as "corruption." According to FE-4, during his training in Georgia, Norfolk Southern instructors prefaced teachings with the disclaimer that trainees are shown the correct way to perform their duties as well as the actual way they will be performed in the field.

122.    According to FE-4, a lot of contractors, many of which were former Canadian railroaders, taught the training for Conductors and Engineers at Norfolk Southern. FE-4 explained that previously the trainings were done by Norfolk Southern employees, but it was viewed as a cost cutting measure to contract it out and that is when trainees began seeing the approach of showing how things should be done and how they were actually done.

123.    FE-4 explained that when he first arrived at the Allentown Yard that he was a "kicker," or someone who walked the trains to make sure they were ready to make deliveries.  FE-

4 continued to say that Allentown, before his arrival, had a hill that cars were pushed down when the operator pulled a pin to send the car into the yard.  FE-4 explained that once he arrived, the hill was no longer used and the process now resulted in injuries, including back injuries. FE-4 added that allegedly the reason for getting rid of the hill was a cost saving measure due to maintenance costs, however, it was less efficient as now there was no assist from gravity to help move the trains.

124.   FE-4 recalled shortly after his arrival in Allentown, a woman lost her foot while moving railcars and a man lost his arm shortly after that.  FE-4 explained that each day when he arrived at work, he received a bulletin and a debrief regarding any accidents that had occurred, with the message to be safe, but without actionable items.  FE-4 continued to say that each day when he went to work, he "always" knew that there was a chance of injury.

125.   FE-4 described working at Norfolk Southern as "being a slave, in every sense of the word."  FE-4 explained that the Company was understaffed and there was "never any relief" as the Company continued to "cut and cut and cut" employees and those who remained employed regularly called out because they were sick, injured, or exhausted.  According to FE-4, trains at one point each had five or six employees on them, but while he was there that number was only two, a Conductor and an Engineer.  FE-4 continued to say that the Engineer's job remained the same, while the Conductor was now responsible for the tasks of multiple jobs.

126.   FE-4 added that the days of a locomotive having a crew are gone. According to FE-4, if there was a hot axel at the back of the train, the Conductor had to walk to the back of a potentially two-mile-long train, assess the issue, walk back, speak with the Engineer, and then speak with dispatch to decide what to do. FE-4 explained that there used to be a crew member at the caboose that considerably cut down on walking miles, but this employee was replaced by an EOTD (end-of-train device).

127.     According to FE-4, as part of the Conductor's increased number of duties, he had to walk the length of a two-to-three-mile-long train, multiple times a night while staying awake for ten hours on the train itself.  FE-4 recalled an instance on a train from Hagerstown, Maryland to Allentown where after a 12-hour shift concluded, he had to wait three to five hours to be picked up, then in eight hours he had to be ready to get on another train.

128.     FE-4 explained that this was a common occurrence and by the time he was picked up and got to the hotel, he would only have six hours of his rest period before he needed to get back onto the train and go again.  FE-4 continued to say that he had dozed off while working and that Engineers had a "dead man's switch" they were required to press every 10 seconds to confirm they were awake, but they too had managed to find ways to fall asleep while maintaining the switch.

129.     FE-4 added that subcontractors came to pick up crew members in cars and by the time they were retrieved from the middle of nowhere, showered, and cleaned up for bed, he had approximately six hours available for sleep. FE-4 continued to say that when your eight-hour rest period was up "they will call you" to come back in. FE-4 explained that he suspected this was a Company-wide issue but knew it was an issue in his territory, the Keystone region, which was comprised of Maryland, Pennsylvania, and Ohio.

130.     According to FE-4, the responsibility of the Carmen was to inspect cars "24/7/365," but due to staffing issues, there were instances at a number of yards where they essentially "just walked" the train before clearing it.  FE-4 explained that derailments were "a matter of when, not if" and when he was at the Enola Yard, shortly after they had experienced a "major derailment," managers were much more concerned about how that impacted their delivery timetables, rather than finding a way to ensure that more derailments did not occur.

131.    FE-4 stated that "we [Norfolk Southern] employees knew this was going to happen" and that it was "100%" not if, but when.  FE-4 recalled current CEO Alan Shaw being more concerned with getting "this PR nightmare over with" than with improving processes to ensure it did not happen again. FE-4 added that at Norfolk Southern it was all about "putting on a show for investors" and the Company did not care about employees or even customers.

132.    FE-4 explained that he was aware of Norfolk Southern taking advantage of a loophole in regulations where a full inspection did not need to be conducted if Carmen were not available. According to FE-4, at a yard in Reading, Pennsylvania, that moved "heavy, heavy" cars with cargo such as coal, there were never any Carmen, just a few Engineers and Conductors. FE-4 explained that with cargo that heavy, it was important to have thorough checks. FE-4 continued to say that because there were no Carmen, the Engineers and Conductors had to conduct the checks and do so in an unrealistic amount of time. FE-4 recalled that they pulled the train out of the yard and set its speed to 10-15 miles per hour, and they watched the train roll past them as they looked for deficiencies or issues.

133.    According to FE-4, if there was a defect, they just left that car there because there were no Carmen to fix it. FE-4 continued to say that the review conducted was limited to spotting issues in plain sight and was less thorough than the inspection that should have been done had it been done by a Carman.

134.    FE-4 recalled other issues, such as trains leaking "powder" and "hard chemicals" in the yard.  FE-4 explained that there were alarms for hazardous materials at the yards but was suspicious that they did not work or else "they'd be going off every day."  According to FE-4, white powder was leaking from the trains "everywhere" and no one knew what it was.  FE-4

recalled asking himself, "is this flammable?" but there was no clean up despite an apartment community being located right behind the Allentown yard.

135.    FE-4 further recalled that there are sensors on both sides of the railyards that read an RFID chip on the train cars to track when cars come in and when they go out and that the "only goal" was to get them through the departure sensor on time. FE-4 explained that there were instances where he spent ten or eleven hours reorganizing a train to address a car with a deficiency and then was told "just get it [the train] through [the sensor] and bring it back." FE-4 continued to say that in Bethlehem, PA, there is a small yard behind steel stacks where Norfolk Southern brought cars to be worked on outside of the yard and the sensors still read that it had left on time. FE-4 explained that at Norfolk Southern, "you work for the shareholders" and priorities were a gray area as some decisions did not seem to ultimately benefit the customer.

136.    FE-4 explained that a train passes through four sensors on its way out of the yard, a hot wheel sensor, an axel counter, an over height sensor, and the RFID sensor. FE-4 recalled instances where warnings were ignored just to get a train through the RFID sensor and then issues were addressed elsewhere nearby shortly after.

137.    FE-4 explained that at Norfolk Southern, employee "turnover is so high" and they know if they get 1,000 people in the door that only some will stay.  According to FE-4, the cuts and influx of new, inexperienced employees contributed to a loss of institutional knowledge at the yards and on the trains. FE-4 added that the seasoned employees have been so overworked as a result of the changes that they do not have sympathy for new employees.

138.    FE-4 recalled a hostile work environment between management and the unions, and while they were regularly in talks, it always resulted in compromises that did not improve the quality of life for the workers.  FE-4 explained that the tension between the groups makes it

difficult to address issues for fear of retribution from union members, noting a concern with being labeled a "rat."

### 5.    FE-5: Former Track Supervisor

139.    FE-5 was formerly employed as a Norfolk Southern in a variety of Track Supervisor positions from July 2018 until January 2022.  Most recently, FE-5 was the Supervisor Track Inspection - Elkhart Terminal in Elkhart, Indiana.  FE-5 explained that he was a member of the Engineering Department responsible for inspecting all relevant tracks and switches and he worked closely, in coordination with the Transportation Department.

140.    FE-5 explained that Norfolk Southern was "more about speed" than doing things the right way, including when it came to thorough inspections because "doing things the right way takes longer."

141.    According to FE-5, PSR was in its early stages when he arrived at the Company in 2018. FE-5 explained that he liked to be efficient with his work, but Norfolk Southern wanted a faster approach. According to FE-5, Norfolk Southern preferred to fix something 60% to keep things moving with the plan being to return to it later. FE-5 explained that as time went on and Norfolk Southern continued to implement their version of PSR that the emphasis on speed increased. FE-5 recalled the Company wanting cars processed faster, sorted faster, and sent out faster.

142.    FE-5 explained that while he was in the Engineering Department, he worked with the Transportation Department and Mechanical Department in one of Norfolk Southern's big hump yards. According to FE-5, car inspections included one employee walking an entire train on both sides, which were at least one mile each. FE-5 added that Norfolk Southern still wanted these inspections to be performed in a shorter amount of time and that the Company wanted time cut down across the board for its operations.

143.     FE-5 confirmed that Norfolk Southern "absolutely" crossed the line in trying to be efficient and increased risks related to safety in the process. According to FE-5, in theory, a yard can go six months without inspecting the hump, but if just one-part breaks and they let it slide, there can be a domino effect. FE-5 explained that Norfolk Southern's mentality was that because the last 100 cars were OK, then the next 100 will also be OK.

144.     According to FE-5, at a hump yard every track is supposed to be inspected every month, but in reality, they were lucky to be able to complete a full round of inspections in three months because it was a "fight" with the Company's Transportation department to get track time due to the desire to continue running trains.  FE-5 explained that the yard can feasibly be inspected in a month, but the hump is what takes the longest and is "most crucial." FE-5 recalled the Transportation Department telling him that the Engineering Department was "not getting their hump time." FE-5 explains that the hump gets "battered" with the number of cars that go over it. FE-5 continued to say that everything in a hump yard is "old" and requires inspections, but it was "impossible" to inspect everything required in the allotted amount of time following cuts to employee numbers.

145.     According to FE-5, hump yards are not normal yards. FE-5 explained that while most yards are flat, hump yards have a literal hump that trains come down one car at a time and then an employee in a tower sorts them down the various tracks where they will eventually meet up to form a new train. FE-5 added that there are about 50 switches for sorting that distribute the cars to a locomotive to take them to the next destination. FE-5 continued to say that hump yards are "extremely critical" and that Norfolk Southern had approximately five hump yards that acted as distribution centers.

146.    FE-5 explained that it is "critical" that cars are inspected, and that each car needs to be inspected after a certain number of miles or tonnage. FE-5 continued to say that because each car is on an individual program, they do not require inspection every time that they enter the hump yard. FE-5 explained that regardless, the approach at Norfolk Southern was "don't fix it if it's not broken" and the Company did not inspect cars unless it was due for an inspection.

147.    According to FE-5, the hump itself is the "critical" part and once a car goes over the hump, forms a train, and is attached to the locomotive, then the whole train is supposed to be inspected. FE-5 continued to say that this did not occur every time as required. FE-5 explained that there were instances where couplers did not attach properly and it was not seen in the inspection, which led to tracks being destroyed and prevented the train from leaving the yard.

148.    FE-5 continued to say that due to Norfolk Southern's PSR plan and the need to get trains out quicker to make the customers happy, the Company had to "cut time somewhere" and safety and inspections were cut to the "limit." FE-5 explained that the mentality was "screw it, we'll just get the train out." FE-5 recalled pressure on employees to move quickly to get trains out contributing to issues.

149.    FE-5 recalled that his department had upwards of 30 employees when he began, and that number dwindled to approximately 15 following the institution of PSR. FE-5 explained that Norfolk Southern's PSR strategy contributed to cuts both in terms of employees and equipment. FE-5 continued to say that employees who left due to injuries, retirement, or quitting were not replaced and the amount of equipment like loaders and backhoes decreased. FE-5 explained that despite the cuts in equipment and personnel, work was expected to be completed at the same rate.

150.    FE-5 explained that when employees were shifted to other locations and others were retired or injured, those positions were not replaced with new employees.  FE-5 continued to say that this impacted areas across the organization, including the Track, Transportation, C&S (Communications and Signals), and the Car Department, which was took a "bigger hit."  FE-5 explained that with the cuts, work began to pile up.

151.    FE-5 added that the Company demanded work be done at the same rate with half as many people. FE-5 continued to say that this was difficult even if everyone was working at 120% and forced the Company to "cut corners."

152.    FE-5 explained that the Engineering aspect of Norfolk Southern costs the Company money because that is where fixes are instituted and trains are taken off of the tracks which led to a hesitancy from the Transportation Department to allow the Track Department time to institute adequate fixes and perform thorough inspections because they did not want to lose time and were facing pressure from their own superiors to keep things running. According to FE-5, the Engineering Department is a "money pit" and he frequently was at odds with the Transportation Department that wanted him to do the bare minimum. FE-5 continued to say that he was "pressured to do the least amount possible." FE-5 recalled that this worsened over time with Norfolk Southern's PSR system. FE-5 added that derailments occurred in the hump yard "several times a week."

153.    According to FE-5, the issues at Norfolk Southern came from the tone at the top and pressure on every department to keep moving trains and that the approach was "take your time but hurry up" with an insinuation that you were not really supposed to take your time.  FE-5 explained that the Company did not make money if trains were not moving, so there were corners cut and a lot of looking the other way when it came to issues.

154.    FE-5 further explained that the Transportation Department "bullied" other departments because they handled the movement of trains and dictated the time allotted to other departments. FE-5 recalled complaining about this issue to three levels above his role and noted that they did nothing. FE-5 added that "no one wanted to do what was right." FE-5 further recalled that this got "significantly" worse as time went on and as PSR was further implemented, recalling that he subsequently had less and less time to conduct inspections.

155.    FE-5 explained that there were requirements to submit Federal Railroad Administration ("FRA") reports every day and that Norfolk Southern had to attest to completed inspections by submitting a form composed of various check boxes. FE-5 continued to say that whether these submissions were reviewed by a manager depended on the specific yard. FE-5 explained that there was an FRA database that housed all submissions, and he was able to look back at reports from past years that he had submitted, and that upper management had the ability to access them if they wished.

156.    FE-5 explained that there were cost saving issues, such as not using the correct parts to fix switches. FE-5 recalled using components not in accordance with regulations to make fixes and then superiors would say a note had been made to order the correct part, but everyone knew that that it would never actually happen as more issues would come up with more insufficient fixes utilized and they just continued to pile up. FE-5 added that at times, proper materials were not available and they had to use refurbished parts from the 1950s.

157.    FE-5 explained that as more steps were skipped, and corners were cut, the trains and tracks became more prone to breaking. FE-5 continued to say that that in his area the worst-case scenario was a derailment and while mainline derailments were not as common, derailments occurred in the yard "every day or every week." FE-5 explained that most yards were built in the

1940s or 1950s and still had original components. FE-5 continued to say that Norfolk Southern did not fix something until it was "obliterated." According to FE-5, Norfolk Southern just fixed little things without addressing the larger issues. FE-5 noted that there were derailments every day and that it got worse over time as PSR was further implemented.

158.    FE-5 then recalled instances of derailments where only two Engineers were available to do the job of ten because of the smaller workforces and overworked personnel. FE-5 explained that in these instances, there was still the expectation that work would be completed in the same amount of time. FE-5 continued to say that corners were "definitely" cut in these instances. According to FE-5, the implementation of PSR led to the decrease in available employees and the work "piled up."

159.    FE-5 explained that he knew some employees involved in the derailment in East Palestine, Ohio, because he spent time at a neighboring terminal. FE-5 continued to say that when it came to a hot wheel bearing, there were sensors on the side of the track to pick up temperature levels, but if a temperature reading was below a threshold by 1 degree that it was common sense it would be above the threshold before the next sensor, given the mileage in between, but no one ever wanted to stop. FE-5 explained that the Conductor is supposed to inspect the entire train, which could be 2.5 miles long and that the time it takes to inspect both sides is considerable and would back everything up, so corners are cut. FE-5 added that corners are cut "every day of the week" at Norfolk Southern.

160.    FE-5 explained that with the various detectors, a Conductor may be required to walk the entire length of the train, 2.5 miles each side. FE-5 continued to say that corners were cut "every day," as the combined rule books at Norfolk Southern exceed 1,000 pages, and there was no way to do everything required in the time that employees were allotted.

161.     According to FE-5, if a bearing is worn down during an inspection, even if it is above the threshold to continue, it will clearly end up below that during a journey, but the train will be sent out anyway because Norfolk Southern did not want to lose time which translated into profit. FE-5 added that nothing at Norfolk Southern gets fixed until it is broken, because taking the time to preemptively make the appropriate fixes takes time and costs money. FE-5 recalled that the mentality was "keep it in if it's not completely broken."

### 6.     FE-6: Former Supervisory Gang Leader

162.     FE-6 was formerly employed by Norfolk Southern for over four years until January 2020 in a variety of roles at the Company's Bellevue Yard in Bellevue, Ohio in the "locomotive shop." FE-6 added that Bellevue is Norfolk Southern's largest "hump yard."  FE-6 explained that during the first approximately three years of his employment he worked as a laborer, which is also known as a Fireman and Oiler. FE-6 added that this consisted of "jockeying" or moving locomotives around the yard and responsibility over cleaning and sanding locomotives. According to FE-6, he was then appointed to an Electrician role and his final role was as a Supervisory Gang Leader ("SGL"), also known as a "Pit Foreman." FE-6 explained that two days per week he served as the Pit Supervisor as relief for the full-time employee and that his duties included sitting in a tower and watching locomotives come into the yard for repairs. According to FE-6, he directed locomotives where to go for repairs and liaised with supervisors in the repair shops. FE-6 recalled that his final role at Norfolk Southern required responsibility for "a lot" of the yard.

163.     According to FE-6, Trainmasters or someone with a supervisory role traditionally had filled the SGL role but following the layoffs resulting from introduction of PSR it was now filled by "regular" union employees, such as himself.

164.     FE-6 explained that during his time at Norfolk Southern he worked all three shifts, and this could mean working the day shift, having two days off, and then the night of the second

off day finding out he had to work the night shift the following day.  FE-6 continued to say that working at Norfolk Southern meant that "my life was whatever the railroad wants it to be" and that the Company was "paying you to be a disservice to your life."

165.    According to FE-6, he was a member of the safety team at Bellevue for approximately 1.5 to 2 years and that consisted of attending internal meetings that were up to eight hours in length discussing issues and potential fixes. FE-6 explained that when a solution to a problem or way to make things safer was proposed that if it cost money than the answer was always, "this is not a safety concern right now." FE-6 recalled that certain members of the team traveled to nearby yards such as Conway, Pennsylvania or Fort Wayne, Indiana and had similar meetings.

166.    FE-6 explained that when he first arrived at the Company in 2015, if money was needed to institute fixes or improve safety, then it was available, but around the time that Norfolk Southern implemented its PSR strategy, money was no longer available. FE-6 continued to say that if employees brought up an issue where things could be made safer, the response received was "well it's not unsafe." FE-6 added that issues that may not have been a concern in that exact moment could grow to become concerns if they were not addressed.

167.    FE-6 explained that the rulebook at Norfolk Southern is "massive" and that "every rule is written in blood" from an accident or issue that was the catalyst for them including a rule. FE-6 continued to say that the derailment like that that occurred in East Palestine, Ohio was a matter of when and not if. According to FE-6, he observed "frequent" instances of employees not wanting to sign off on a locomotive to leave the yard but being either forced by a supervisor to sign off or a supervisor signed off on it themselves. FE-6 added that instances of employees not wanting to sign off on a locomotive to leave the yard "definitely" increased over time. FE-6

recalled that when he first joined the Company there was money and manpower available and the Company valued accuracy and thoroughness, but this decreased over time.

168.   FE-6 continued to say that there was pressure coming from above to keep locomotives moving and that leadership was more interested in getting a locomotive out than making sure it was 100%.  FE-6 explained that while 95% of the time the trains ran fine, there was the inevitability that something like the East Palestine derailment would happen eventually.

169.   FE-6 explained that there were daily safety meetings prior to each shift where the employees stretched and reviewed slides that detailed the consistency and accuracy of their yard as well as those comparable to them. FE-6 explained that the slides compared yards of similar sizes on metrics for trains in and out and that they were given grades on performance. FE-6 added that the "bosses of the bosses in Bellevue," or Area Manager, used these figures in meetings with higher ups, employees in Atlanta, and received directives with instructions regarding how many trains they needed to get out.

170.   According to FE-6, Norfolk Southern preferred to take a train into the shop with an easy fix that could have been completed in the yard than fix something that truly needed it. FE-6 added that at times they elected to do neither and just said "send it [the train] out."

171.   FE-6 explained that there was a database that housed information about the history of a locomotive. FE-6 continued to say that there were scanners the trains passed through when coming to a yard that provided the pit foreman information such as the train number, direction it was traveling, and a brief history that included the last shop it was at and any issues reported there. According to FE-6, he could print diagnostics to see previous issues and fixes, and at which shop they occurred.

172.     FE-6 recalled that his yard received trains with issues from other yards and "a lot" of times those in charge at the dispatching yard saw issues and said, "it's good enough to make it eight hours, just send it." According to FE-6, the problematic train was just removed from the lead and placed in a "B" train position.

173.     FE-6 explained that when a locomotive arrives at a yard a "task sheet" is printed that displays all work previously done to eliminate an issue on a train. FE-6 continued to say that certain issues cannot be signed off only by an employee and required a supervisor to also sign off. According to FE-6, supervisors at times instructed employees not to include those issues and instead move a locomotive to a "B" position and became upset if an employee documented it.

174.     According to FE-6, there are a ton of "band-aid locomotives" running around at Norfolk Southern, where critical issues have been addressed, but a lot of little issues remain that can compound one another over time.

175.     FE-6 recalled that there was pressure from above to meet quotas for the number trains out and that pressure trickled down to lower employees.

176.     According to FE-6, PSR had failed long-term at every railroad it has been instituted on and the layoffs and cuts were just a way for Norfolk Southern to make a lot of short-term money. FE-6 explained that the cuts and layoffs put a greater pressure on employees to "get more out of less" and there was a considerable loss of institutional knowledge as experienced employees were let go or departed the Company. FE-6 continued to say that college graduates with engineering degrees came on board and lacked any practical knowledge of how to fill the roles and duties and the experienced workers who previously had trained new workers had left the Company.

177.     FE-6 explained that previously Norfolk Southern had promoted from within to fill these roles, but now with college graduates without railroad experience, they had "a few guys with

49

a little knowledge." FE-6 continued to say that there was a difference between being able to read blueprints and hands-on experience and that "a pencil and a wrench do not always work the same."

### 7.    FE-7: Former Senior Operations Road Supervisor

178.    FE-7 was formerly employed by Norfolk Southern from July 2019 until March 2021 in a variety of roles and most recently was the Senior Operations Road Supervisor for safe and efficient train performance of the Macon to Savannah Territory. FE-7 explained that he joined the Company as PSR was being implemented and older employees he spoke with were not surprised at the direction the Company went in in terms of safety.

179.    According to FE-7, employees in management positions, like himself, had to be "very careful" about sending complaints. FE-7 explained that it was necessary to be a "Company man" or risk being let go. FE-7 recalled employees who did push back on the way the Company was being run and expressed concerns about safety, were either laid off or fired.

180.    FE-7 described PSR as "horrible" and that it was great money in the short-term for Norfolk Southern to show their investors but carried risks in the long-term. FE-7 explained that the lay-offs and reduction in personnel caused trains to be backed up and the under-manned crew contributed to insufficient checks. FE-7 recalled that the books for inspections and checks were always signed off properly despite him identifying obvious issues, which caused him to think about what else had been missed if he was able to quickly identify issues.

181.    According to FE-7, rails were not being properly inspected because there were not enough people available to do them thoroughly. FE-7 recalled instances where there were not enough personnel available to run trains on the weekends and he had to call people in from their off days in order to make up the numbers. FE-7 explained that, for example, if he needed ten people, Norfolk would give him six, and the crews were "run ragged." FE-7 continued to say that

there was no required rest for supervisor positions and recalled working three or four days straight and sleeping in his car or at the train station.

182.     FE-7 described the working environment at Norfolk Southern as "horrible." FE-7 explained that Norfolk Southern put supervisors in "ridiculous" positions and supervisors were punished if they failed to write-up enough employees. FE-7 continued to say that there were not official quotas, but that they were implied. FE-7 explained that the Company believed if people were being written up then "it shows [the Company] did its part" and it was employees working in the terminals that were hammered on the hardest. According to FE-7, this was done so the Company could blame issues on isolated events and individuals and that the Company wanted "ridiculous" things written up. FE-7 explained that issues occurred as the result of equipment being "messed up" or "not proper," rather than actions of employees.

183.     FE-7 explained that any fixes that that were needed to be done always came down to how implementing them impacted the train schedule. FE-7 continued to say that if there was an issue actively hindering trains running then it was addressed, but if fixing something would require a stoppage and negatively impact scheduling then it was not done. FE-7 recalled an issue with rotted out cross ties and when he brought it to the attention of his superiors they asked, "can they still ride on it?" and he explained that while technically yes, it was not safe. FE-7 added that because the issue did not immediately impact the train schedule that it was not addressed.

184.     According to FE-7, "there were a ton of derailments in my time." FE-7 continued to say that a broken rail or track was the most common cause, and this was related to the lack of proper inspections due to being undermanned. FE-7 explained that his area was supposed to have 10 track inspectors, whose job it was to drive up and down the tracks, and they only had three. According to FE-7, he never saw a department fully staffed during his time at Norfolk Southern.

185.     FE-7 explained that within his territory or territories, he was brought in to help out on "some pretty gnarly derailments." According to FE-7, some derailments were minor, but he experienced approximately seven "bad ones." FE-7 recalled that these took three to four days to fix, two of which had hazardous materials on board. FE-7 explained that these occurred in "very rural" areas and there was no damage to life but could have been much more severe had they occurred under different circumstances.

186.     FE-7 explained that Norfolk Southern was "grimy from the top down" and "100%" knew what they were doing with the introduction of PSR. FE-7 continued to say that the Company did not care about the safety of the crews or derailments and only cared about trains running on time. FE-7 recalled management visiting a derailment and not asking about the crew rather they only expressed concern for the train schedule. FE-7 further recalled an instance where the Company bulldozed a person's property without permission in order to get to a derailed train and only went back to offer compensation afterwards.

187.     According to FE-7, the Company had become "so lean" that they moved into the realm where the possibility of failure was greater than any benefit. FE-7 continued to say that greed and the desire to keep stockholders happy fueled Norfolk Southern's decision making. According to FE-7, all of the executive team are attorneys without firsthand railroad experience. FE-7 recalled employees referring to Norfolk Southern's approach as "railroading by numbers," where they only looked at the bottom line and not the fallout from their decisions on a human level. FE-7 added that when it came to issues the Company essentially wanted you to "just [not] look at it" because if things are not reported then there is plausible deniability.

188.     When asked about the derailment in East Palestine, Ohio, FE-7 explained that he was only surprised about how long it took for something like that to happen. FE-7 recalled that

everyone from at least his level down were concerned about safety, and railroad veterans of 25-30 years at the Company would say that "Norfolk is going to get people killed." FE-7 noted that it was a miracle that something worse had not happened.

## V.   DEFENDANTS' VIOLATIONS OF THE SECURITIES ACT

### A.   The Offerings

189.   On February 4, 2021, Norfolk Southern filed with the SEC a shelf registration statement on Form S-3 ASR (the "Registration Statement") authorizing the Company to sell various types of securities to public investors, including debt securities. Each of the Offerings was conducted pursuant to the Registration Statement. The Registration Statement incorporates by reference Norfolk Southern's Form 10-K for the fiscal year ended December 31, 2020, as filed with the SEC on February 4, 2021 (the "2020 Annual Report").

190.   Between 2021 and 2023, Norfolk Southern filed with the SEC prospectus supplements to the Registration Statement on Forms 424B5 to issue seven separate unsecured Senior Notes.

### 1.   The May 2021 Senior Note Offerings

191.   On May 3 and 5, 2021, Norfolk Southern filed prospectus supplements on Forms 424B5 (the "May 2021 Prospectus") for $500 million worth of 2.300% Senior Notes due 2031 (CUSIP 655844CK2, the "May 2021 2.300% Senior Note Offering") and $600 million worth of 4.100% Senior Notes due 2121 (CUSIP 655844CJ5, the "May 2021 4.100% Senior Note Offering," together with the May 2021 2.300% Senior Note Offering, the "May 2021 Senior Note Offerings").  The May 2021 Prospectus provided that the proceeds from the May 2021 2.300% Senior Note Offering will be approximately $1,087 million and that the proceeds would be used in part for expenditures relating to clean transportation, renewable energy, green buildings, pollution prevent and control, and other efficiency and environmental processes.  Whereas the

May 2021 Prospectus provided that the proceeds from the May 2021 4.100% Senior Note Offering would be used for general corporate purposes.

192.     The Joint Book-Running Managers for the May 2021 Senior Note Offerings were BofA Securities, Morgan Stanley, and Wells Fargo Securities.   The Co-Managers for the May 2021 Senior Note Offerings were Capital One, Fifth Third, MUFG, PNC Capital, Siebert Williams Shank, and SMBC Nikko.   These Underwriter Defendants sold the respective principal amounts of the Norfolk Southern Senior Notes in the May 2021 Senior Note Offerings:

| Underwriters | Principal Amount of 2031 Notes | Principal Amount of 2121 Notes |
|---|---|---|
| BofA Securities, Inc. | $125,000,000 | $150,000,000 |
| Morgan Stanley & Co. LLC | 125,000,000 | 150,000,000 |
| Wells Fargo Securities, LLC | 125,000,000 | 150,000,000 |
| Capital One Securities, Inc. | 20,834,000 | 25,000,000 |
| Fifth Third Securities, Inc. | 20,834,000 | 25,000,000 |
| MUFG Securities Americas Inc. | 20,833,000 | 25,000,000 |
| PNC Capital Markets LLC | 20,833,000 | 25,000,000 |
| Siebert Williams Shank & Co., LLC | 20,833,000 | 25,000,000 |
| SMBC Nikko Securities America, Inc. | 20,833,000 | 25,000,000 |
| Total | $500,000,000 | $600,000,000 |

## 2.        The August 2021 Senior Note Offering

193.     On August 16 and 18, 2021, Norfolk Southern filed prospectus supplements on Forms 424B5 (the "August 2021 Prospectus") for $600 million worth of 2.900% Senior Notes due 2051 (CUSIP 665844CL0, the "August 2021 Senior Note Offering").  The August 2021 Prospectus provided that the proceeds from the August 2021 Senior Note Offering will be approximately $588.8 million and that the proceeds would be used for general corporate purposes.

194.     The Joint Book-Running Managers for the August 2021 Senior Note Offering were Citigroup, Goldman Sachs, and US Bancorp. The Co-Managers for the August 2021 Senior Note Offering were Capital One, Fifth Third, MUFG, PNC Capital, Siebert Williams Shank, and SMBC Nikko. These Underwriter Defendants sold the respective principal amounts of the Norfolk Southern Senior Notes in the August 2021 Senior Note Offering:

| Underwriters | Principal Amount of Notes |
| --- | --- |
| Citigroup Global Markets Inc. | $150,000,000 |
| Goldman Sachs & Co. LLC | 150,000,000 |
| U.S. Bancorp Investments, Inc. | 150,000,000 |
| Capital One Securities, Inc. | 25,000,000 |
| Fifth Third Securities, Inc. | 25,000,000 |
| MUFG Securities Americas Inc. | 25,000,000 |
| PNC Capital Markets LLC | 25,000,000 |
| Siebert Williams Shank & Co., LLC | 25,000,000 |
| SMBC Nikko Securities America, Inc. | 25,000,000 |
| Total | $600,000,000 |

### 3.      The February 2022 Senior Note Offerings

195.    On February 15 and 17, 2022, Norfolk Southern filed prospectus supplements on Forms 424B5 (the "February 2022 Prospectus") for $600 million worth of 3.000% Senior Notes due 2032 (CUSIP 655844CM8, the "February 2022 3.000% Senior Note Offering") and $400 million worth of 3.700% Senior Notes due 2053 (CUSIP 655844CN6, the "February 2022 3.700% Senior Note Offering," together with the February 2022 3.000% Senior Note Offering, the "February 2022 Senior Note Offerings").   The February 2022 Prospectus provided that the proceeds from the February 2022 Senior Note Offerings will be approximately $988.4 million and that the proceeds would be used for general corporate purposes.

196.    The Joint Book-Running Managers for the February 2022 Senior Note Offerings were Citigroup, Goldman Sachs, and US Bancorp.  The Co-Managers for the February 2022 Senior Note Offerings were Capital One, Fifth Third, MUFG, PNC Capital, Siebert Williams Shank, and SMBC Nikko.  These Underwriter Defendants sold the respective principal amounts of the Norfolk Southern Senior Notes in the February 2022 Senior Note Offerings:

| Underwriters | Principal Amount of 2032 Notes | Principal Amount of 2053 Notes |
| --- | --- | --- |
| Citigroup Global Markets Inc. | $ 150,000,000 | $ 100,000,000 |
| Goldman Sachs & Co. LLC | 150,000,000 | 100,000,000 |
| U.S. Bancorp Investments, Inc. | 150,000,000 | 100,000,000 |
| Capital One Securities, Inc. | 25,000,000 | 16,667,000 |
| Fifth Third Securities, Inc. | 25,000,000 | 16,667,000 |
| MUFG Securities Americas Inc. | 25,000,000 | 16,667,000 |
| PNC Capital Markets LLC | 25,000,000 | 16,667,000 |
| Siebert Williams Shank & Co. LLC | 25,000,000 | 16,666,000 |
| SMBC Nikko Securities America, Inc. | 25,000,000 | 16,666,000 |
| Total | $ 600,000,000 | $ 400,000,000 |

### 4.      The June 2022 Senior Note Offering

197.    On June 2 and 6, 2022, Norfolk Southern filed prospectus supplements on Forms 424B5 (the "June 2022 Prospectus") for $750 million worth of 4.550% Senior Notes due 2053 (CUSIP 655844CP1, the "June 2022 Senior Note Offering").  The June 2022 Prospectus provided that the proceeds from the June 2022 Senior Note Offering will be approximately $741.9 million and that the proceeds would be used for general corporate purposes.

198.    The Joint Book-Running Managers for the June 2022 Senior Note Offering were BofA Securities, Morgan Stanley, and Wells Fargo Securities.  The Co-Managers for the June 2022 Senior Note Offering were Capital One, Fifth Third, MUFG, PNC Capital, Siebert Williams Shank, and SMBC Nikko.  These Underwriter Defendants sold the respective principal amounts of the Norfolk Southern Senior Notes in the June 2022 Senior Note Offering:

| Underwriters | Principal Amount of Notes |
|---|---|
| BofA Securities, Inc. | $187,500,000 |
| Morgan Stanley & Co. LLC | $187,500,000 |
| Wells Fargo Securities, LLC | $187,500,000 |
| Capital One Securities, Inc. | $ 31,250,000 |
| Fifth Third Securities, Inc. | $ 31,250,000 |
| MUFG Securities Americas Inc. | $ 31,250,000 |
| PNC Capital Markets LLC | $ 31,250,000 |
| Siebert Williams Shank & Co. LLC | $ 31,250,000 |
| SMBC Nikko Securities America, Inc. | $ 31,250,000 |
| Total | $750,000,000 |

### 5.      The January 2023 Senior Note Offering

199.    On January 26 and 27, 2023, Norfolk Southern filed prospectus supplements on Forms 424B5 (the "January 2023 Prospectus") for $500 million worth of 4.450% Senior Notes due 2033 (CUSIP 655844CQ9, the "January 2023 Senior Note Offering").  The January 2023 Prospectus provided that the proceeds from the January 2023 Senior Note Offering will be approximately $494 million and that the proceeds would be used for general corporate purposes.

200.    The Joint Book-Running Managers for the January 2023 Senior Note Offering were Citigroup, Goldman Sachs, and US Bancorp.  The Co-Managers for the January 2023 Senior Note Offering were Capital One, Fifth Third, MUFG, PNC Capital, Siebert Williams Shank, and SMBC Nikko.   These Underwriter Defendants sold the respective principal amounts of the Norfolk Southern Senior Notes in the January 2023 Senior Note Offering:

| Underwriters | | Principal Amount of Notes |
| --- | --- | --- |
| Citigroup Global Markets Inc. | $ | 125,000,000 |
| Goldman Sachs & Co. LLC | $ | 125,000,000 |
| U.S. Bancorp Investments, Inc. | $ | 125,000,000 |
| Capital One Securities, Inc. | $ | 20,834,000 |
| Fifth Third Securities, Inc. | $ | 20,834,000 |
| MUFG Securities Americas Inc. | $ | 20,833,000 |
| PNC Capital Markets LLC | $ | 20,833,000 |
| Siebert Williams Shank & Co., LLC | $ | 20,833,000 |
| SMBC Nikko Securities America, Inc. | $ | 20,833,000 |
| Total | $ | 500,000,000 |

201.    Pursuant to the Registration Statement and these prospectus supplements (¶¶189-200), Norfolk issued seven different Senior Notes for total proceeds of $3.95 billion.   The "Offering Documents" referred to herein includes the Registration Statement and the five related prospectus supplements, as well as all documents incorporated by inclusion or reference.

**B.      The Offerings Documents Contained Materially False Statements and Omissions**

202.    The Offering Documents were negligently prepared and, as a result, contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not misleading, and failed to make necessary disclosures required under the rules and regulations governing its preparation. Specifically, the Offering Documents were materially false and misleading in that they omitted to failed to disclose material adverse facts about the Company's increased risk-taking at the expense of reasonable and/or required safety precautions due to the Company's near-term focus on profits.  Specifically, the Offering contained false and/or misleading statements and/or failed to disclose that:

a) At the time of the Offerings, Norfolk Southern's lowered Operating Ratio was the result of undisclosed, unsustainable business practices that involved cutting corners, violating relevant regulations, and sacrificing safety for short term profits (*see* ¶¶83-85, 87, 89-94, 100-102, 107-113, 121-127, 130-136, 140-144, 147-154, 156-161, 163-170, 172-177, 179-188);

b) At the time of the Offerings, Norfolk Southern had cut employees necessary to monitor issues with moving trains and conduct proper research into previous train accidents to avoid similar incidents (*see* ¶¶65-75, 279-284);

c) At the time of the Offerings, Norfolk Southern had violated or exposed and took advantage of loopholes within regulations in order to decrease dwelling time, resulting in increased, undisclosed risks associated with trains that operated without mechanical inspections, and led to an increase in the Company's rate of accidents (*see* ¶¶100-104, 107-110, 130, 132-133, 276-278, 289-294);

d) At the time of the Offerings, the combination of the insufficient level of training and exhaustion faced by Norfolk Southern employees, who were forced to juggle several responsibilities at once in light of the Company's reduced employee headcount, resulted in an increase in the Company's rate of accidents and increased risks for employee safety and future derailments (*see* ¶¶74-78, 95-98, 105-106, 115-119, 121-122, 125-129, 137, 149-151, 158, 163-164, 180-181, 276-280);

e) At the time of the Offerings, Norfolk Southern's TOP Initiative led to an increase in the Company's rate of accidents, undermined worker safety, and undermined the Company's purported "commitment to an injury-free workplace" because the plan prioritized reducing expenses by, among other things, reducing personnel, making

trains longer, and spending less money on equipment and time on repairs (*see* ¶¶65-78, 85, 89-94, 100-102, 111-113, 123-127, 130-134, 140-144, 147-154, 156-161, 163-170, 172-177, 179-188, 276-278); and

    f)  At the time of the Offerings, Norfolk Southern's TOP Initiative and its newfound focus on short term profits incentivized increased, undisclosed risk taking at the expense of reasonable safety precautions (*see* ¶¶79-81).

203.    Section 11 of the Securities Act create liability against each of the Defendants for each (i) misstatement, (ii) omission in contravention of an affirmative legal disclosure obligation, and (iii) omission of information that is necessary to prevent existing disclosures from being misleading, in the Offering Documents.

204.    Pursuant to SEC Regulation C, the Offering Documents were required to disclose material information necessary to ensure that representations in the Registration Statement were not misleading.  Specifically, Rule 408, 17 C.F.R. § 230.408(a), states that "[i]n addition to the information expressly required to be included in a registration statement, there shall be added such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not misleading."

205.    Separately, Norfolk Southern, the Individual Defendants, and the Underwriter Defendants were required to comply with Item 303 of Regulation S-K, 17 C.F.R. § 229.303. Specifically, Item 303 and the SEC's related interpretive releases thereto, requires issuers to disclose events and uncertainties, including any known trends that have had or are reasonably likely to cause the issuer's financial information not to be indicative of future operating results.

206.    Moreover, Norfolk Southern, the Individual Defendants, and the Underwriter Defendants were also separately required to comply with Item 105 (formerly 503) of Regulation

S-K, 17 C.F.R. § 229.105.  Specifically, Item 105 required that the Offering Documents furnish, among other things, a discussion of the most significant factors that made the IPO speculative or risky.

207.    The Offering Documents incorporated by reference the below mentioned filings with the SEC, including certain of Norfolk Southern's annual reports on Form 10-K, annual proxy statements on Schedule 14A, and quarterly reports on Form 10-Q:

| Offering Documents | Documents Incorporated by Reference |
|---|---|
| Registration Statement | • Annual Report on Form 10-K for the fiscal year ended December 31, 2020, as filed with the SEC on February 4, 2021 (the "2020 Annual Report") |
| May 2021 Prospectus | • 2020 Annual Report<br>• Definitive Proxy Statement on Schedule 14A, as filed with the SEC on March 31, 2021 (the "2021 Proxy Statement")<br>• Quarterly Report on Form 10-Q for the quarter ended March 31, 2021, as filed with the SEC on April 28, 2021 (the "Q1 2021 10-Q") |
| August 2021 Prospectus | • 2020 Annual Report<br>• 2021 Proxy Statement<br>• Q1 2021 10-Q<br>• Quarterly Report on Form 10-Q for the quarter ended June 30, 2021, as filed with the SEC on July 28, 2021 (the "Q2 2021 10-Q") |
| February 2022 Prospectus | • Annual Report on Form 10-K for the fiscal year ended December 31, 2021, as filed with the SEC on February 4, 2022 (the "2021 Annual Report")<br>• 2021 Proxy Statement |
| June 2022 Prospectus | • 2021 Annual Report<br>• Definitive Proxy Statement on Schedule 14A, as filed with the SEC on March 31, 2022 (the "2022 Proxy Statement")<br>• Quarterly Report on Form 10-Q for the quarter ended March 31, 2022, as filed with the SEC on April 27, 2022 (the "Q1 2022 10-Q") |
| January 2023 Prospectus | • 2021 Annual Report<br>• 2022 Proxy Statement<br>• Q1 2022 10-Q |

|  | • Quarterly Report on Form 10-Q for the quarter ended June 30, 2022, as filed with the SEC on July 27, 2022 (the "Q2 2022 10-Q") |
|---|---|

### 1. Norfolk Southern's 2020 Annual Report

208.   Norfolk Southern's 2020 Annual Report, as filed with the SEC on February 4, 2021, was incorporated by reference in the Registration Statement, the May 2021 Prospectus, and the August 2021 Prospectus. The 2020 Annual Report touted the Company's focus on and investment in safety and environmental protection, claiming that the Company's "*capital spending and replacement programs are and have been designed to assure the ability to provide safe, efficient, and reliable rail transportation services.*"

209.   The 2020 Annual Report also provided that "*[m]aintaining appropriate headcount levels for our craft-employee workforce is critical to our on-time and consistent delivery of customers' goods and operational efficiency goals*."

210.   Further, the 2020 Annual Report stated:

> Safety – *We are dedicated to providing employees with a safe workplace and the knowledge and tools they need to work safely and return home safely every day. Our commitment to an injury-free workplace is illustrated by our "I am Coming Home" safety message, which is featured prominently in our yards, shops, and facilities and further reinforces the importance of working safely*. We measure employee safety performance through internal metrics such as lost-time injuries and serious injuries per 200,000 employee-hours and metrics established by the Federal Railroad Administration (FRA), such as FRA reportable injuries per 200,000 employee-hours. *Given the importance of safety among our workforce and business*, in 2020, our Board of Directors established a standing Safety Committee that, among other duties, reviews, monitors, and evaluates our compliance with our safety programs and practices.

211.   The 2020 Annual Report also stated that "*We provide a range of developmental programs, opportunities, skills, and resources for our employees to work safely and be*

*successful in their careers. We provide hands-on training and simulation training designed to improve training effectiveness and safety outcomes*."

212.    The Management's Discussion and Analysis of Financial Condition and Results of Operations (MD&A) section of the 2020 Annual Report stated:

> *In 2020, we continued the implementation of our strategic plan, including tactical changes to our operating plan, to generate operational efficiencies, improve customer service, and deliver strong financial results.* The COVID-19 pandemic caused significant economic disruption and, along with softening energy markets, reduced the demand for our services. *Nevertheless, we executed on operational initiatives to generate efficiencies and lower our cost structure. In the face of economic headwinds that resulted in a year-over-year volume decline of 12%, we improved productivity by driving year-over-year average headcount down by 18%, and we increased asset utilization through rationalization of our locomotive fleet. These sustainable cost structure improvements will provide greater benefits as the economy recovers.*

213.    The MD&A section of the 2020 Annual Report also stated that:

> Income from railway operations declined in 2020 compared to 2019 as railway operating revenues fell 13% which exceeded *a 7% reduction in operating expenses*. Railway operating revenues declined as lower customer demand resulted in volume reductions. Additionally, negative mix and lower fuel surcharge revenue, partially offset by increased pricing, led to lower revenue per unit. *Railway operating expenses decreased due to declines in fuel price and consumption, reduced employment levels, lower volumes and operational efficiency improvements*. Additionally, 2020 results were adversely impacted by a loss on asset disposal of $385 million related to locomotives sold, and by a $99 million impairment charge related to an equity method investment. For more information on the impact of these charges, see Notes 7 and 6, respectively.
>
> *Income from railway operations rose in 2019 compared to 2018 as a 3% reduction in railway operating expenses more than offset the impact of a 1% decline in railway operating revenues.*

214.    These statements from the 2020 Annual Report, and incorporated by reference into the Offering Documents, were materially false and misleading in that they omitted or failed to

disclose material adverse facts about the Company's increased risk-taking at the expense of reasonable and/or required safety precautions due to the Company's near-term focus on profits. Specifically, when speaking about the Company's capital spending and replacement program, headcount levels, safety, employee training, operating plan (*i.e.*, the TOP Initiative), and operating expenses, the 2020 Annual Report contained false and/or misleading statements and/or failed to disclose that:

a) At the time of the Offerings, Norfolk Southern's lowered Operating Ratio was the result of undisclosed, unsustainable business practices that involved cutting corners, violating relevant regulations, and sacrificing safety for short term profits (*see* ¶¶83-85, 87, 89-94, 100-102, 107-113, 121-127, 130-136, 140-144, 147-154, 156-161, 163-170, 172-177, 179-188);

b) At the time of the Offerings, Norfolk Southern had cut employees necessary to monitor issues with moving trains and conduct proper research into previous train accidents to avoid similar incidents (*see* ¶¶65-75, 279-284);

c) At the time of the Offerings, Norfolk Southern had violated or exposed and took advantage of loopholes within regulations in order to decrease dwelling time, resulting in increased, undisclosed risks associated with trains that operated without mechanical inspections, and led to an increase in the Company's rate of accidents (*see* ¶¶100-104, 107-110, 130, 132-133, 276-278, 289-294);

d) At the time of the Offerings, the combination of the insufficient level of training and exhaustion faced by Norfolk Southern employees, who were forced to juggle several responsibilities at once in light of the Company's reduced employee headcount, resulted in an increase in the Company's rate of accidents and increased

risks for employee safety and future derailments (*see* ¶¶74-78, 95-98, 105-106, 115-119, 121-122, 125-129, 137, 149-151, 158, 163-164, 180-181, 276-280);

e)   At the time of the Offerings, Norfolk Southern's TOP Initiative led to an increase in the Company's rate of accidents, undermined worker safety, and undermined the Company's purported "commitment to an injury-free workplace" because the plan prioritized reducing expenses by, among other things, reducing personnel, making trains longer, and spending less money on equipment and time on repairs (*see* ¶¶65-78, 85, 89-94, 100-102, 111-113, 123-127, 130-134, 140-144, 147-154, 156-161, 163-170, 172-177, 179-188, 276-278); and

f)   At the time of the Offerings, Norfolk Southern's TOP Initiative and its newfound focus on short term profits incentivized increased, undisclosed risk taking at the expense of reasonable safety precautions (*see* ¶¶79-81).

### 2.   Norfolk Southern's 2021 Proxy Statement

215.   Norfolk Southern's 2021 Proxy Statement, as filed with the SEC on March 31, 2021, was incorporated by reference in the May 2021 Prospectus, the August 2021 Prospectus, and the February 2022 Prospectus.

216.   In Defendant Leer's Letter to Shareholder, contained within the 2021 Proxy Statement, Norfolk Southern touted its record fourth quarter Operating Ratio, stating: "*[t]hroughout 2020, despite historic challenges, our management team pressed forward to adopt a precision scheduled railroad-based operating plan to the changing business environment, while seizing efficiency opportunities that resulted in a record fourth quarter operating ratio*."

217.   The 2021 Proxy Statement continued to tout the success of Norfolk Southern's strategic plan, stating, "*In 2020, we continued the implementation of our strategic plan, including the transformation of our operations to generate efficiencies, improve customer*

*service, and deliver strong financial results*." Moreover, the Company touted its reduction in its operating ratio, stating

> F*or 2020, we achieved the following results: … operating ratio of 69.3 percent*." Excluding the non-cash charges, *we drove down operating expenses by 14 percent, exceeding the revenue percentage decline, and produced record free cash flow and a fifth consecutive year of operating ratio improvement. We achieved these results by pressing forward with our precision scheduled railroading implementation, including the idling of four hump operations and consolidation of trains. Adjusted 2020 results were as follows: … adjusted operating ratio of 64.4 percent, a 30 basis point improvement over the prior year's record*.

218.    The Corporate Responsibility Highlights section of the 2021 Proxy Statement stated, "*[s]afety is a way of life at Norfolk Southern, extending beyond our rail operations and into the communities where we live and work.*"

219.    Norfolk Southern's 2021 Proxy Statement also touted the Company's ability to decrease the number of reportable train accidents, stating that there was a "*15% year-over-year decline in the number of train accidents*." The Company's 2021 Proxy Statement reiterated this statement under a section titled "Safety," stating "*Focus on Accident Prevention: Year-over-year decline in number of train accidents of 15%.*"

220.    These statements from the 2021 Proxy Statement, and incorporated by reference into the Offering Documents, were materially false and misleading in that they omitted or failed to disclose material adverse facts about the Company's increased risk-taking at the expense of reasonable and/or required safety precautions due to the Company's near-term focus on profits. Specifically, when speaking about the Company's safety, number of train accidents, strategic plan (*i.e.*, the TOP Initiative), Operating Ratio, and operating expenses, the 2021 Proxy Statement contained false and/or misleading statements and/or failed to disclose that:

a) At the time of the Offerings, Norfolk Southern's lowered Operating Ratio was the result of undisclosed, unsustainable business practices that involved cutting corners, violating relevant regulations, and sacrificing safety for short term profits (*see* ¶¶83-85, 87, 89-94, 100-102, 107-113, 121-127, 130-136, 140-144, 147-154, 156-161, 163-170, 172-177, 179-188);

b) At the time of the Offerings, Norfolk Southern had cut employees necessary to monitor issues with moving trains and conduct proper research into previous train accidents to avoid similar incidents (*see* ¶¶65-75, 279-284);

c) At the time of the Offerings, Norfolk Southern had violated or exposed and took advantage of loopholes within regulations in order to decrease dwelling time, resulting in increased, undisclosed risks associated with trains that operated without mechanical inspections, and led to an increase in the Company's rate of accidents (*see* ¶¶100-104, 107-110, 130, 132-133, 276-278, 289-294);

d) At the time of the Offerings, the combination of the insufficient level of training and exhaustion faced by Norfolk Southern employees, who were forced to juggle several responsibilities at once in light of the Company's reduced employee headcount, resulted in an increase in the Company's rate of accidents and increased risks for employee safety and future derailments (*see* ¶¶74-78, 95-98, 105-106, 115-119, 121-122, 125-129, 137, 149-151, 158, 163-164, 180-181, 276-280);

e) At the time of the Offerings, Norfolk Southern's TOP Initiative led to an increase in the Company's rate of accidents, undermined worker safety, and undermined the Company's purported "commitment to an injury-free workplace" because the plan prioritized reducing expenses by, among other things, reducing personnel, making

trains longer, and spending less money on equipment and time on repairs (*see* ¶¶65-78, 85, 89-94, 100-102, 111-113, 123-127, 130-134, 140-144, 147-154, 156-161, 163-170, 172-177, 179-188, 276-278); and

f)   At the time of the Offerings, Norfolk Southern's TOP Initiative and its newfound focus on short term profits incentivized increased, undisclosed risk taking at the expense of reasonable safety precautions (*see* ¶¶79-81).

### 3.      Norfolk Southern's Q1 2021 10-Q

221.   Norfolk Southern's Q1 2021 10-Q, as filed with the SEC on April 28, 2021, was incorporated by reference in the May 3, 2021 Prospectus and the August 2021 Prospectus.

222.   The Q1 2021 10-Q stated, "*[w]e remain committed to protecting our employees and providing excellent transportation service products for our customers.*"

223.   Moreover, the Q1 2021 10-Q touted Norfolk Southern's record quarterly railway Operating Ratio, stating "*Our operating ratio improved to 61.5 percent, a quarterly record*" and:

> *Our first-quarter results reflect our sustained focus on margin improvement through initiatives to drive organizational and operational efficiencies and grow our revenue base.* Although challenging winter conditions adversely impacted our network, *we were able to reduce expenses while absorbing an increase in total volume. As a result, we achieved a record quarterly railway operating ratio (a measure of the amount of operating revenues consumed by operating expenses) of 61.5 percent* and increased net income and diluted earnings per share.

224.   These statements from the Q1 2021 10-Q, and incorporated by reference into the Offering Documents, were materially false and misleading in that they omitted or failed to disclose material adverse facts about the Company's increased risk-taking at the expense of reasonable and/or required safety precautions due to the Company's near-term focus on profits.  Specifically, when speaking about the Company's safety, Operating Ratio, and operating expenses, the Q1 2021 10-Q contained false and/or misleading statements and/or failed to disclose that:

a) At the time of the Offerings, Norfolk Southern's lowered Operating Ratio was the result of undisclosed, unsustainable business practices that involved cutting corners, violating relevant regulations, and sacrificing safety for short term profits (*see* ¶¶83-85, 87, 89-94, 100-102, 107-113, 121-127, 130-136, 140-144, 147-154, 156-161, 163-170, 172-177, 179-188);

b) At the time of the Offerings, Norfolk Southern had cut employees necessary to monitor issues with moving trains and conduct proper research into previous train accidents to avoid similar incidents (*see* ¶¶65-75, 279-284);

c) At the time of the Offerings, Norfolk Southern had violated or exposed and took advantage of loopholes within regulations in order to decrease dwelling time, resulting in increased, undisclosed risks associated with trains that operated without mechanical inspections, and led to an increase in the Company's rate of accidents (*see* ¶¶100-104, 107-110, 130, 132-133, 276-278, 289-294);

d) At the time of the Offerings, the combination of the insufficient level of training and exhaustion faced by Norfolk Southern employees, who were forced to juggle several responsibilities at once in light of the Company's reduced employee headcount, resulted in an increase in the Company's rate of accidents and increased risks for employee safety and future derailments (*see* ¶¶74-78, 95-98, 105-106, 115-119, 121-122, 125-129, 137, 149-151, 158, 163-164, 180-181, 276-280);

e) At the time of the Offerings, Norfolk Southern's TOP Initiative led to an increase in the Company's rate of accidents, undermined worker safety, and undermined the Company's purported "commitment to an injury-free workplace" because the plan prioritized reducing expenses by, among other things, reducing personnel, making

trains longer, and spending less money on equipment and time on repairs (*see* ¶¶65-78, 85, 89-94, 100-102, 111-113, 123-127, 130-134, 140-144, 147-154, 156-161, 163-170, 172-177, 179-188, 276-278); and

g)   At the time of the Offerings, Norfolk Southern's TOP Initiative and its newfound focus on short term profits incentivized increased, undisclosed risk taking at the expense of reasonable safety precautions (*see* ¶¶79-81).

### 4.      Norfolk Southern's Q2 2021 10-Q

225.   The Company's Q2 2021 10-Q, as filed with the SEC on July 28, 2021, was incorporated by reference in the August 16, 2021 Prospectus. The Company's Q2 2021 10-Q contained the same statements mentioned in the Q1 2021 10-Q.  The Q2 2021 10-Q also stated, "*[w]e remain committed to* monitoring the evolving nature of the pandemic and its impact to our business as well as *protecting our employees and providing excellent transportation service products for our customers*."

226.   Norfolk Southern's Q2 2021 10-Q also touted the Company's second quarter Operating Ratio, stating, "*Our second-quarter operating ratio (a measure of the amount of operating revenues consumed by operating expenses) was 58.3% and net income and diluted earnings per share more than doubled compared to one year ago*."

227.   These statements from the Q2 2021 10-Q, and incorporated by reference into the Offering Documents, were materially false and misleading in that they omitted or failed to disclose material adverse facts about the Company's increased risk-taking at the expense of reasonable and/or required safety precautions due to the Company's near-term focus on profits.  Specifically, when speaking about the Company's safety, Operating Ratio, and operating expenses, the Q2 2021 10-Q contained false and/or misleading statements and/or failed to disclose that:

a) At the time of the Offerings, Norfolk Southern's lowered Operating Ratio was the result of undisclosed, unsustainable business practices that involved cutting corners, violating relevant regulations, and sacrificing safety for short term profits (*see* ¶¶83-85, 87, 89-94, 100-102, 107-113, 121-127, 130-136, 140-144, 147-154, 156-161, 163-170, 172-177, 179-188);

b) At the time of the Offerings, Norfolk Southern had cut employees necessary to monitor issues with moving trains and conduct proper research into previous train accidents to avoid similar incidents (*see* ¶¶65-75, 279-284);

c) At the time of the Offerings, Norfolk Southern had violated or exposed and took advantage of loopholes within regulations in order to decrease dwelling time, resulting in increased, undisclosed risks associated with trains that operated without mechanical inspections, and led to an increase in the Company's rate of accidents (*see* ¶¶100-104, 107-110, 130, 132-133, 276-278, 289-294);

d) At the time of the Offerings, the combination of the insufficient level of training and exhaustion faced by Norfolk Southern employees, who were forced to juggle several responsibilities at once in light of the Company's reduced employee headcount, resulted in an increase in the Company's rate of accidents and increased risks for employee safety and future derailments (*see* ¶¶74-78, 95-98, 105-106, 115-119, 121-122, 125-129, 137, 149-151, 158, 163-164, 180-181, 276-280);

e) At the time of the Offerings, Norfolk Southern's TOP Initiative led to an increase in the Company's rate of accidents, undermined worker safety, and undermined the Company's purported "commitment to an injury-free workplace" because the plan prioritized reducing expenses by, among other things, reducing personnel, making

trains longer, and spending less money on equipment and time on repairs (*see* ¶¶65-78, 85, 89-94, 100-102, 111-113, 123-127, 130-134, 140-144, 147-154, 156-161, 163-170, 172-177, 179-188, 276-278); and

f)   At the time of the Offerings, Norfolk Southern's TOP Initiative and its newfound focus on short term profits incentivized increased, undisclosed risk taking at the expense of reasonable safety precautions (*see* ¶¶79-81).

### 5.   Norfolk Southern's 2021 Annual Report

228.   Norfolk Southern's 2021 Annual Report, as filed with the SEC on February 4, 2022, was incorporated by reference in the February 2022 Prospectus, the June 2022 Prospectus, and the January 2023 Prospectus. The 2021 Annual Report contained the same statements as those mentioned above for the Company's 2020 Annual Report, except for those mentioned in ¶¶212-213.

229.   The 2021 Annual Report contained parts of the statement in ¶213.   The 2021 Annual Report stated:

> *Income from railway operations increased in 2021 compared to 2020, the result of a 14% increase in railway operating revenues and a 1% reduction in railway operating expenses. Revenue growth was driven by increased average revenue per unit and higher volumes, the result of improved customer demand. The decline in railway operating expenses was largely due to the absence of two charges, as 2020 results were adversely impacted by a $385 million loss on asset disposal related to locomotives and a $99 million impairment charge related to an equity method investment.*

230.   Further, the MD&A section of the 2021 Annual Report also states that "*We connect customers to markets and communities to economic opportunity with safe, reliable, and cost-effective shipping solutions*."   The MD&A section adds that "*[w]e remain committed to protecting our employees, operating safely, and providing excellent transportation service products for our customers*."

231.    The 2021 Annual Report touted that the Company's decreased Operating Ratio,

stating:

> ***Our railway operating ratio (a measure of the amount of operating
> revenues consumed by operating expenses) decreased to 60.1
> percent.***
>
> Income from railway operations declined in 2020 compared to 2019
> as railway operating revenues fell 13% ***which exceeded a 7%
> reduction in operating expenses***. Railway operating revenues
> declined as lower customer demand resulted in reduced volume.
> Additionally, negative mix and lower fuel surcharge revenue,
> partially offset by increased pricing, led to lower average revenue
> per unit. ***Railway operating expenses decreased due to*** declines in
> fuel price and consumption, ***reduced employment levels***, lower
> volumes ***and operational efficiency improvements***. These
> decreases in expenses were partially offset by the impact of the
> aforementioned charges.

232.    These statements from the 2021 Annual Report, and incorporated by reference into

the Offering Documents, were materially false and misleading in that they omitted or failed to

disclose material adverse facts about the Company's increased risk-taking at the expense of

reasonable and/or required safety precautions due to the Company's near-term focus on profits.

Specifically, when speaking about the Company's capital spending and replacement program,

headcount levels, safety, employee training, Operating Ratio, and operating expenses, the 2021

Annual Report contained false and/or misleading statements and/or failed to disclose that:

    a)   At the time of the Offerings, Norfolk Southern's lowered Operating Ratio was the

        result of undisclosed, unsustainable business practices that involved cutting

        corners, violating relevant regulations, and sacrificing safety for short term profits

        (*see* ¶¶83-85, 87, 89-94, 100-102, 107-113, 121-127, 130-136, 140-144, 147-154,

        156-161, 163-170, 172-177, 179-188);

b) At the time of the Offerings, Norfolk Southern had cut employees necessary to monitor issues with moving trains and conduct proper research into previous train accidents to avoid similar incidents (*see* ¶¶65-75, 279-284);

c) At the time of the Offerings, Norfolk Southern had violated or exposed and took advantage of loopholes within regulations in order to decrease dwelling time, resulting in increased, undisclosed risks associated with trains that operated without mechanical inspections, and led to an increase in the Company's rate of accidents (*see* ¶¶100-104, 107-110, 130, 132-133, 276-278, 289-294);

d) At the time of the Offerings, the combination of the insufficient level of training and exhaustion faced by Norfolk Southern employees, who were forced to juggle several responsibilities at once in light of the Company's reduced employee headcount, resulted in an increase in the Company's rate of accidents and increased risks for employee safety and future derailments (*see* ¶¶74-78, 95-98, 105-106, 115-119, 121-122, 125-129, 137, 149-151, 158, 163-164, 180-181, 276-280);

e) At the time of the Offerings, Norfolk Southern's TOP Initiative led to an increase in the Company's rate of accidents, undermined worker safety, and undermined the Company's purported "commitment to an injury-free workplace" because the plan prioritized reducing expenses by, among other things, reducing personnel, making trains longer, and spending less money on equipment and time on repairs (*see* ¶¶65-78, 85, 89-94, 100-102, 111-113, 123-127, 130-134, 140-144, 147-154, 156-161, 163-170, 172-177, 179-188, 276-278); and

f) At the time of the Offerings, Norfolk Southern's TOP Initiative and its newfound focus on short term profits incentivized increased, undisclosed risk taking at the expense of reasonable safety precautions (*see* ¶¶79-81).

### 6. Norfolk Southern's 2022 Proxy Statement

233. Norfolk Southern's 2022 Proxy Statement, as filed with the SEC on March 31, 2022, was incorporated by reference in the June 2022 Prospectus and the January 2023 Prospectus.

234. In Defendant Leer's Letter to Investors, within the 2022 Proxy Statement, Norfolk Southern touted the Company's three-year strategic plan achievements & 2021 performance, stating:

> ***Our management team delivered upon our company's three-year strategic plan, producing industry-leading total shareholder return of 110% over the course of our plan, and an all-time record full year operating ratio of 60.1%***, in the face of significant headwinds associated with the pandemic and global supply chain disruptions.

235. The Company's 2022 Proxy Statement touted Norfolk Southern's record Operating Ratio, stating:

> At our investor day in 2019, we announced an ambitious three-year strategic plan. Through a multi-year effort, we delivered on our commitments, overcoming significant headwinds associated with first a freight recession and then a global pandemic over the course of our plan. ***The results of our multi-year effort are highlighted by what we achieved in 2021: Record Operating Ratio of 60.1%***. . .

236. The 2022 Proxy Statement further touted the success of Norfolk Southern's strategic plan, stating:

> ***2021 does not stand on its own though; it represents the culmination of our ambitious multi-year strategic plan. In the past three years, we've produced industry-leading total shareholder return. We've grown earnings per share by 27%, reduced our operating ratio by 530 basis points, and returned nearly $10 billion to our shareholders in the form of share repurchases and dividends.***

237.    Norfolk Southern's 2022 Proxy Statement also touted the Company's ability to decrease the number of reportable train accidents stating that there was a "**16% year-over-year decline in number of FRA reportable train accidents**" as a highlight of 2021.  The Company's 2022 Proxy Statement reiterated this point, stating that there was a "**7% reduction in Federal Railroad Administration (FRA) reportable train accidents and a 16% reduction in FRA reportable mainline train accidents**."  Further, the Company's 2022 Proxy Statement stated:

> *In 2021, the Corporation achieved record performance for train length and weight, gross ton-miles per employee, and fuel efficiency. In addition, management created a safer organization with a reduction in both mainline train accidents per million train miles and serious injuries per 200,000 workhours.*

238.    The 2022 Proxy Statement also stated:

> *Safety is part of who we are. Safety is core to our business strategy and essential to achieving operational excellence. From our Board of Directors' Safety Committee to our local safety and service committees, safety is top down-bottom up.*

239.    These statements from the 2022 Proxy Statement, and incorporated by reference into the Offering Documents, were materially false and misleading in that they omitted or failed to disclose material adverse facts about the Company's increased risk-taking at the expense of reasonable and/or required safety precautions due to the Company's near-term focus on profits. Specifically, when speaking about the Company's safety, number of train accidents, strategic plan (*i.e.*, the Top Initiative), Operating Ratio, and operating expenses, the 2022 Proxy Statement contained false and/or misleading statements and/or failed to disclose that:

      a)    At the time of the Offerings, Norfolk Southern's lowered Operating Ratio was the result of undisclosed, unsustainable business practices that involved cutting corners, violating relevant regulations, and sacrificing safety for short term profits

(*see* ¶¶83-85, 87, 89-94, 100-102, 107-113, 121-127, 130-136, 140-144, 147-154, 156-161, 163-170, 172-177, 179-188);

b) At the time of the Offerings, Norfolk Southern had cut employees necessary to monitor issues with moving trains and conduct proper research into previous train accidents to avoid similar incidents (*see* ¶¶65-75, 279-284);

c) At the time of the Offerings, Norfolk Southern had violated or exposed and took advantage of loopholes within regulations in order to decrease dwelling time, resulting in increased, undisclosed risks associated with trains that operated without mechanical inspections, and led to an increase in the Company's rate of accidents (*see* ¶¶100-104, 107-110, 130, 132-133, 276-278, 289-294);

d) At the time of the Offerings, the combination of the insufficient level of training and exhaustion faced by Norfolk Southern employees, who were forced to juggle several responsibilities at once in light of the Company's reduced employee headcount, resulted in an increase in the Company's rate of accidents and increased risks for employee safety and future derailments (*see* ¶¶74-78, 95-98, 105-106, 115-119, 121-122, 125-129, 137, 149-151, 158, 163-164, 180-181, 276-280);

e) At the time of the Offerings, Norfolk Southern's TOP Initiative led to an increase in the Company's rate of accidents, undermined worker safety, and undermined the Company's purported "commitment to an injury-free workplace" because the plan prioritized reducing expenses by, among other things, reducing personnel, making trains longer, and spending less money on equipment and time on repairs (*see* ¶¶65-78, 85, 89-94, 100-102, 111-113, 123-127, 130-134, 140-144, 147-154, 156-161, 163-170, 172-177, 179-188, 276-278); and

f) At the time of the Offerings, Norfolk Southern's TOP Initiative and its newfound focus on short term profits incentivized increased, undisclosed risk taking at the expense of reasonable safety precautions (*see* ¶¶79-81).

**7.      Norfolk Southern's Q1 2022 10-Q**

240.   The Company's Q1 2022 10-Q, as filed with the SEC on April 27, 2022, was incorporated by reference in the June 2022 Prospectus and the January 2023 Prospectus. The Company's Q1 2022 10-Q contained the same statements mentioned in the Q1 2021 10-Q, except for ¶¶222-223.

241.   The Q1 2022 10-Q includes the statement referenced in ¶222, however, the Q1 2022 10-Q statement added the phrase "***operating safely***." Specifically, the Q1 2022 10-Q stated, "***[w]e remain committed to protecting our employees, operating safely, and providing excellent transportation service products for our customers***."

242.   These statements from the Q1 2022 10-Q, and incorporated by reference into the Offering Documents, were materially false and misleading in that they omitted or failed to disclose material adverse facts about the Company's increased risk-taking at the expense of reasonable and/or required safety precautions due to the Company's near-term focus on profits.  Specifically, when speaking about the Company's safety, Operating Ratio, and operating expenses, the Q1 2022 10-Q contained false and/or misleading statements and/or failed to disclose that:

a) At the time of the Offerings, Norfolk Southern's lowered Operating Ratio was the result of undisclosed, unsustainable business practices that involved cutting corners, violating relevant regulations, and sacrificing safety for short term profits (*see* ¶¶83-85, 87, 89-94, 100-102, 107-113, 121-127, 130-136, 140-144, 147-154, 156-161, 163-170, 172-177, 179-188);

b) At the time of the Offerings, Norfolk Southern had cut employees necessary to monitor issues with moving trains and conduct proper research into previous train accidents to avoid similar incidents (*see* ¶¶65-75, 279-284);

c) At the time of the Offerings, Norfolk Southern had violated or exposed and took advantage of loopholes within regulations in order to decrease dwelling time, resulting in increased, undisclosed risks associated with trains that operated without mechanical inspections, and led to an increase in the Company's rate of accidents (*see* ¶¶100-104, 107-110, 130, 132-133, 276-278, 289-294);

d) At the time of the Offerings, the combination of the insufficient level of training and exhaustion faced by Norfolk Southern employees, who were forced to juggle several responsibilities at once in light of the Company's reduced employee headcount, resulted in an increase in the Company's rate of accidents and increased risks for employee safety and future derailments (*see* ¶¶74-78, 95-98, 105-106, 115-119, 121-122, 125-129, 137, 149-151, 158, 163-164, 180-181, 276-280);

e) At the time of the Offerings, Norfolk Southern's TOP Initiative led to an increase in the Company's rate of accidents, undermined worker safety, and undermined the Company's purported "commitment to an injury-free workplace" because the plan prioritized reducing expenses by, among other things, reducing personnel, making trains longer, and spending less money on equipment and time on repairs (*see* ¶¶65-78, 85, 89-94, 100-102, 111-113, 123-127, 130-134, 140-144, 147-154, 156-161, 163-170, 172-177, 179-188, 276-278); and

    f)   At the time of the Offerings, Norfolk Southern's TOP Initiative and its newfound focus on short term profits incentivized increased, undisclosed risk taking at the expense of reasonable safety precautions (*see* ¶¶79-81).

### 8.    Norfolk Southern's Q2 2022 10-Q

243.    The Company's Q2 2022 10-Q, as filed with the SEC on July 27, 2022, was incorporated by reference in the January 2023 Prospectus. The Company's Q2 2022 10-Q contained the same statements mentioned in the Q1 2022 10-Q, except for ¶¶222-223. The Q2 2022 10-Q includes the statement referenced in ¶222, however, the Q2 2022 10-Q statement added the phrase "***operating safely***." The Q2 2022 10-Q stated, "***[w]e remain committed to protecting our employees, operating safely, and providing excellent transportation service products for our customers***."

244.    These statements from the Q2 2022 10-Q, and incorporated by reference into the Offering Documents, were materially false and misleading in that they omitted or failed to disclose material adverse facts about the Company's increased risk-taking at the expense of reasonable and/or required safety precautions due to the Company's near-term focus on profits.  Specifically, when speaking about the Company's safety, Operating Ratio, and operating expenses, the Q2 2022 10-Q contained false and/or misleading statements and/or failed to disclose that:

    a)   At the time of the Offerings, Norfolk Southern's lowered Operating Ratio was the result of undisclosed, unsustainable business practices that involved cutting corners, violating relevant regulations, and sacrificing safety for short term profits (*see* ¶¶83-85, 87, 89-94, 100-102, 107-113, 121-127, 130-136, 140-144, 147-154, 156-161, 163-170, 172-177, 179-188);

b) At the time of the Offerings, Norfolk Southern had cut employees necessary to monitor issues with moving trains and conduct proper research into previous train accidents to avoid similar incidents (*see* ¶¶65-75, 279-284);

c) At the time of the Offerings, Norfolk Southern had violated or exposed and took advantage of loopholes within regulations in order to decrease dwelling time, resulting in increased, undisclosed risks associated with trains that operated without mechanical inspections, and led to an increase in the Company's rate of accidents (*see* ¶¶100-104, 107-110, 130, 132-133, 276-278, 289-294);

d) At the time of the Offerings, the combination of the insufficient level of training and exhaustion faced by Norfolk Southern employees, who were forced to juggle several responsibilities at once in light of the Company's reduced employee headcount, resulted in an increase in the Company's rate of accidents and increased risks for employee safety and future derailments (*see* ¶¶74-78, 95-98, 105-106, 115-119, 121-122, 125-129, 137, 149-151, 158, 163-164, 180-181, 276-280);

e) At the time of the Offerings, Norfolk Southern's TOP Initiative led to an increase in the Company's rate of accidents, undermined worker safety, and undermined the Company's purported "commitment to an injury-free workplace" because the plan prioritized reducing expenses by, among other things, reducing personnel, making trains longer, and spending less money on equipment and time on repairs (*see* ¶¶65-78, 85, 89-94, 100-102, 111-113, 123-127, 130-134, 140-144, 147-154, 156-161, 163-170, 172-177, 179-188, 276-278); and

f) At the time of the Offerings, Norfolk Southern's TOP Initiative and its newfound focus on short term profits incentivized increased, undisclosed risk taking at the expense of reasonable safety precautions (*see* ¶¶79-81).

**9.      The Materially False and Misleading Statements Are Incorporated by Reference in the Offering Documents**

245.    Norfolk Southern's Registration Statement incorporated by reference the Company's 2020 Annual Report.   Accordingly, the Registration Statement contained the materially false and misleading statements in ¶¶208-213.

246.    The May 2021 Prospectus incorporated by reference Norfolk Southern's: (1) 2020 Annual Report; (2) 2021 Proxy Statement; and (3) Q1 2021 10-Q. Accordingly, the May 2021 Prospectus contained the materially false and misleading statements in ¶¶208-213. 216-219, 222-223.

247.    The August 2021 Prospectus incorporated by reference Norfolk Southern's: (1) 2020 Annual Report; (2) 2021 Proxy Statement; (3) Q1 2021 10-Q; and (4) Q2 2021 10-Q. Accordingly, the August 2021 Prospectus contained the materially false and misleading statements in ¶¶208-213, 216-219, 222-223, 225-226.

248.    The February 2022 Prospectus incorporated by reference Norfolk Southern's: (1) 2021 Annual Report; and (2) 2021 Proxy Statement. Accordingly, the February 2022 Prospectus contained the materially false and misleading statements in ¶¶216-219, 228-231.

249.    The June 2022 Prospectus incorporated by reference Norfolk Southern's: (1) 2021 Annual Report; (2) 2022 Proxy Statement; and (3) Q1 2022 10-Q. Accordingly, the June 2022 Prospectus contained the materially false and misleading statements in ¶¶228-231, 234-238, 240-241.

250.    The January 2023 Prospectus incorporated by reference Norfolk Southern's: (1) 2021 Annual Report; (2) 2022 Proxy Statement; (3) Q1 2022 10-Q; and (4) Q2 2022 10-Q. Accordingly, the January 2023 Prospectus contained the materially false and misleading statements in ¶¶228-231, 234-238, 240-241, 243.

251.    The statements in the Offering Documents (referenced above) were materially false and misleading when made because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's increased risk-taking at the expense of reasonable and/or required safety precautions due to the Company's near-term focus on profits.  Specifically, the Offering contained false and/or misleading statements and/or failed to disclose that:

a)    At the time of the Offerings, Norfolk Southern's lowered Operating Ratio was the result of undisclosed, unsustainable business practices that involved cutting corners, violating relevant regulations, and sacrificing safety for short term profits (*see* ¶¶83-85, 87, 89-94, 100-102, 107-113, 121-127, 130-136, 140-144, 147-154, 156-161, 163-170, 172-177, 179-188);

b)    At the time of the Offerings, Norfolk Southern had cut employees necessary to monitor issues with moving trains and conduct proper research into previous train accidents to avoid similar incidents (*see* ¶¶65-75, 279-284);

c)    At the time of the Offerings, Norfolk Southern had violated or exposed and took advantage of loopholes within regulations in order to decrease dwelling time, resulting in increased, undisclosed risks associated with trains that operated without mechanical inspections, and led to an increase in the Company's rate of accidents (*see* ¶¶100-104, 107-110, 130, 132-133, 276-278, 289-294);

d)  At the time of the Offerings, the combination of the insufficient level of training and exhaustion faced by Norfolk Southern employees, who were forced to juggle several responsibilities at once in light of the Company's reduced employee headcount, resulted in an increase in the Company's rate of accidents and increased risks for employee safety and future derailments (*see* ¶¶74-78, 95-98, 105-106, 115-119, 121-122, 125-129, 137, 149-151, 158, 163-164, 180-181, 276-280);

e)  At the time of the Offerings, Norfolk Southern's TOP Initiative led to an increase in the Company's rate of accidents, undermined worker safety, and undermined the Company's purported "commitment to an injury-free workplace" because the plan prioritized reducing expenses by, among other things, reducing personnel, making trains longer, and spending less money on equipment and time on repairs (*see* ¶¶65-78, 85, 89-94, 100-102, 111-113, 123-127, 130-134, 140-144, 147-154, 156-161, 163-170, 172-177, 179-188, 276-278); and

f)  At the time of the Offerings, Norfolk Southern's TOP Initiative and its newfound focus on short term profits incentivized increased, undisclosed risk taking at the expense of reasonable safety precautions (*see* ¶¶79-81).

252.    Further, the undisclosed adverse facts and circumstances detailed above presented known trends, uncertainties, and risks that required disclosure in the Offering Documents. Specifically, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303 ("Item 303"), required the Company to disclose "any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Moreover, Item 105 of Regulation S-K, 17 C.F.R. §229.105 ("Item 105"), required disclosure in the Offering Documents of "the material factors that ma[d]e an investment

in [the Offerings] speculative or risky" and an explanation of "how [the] risk affect[ed] [Norfolk Southern] or the securities being offered."  The Offering Documents failed to disclose material facts necessary to apprise purchasers of the Norfolk Southern Senior Notes of the true risks inherent in investing in the Company in violation of Item 303 and Item 105.

253.    Specifically, Defendants failed to disclose the fact that Norfolk Southern's TOP Initiative caused an increase in the Company's rate of accidents (*see* ¶¶276-278) and created serious undisclosed safety risks. The Company's failure to disclose these facts violated Item 303 because these undisclosed facts were known and would (and did) have an unfavorable impact on the Company's operations and financial results.  The Company's failure to make these disclosures also violated Item 105, because these specific risks were not adequately disclosed, even though they were significant factors making an investment in the Senior Notes speculative or risky.

C.    **Post-Offering Events**

1.    **The East Palestine, Ohio Train Derailment and Other Train Related Accidents**

254.    On February 3, 2023, at about 8:54 p.m. Eastern Standard Time, an eastbound NSR general merchandise freight train 32N derailed 38 railcars in East Palestine, Ohio, about a mile from the Ohio-Pennsylvania border (the "East Palestine Incident"), leaving behind what the Associated Press called "a mangled and charred mass of boxcars and flames."  Train 32N was made up of 2 head-end locomotives, 149 railcars, and 1 distributed power locomotive. Although no formal regulatory definition exists, 150 cars is the FRA's threshold for classifying a train as "very long."[12] Train 32N was being operated by just three Norfolk Southern personnel that day: a conductor, an engineer, and a conductor-in-training.

---

[12] In a 2019 study, the Government Accountability Office said 150 cars is more than twice the average length of freight trains operated by major railroads from 2008 through 2017.

255.    Even though the train was not officially classified as a hazardous material train, which would have required the Company to post and display notification of its cargo, the consist (*i.e.*, the group of rail vehicles which make up a train) included 20 placarded hazardous materials tank cars transporting liquids, flammable liquids, and flammable gas. Among the hazardous materials being transported were vinyl chloride, ethylene glycol monobutyl ether, ethylhexyl acrylate, isobutylene, and butyl acrylate. The derailed equipment included 11 tank cars carrying hazardous materials that subsequently ignited, fueling fires that damaged an additional 12 non-derailed railcars. The crash created a roughly 50-car pileup – one third the train's length, as reflected in the following photograph of the derailment:



256.    According to a subsequent preliminary investigative report about the accident by the National Transportation Safety Board ("NTSB"), the derailment occurred after a wheel bearing[13] on a hopper car (a type of railroad freight car used to transport loose bulk commodities

---

[13] Railcar bearings are essential to the safe and efficient operation of a train. Inside each bearing is a series of spinning rollers that surround both ends of a turning axle. When lubricated they allow

Footnote continued on next page

such as coal, ore, and grain) overheated and failed. In this instance, the hopper car contained plastic pellets, and the combination of the hot axle and plastic pellets started an initial fire. Video surveillance from a business 20 miles out of East Palestine showed the axle had been on fire for at least 20 miles before the derailment occurred.

257.    On Sunday, February 5, 2023, Ohio Governor Mike DeWine ordered the immediate evacuation of those within a one mile by two-mile area near the derailment site, with the Governor warning of a pending potentially deadly explosion in pertinent part as follows:

> Following an evening briefing regarding the train derailment in East Palestine, Governor DeWine and Columbiana County officials are issuing an urgent warning to those living within a mile of the derailment. ***Within the last two hours, a drastic temperature change has taken place in a rail car, and there is now the potential of a catastrophic tanker failure which could cause an explosion with the potential of deadly shrapnel traveling up to a mile***.
>
> ***Although teams are working to prevent an explosion from happening, residents living within a mile of the site are advised to immediately leave the area.*** While most individuals in the one-mile radius have already evacuated, local officials say that more than 500 people have declined to leave their homes.
>
> ***Those who have the means to leave are advised to immediately evacuate. Those who need help evacuating the area should call 330-426-4341. According to the Columbiana County Sheriff, those with children in their homes who decline to evacuate may be subject to arrest.***
>
> At approximately 8 p.m., Governor DeWine activated the Ohio National Guard to deploy to the scene to assist local authorities. The Ohio State Highway Patrol, Ohio Emergency Management Agency, and Ohio EPA are also assisting.

258.    Although responders had mitigated the fire, five derailed tank cars carrying 115,580 gallons of vinyl chloride continued to concern authorities because the temperature inside one tank

---

for limited friction while also supporting the weight of the railcar. If a bearing gets too hot, usually from the loss of lubricant, it can melt, causing the bearing to seize up or come off the axle. The resulting damage can throw a railcar out of alignment and cause it to jump the tracks.

was still rising, suggesting that the vinyl chloride was undergoing a polymerization reaction, which could pose an explosion hazard. Responders scheduled a controlled venting of the five vinyl chloride tank cards to release and burn the vinyl chloride, expanded the evacuation zone to a 1-mile by 2-mile area, and dug ditches to contain released vinyl chloride liquid while it vaporized and burned.

259.    Of particular concern were the tank cars "exposed to fire" that contained over 115,000 gallons of vinyl chloride. Vinyl chloride is a flammable petrochemical used in the manufacture of polymer polyvinyl chloride ("PVC") – a common plastic used to make PVC pipe that can be found in most local hardware stores. Vinyl chloride has a boiling point of 7.88 degrees Fahrenheit and, when exposed to heat, can undergo a rapid polymerization reaction that can pose an explosion hazard. Heightening the risks, vinyl chloride is classified by the U.S. Center for Disease Control ("CDC") as a carcinogen (linked to causing liver cancers), with the U.S. Consumer Product Safety Commission ("CPSC") having banned its use in household aerosol spray cans in 1974. The CDC notes that "the lowest levels [of vinyl chloride] that produce liver change, nerve damage, and alterations in immunity in people are not known."

260.    When burned, vinyl chloride becomes hydrogen chloride and phosgene (a deadly gas). Kimberly Garrett, an environmental toxicologist from Northeastern University, told Newsweek that phosgene is likely the chemical that officials were most worried about, stating: "It disrupts the interaction between the lungs and the bloodstream. It makes it so oxygen can't get into the blood and carbon dioxide can't get out." When hydrogen chloride dissolves in water, it becomes hydrochloric acid potentially forming a component of acid rain.

261.    On February 6, 2023, responders engaged in a controlled detonation and burn of the vinyl chloride, spewing massive volumes of chemicals into the vicinity, as reflected in the following photograph:



262.    The chemicals released from the derailment entered the air and water of the surrounding residential areas, the closest of which were only 1,000 feet from the site of the accident. The plume of smoke from the inferno was reportedly thousands of feet high and visible for miles. Reports cited thousands of dead fish, chemical slicks in the water, and chemical odors in the air around the blast site.

263.    On February 8, 2023, Governor DeWine's evacuation order was lifted, permitting the local population to return. Governor DeWine also stated that Norfolk Southern was "the one[] who created the problem. It's their liability. They're the ones who ought to pay for it." Following their return, numerous residents reported hazardous air quality and other health and environmental concerns.

a.    **Regulators Begin Investigating the East Palestine Incident and File Suit**

264.    On February 13, 2023, the EPA stated that it had concluded that Norfolk Southern may be responsible for the cleanup costs of the derailment site or the costs incurred by the EPA for area cleanup.

265.    On February 21, 2023, the EPA issued a unilateral administrative order requiring Norfolk Southern to pay for all cleanup actions at the site. EPA Administrator Michael Regan said at a press conference that day in East Palestine that the agency was using its power under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") to force the Company to act. "Norfolk Southern will pay for cleaning up the mess that they created and for the trauma that they've inflicted on this community," Regan said. "If the company fails to complete any actions as ordered by EPA, the Agency will immediately step in, conduct the necessary work, and then force Norfolk Southern to pay triple the cost."

266.    As part of the order, Regan stated that Norfolk Southern must do the following:

- Identify and remove all contaminated soil and water from the area;

- Safely transport and dispose of contaminated soil and water properly as defined by EPA specifications;

- Reimburse the EPA for any cleanup services the agency offers affected residents and businesses; and

- Attend and participate in public meetings at the EPA's request while maintaining full transparency with the public.

267.    Also appearing at the press conference were Governor DeWine and Pennsylvania Governor Josh Shapiro, both of whom confirmed the need to hold Norfolk Southern accountable and help the people impacted in both states. DeWine said Norfolk Southern should be responsible

for paying all damages caused by the derailment, including by compensating residents for health issues caused by the derailment. He stated: "The railroad needs to pay for anything that they caused, [and] anything that they did." Shapiro was particularly critical of the Company, stating: "They chose not to participate in the unified command. They gave us inaccurate information and conflicting modeling data, and they refused to explore or articulate alternative courses of action when we were dealing with the derailment in the early days." Shapiro added that his office has made a criminal referral to the Pennsylvania Attorney General's office.

268.    In a statement to CNN, Norfolk Southern responded to the EPA's announcement, stating: "We recognize that we have a responsibility, and we have committed to doing what's right for the residents of East Palestine." Norfolk Southern continued: "We have been paying for the clean-up activities to date and will continue to do so. We are committed to thoroughly and safely cleaning the site, and we are reimbursing the residents for the disruption this has caused in their lives."

269.    On February 23, 2023, the NTSB issued a preliminary report regarding the derailment.  Detailing the report at a Washington, D.C. news conference, NTSB Chairwoman Jennifer Homendy said, "I can tell you this much: This was 100% preventable. We call things 'accidents.' There is no accident. . . . We know what happened: A wheel bearing failed."

270.    On Saturday, March 4, 2023, another Norfolk Southern freight train derailed near Springfield, Ohio. About 20 of the train's 212 cars derailed but officials said no hazardous materials spilled and no injuries were reported, further revealing the extent of Norfolk Southern's safety lapses.  According to Norfolk Southern, this derailment could have been caused by loose wheels on the train car.

271.    On March 7, 2023, the NTSB announced that it had opened a special investigation into safety practices at Norfolk Southern because the Company had suffered five significant accidents since December 2021. Three of the five accidents resulted in the deaths of Company employees. The investigation was to focus on Norfolk Southern and its "safety culture," the NTSB said. "Given the number and significance of recent Norfolk Southern accidents, the NTSB also urges the company to take immediate action today to review and assess its safety practices, with the input of employees and others, and implement necessary changes to improve safety."

272.    On March 9, 2023, a Norfolk Southern train derailed in Alabama involving 37 train cars.  Although a spokesperson for the Company confirmed that none of the train cars were carrying hazardous materials, two of the cars are considered "residue" cars because they previously contained hazardous materials.  However, these residue cars were not compromised as a result of the derailment.

273.    On March 14, 2023, Ohio Attorney General Dave Yost filed a complaint against Norfolk Southern alleging trespass, nuisance, negligence, open dumping, and water and discharge violations in connection with a series of Norfolk Southern train derailments, including the derailments in East Palestine, Ohio and Springfield, Ohio.

274.    On August 2, 2023, the U.S. Department of Labor's Occupational Safety and Health Administration department (OSHA) found four violations and imposed $49,111 in penalties after conducting enforcement inspections to assess the union's concerns for the health of workers rebuilding tracks and conducting clean-up operations near the derailment site.  OSHA's enforcement inspections began as soon as March 2, 2023.

275.     On or about August 9, 2023, Norfolk Southern entered into a settlement agreement with OSHA and the Brotherhood of Maintenance of Way Employees Division-International Brotherhood of Teamsters.

### b.     FRA's Safety Assessment of Norfolk Southern

276.     On March 7, 2023, after a series of additional derailments after the East Palestine Incident and the death of one Norfolk Southern employee, the Department of Transportation and FRA announced a plan for the FRA to conduct a Safety Assessment of the Company. In August 2023, the FRA released a Safety Assessment of Norfolk Southern. This assessment included a review of operational elements and an evaluation of Norfolk Southern's overall safety culture.

277.     The Safety Assessment notes that within the past five years, Norfolk Southern has undergone significant organizational and operational changes. For example, the Safety Assessment noted that in January 2021 the Company's operational structure was reorganized and consolidated from nine divisions down to six divisions.  It also pointed to the fact that Norfolk Southern began to operate increasingly longer trains.

278.     After pointing to these organizational and operational changes, the FRA's Safety Assessment suggests that these changes resulted in an increase in train accidents.  Specifically, the Safety Assessment found that between 2018 and 2022, Norfolk Southern's rate of accidents per million train miles rose faster than any other Class I railroad:



279.    The Safety Assessment explicitly states that the FRA is "considering enforcement actions against [Norfolk Southern]" for "non-compliance with safety regulations." Further, the FRA identified, among other things, four cross-cutting safety culture findings: (1) Norfolk Southern communications are not always open and effective and require improvement; (2) Norfolk Southern employees and the organization do not always work to foster mutual trust; (3) Norfolk Southern training and resources are not always effective at supporting safety efforts; and (4) Norfolk Southern is frequently focused on enforcing compliance with minimum safety standards.

280.    As to the third finding, the Safety Assessment notes that: (1) Norfolk Southern's "13-day conductor classroom training window is markedly insufficient, failing to meet the complex demands of Class I freight railroad operations[;]" (2) Norfolk Southern's on-the-job ("OJT") field training "is deficient in structure, consistency, and oversight, leading to a heightened risk of trainees acquiring unsafe work practices[;]" and (3) Norfolk Southern "has neglected FRA's training regulations by designating 'qualified instructors' without seeking concurrence or nonconcurrence from designated employee representatives."

281.    As to the last finding, the Safety Assessment notes that the FRA's report on the 2022 NS System Audit, published on July 2022, identified 21 safety-related findings, and contains

25 recommendations for improvement across all disciplines. However, the Safety Assessment also notes that Norfolk Southern responded on February 1, 2023 (two days before the East Palestine Incident), indicating that there where recommendations that exceeded the minimum regulatory requirements and that the Company would take no further action on those recommendations.

282.    The Safety Assessment also analyzed the Company's ATC Desk.  In doing so, the FRA took note of the fact that the desk operates 24/7 and is continuously staffed by one employee working 12-hour shifts. Moreover, the FRA emphasized the fact that the one employee staffing the ATC Desk was responsible for monitoring Norfolk Southern's system of approximately 1,200 mechanical wayside detectors spread over its 19,500-mile network, such as, looking for trending data, addressing alarms when they occur and conducting research of records to determine steps to follow after an alert is received, while handling other supervisory responsibilities, including being the primary point of contact for Train and Engine Service ("T&E") crews experiencing mechanical issues. In doing so, the FRA found that there was a "risk of delays or disruptions due to having only a single employee working the ATC desk," including the "lack of redundancy and coverage gaps during employee breaks."

283.    The FRA also found that the Company's process for handling, analyzing, and reacting to the data in the wayside detector reports by the ATC desk "demonstrated a significant lack of standardizations and consistency, directly contributing to data not being received by the personnel responsible for addressing the issues identified." In addition, the FRA noted that "communication between the ATC desk and dispatchers was primarily via e-mail and as a result, FRA observed communication gaps, potentially allowing for delayed feedback and impeding issue resolution."

284.    Further, the FRA found that Norfolk Southern's processes showed a lack of escalation for unanswered calls to the ATC Desk from the dispatch floor. As explained in the Safety Assessment, when a critical alarm is received and after contacting the affected train crew, the ATC Desk communications with the dispatch center primarily via email. The Safety Assessment noted that the "FRA witnessed dispatchers who were unfamiliar with detector locations and types" and found a "lack[] [of] a standardized turnover process."

### c.    Norfolk Southern Announces a Six-Part Plan to Improve Operational Safety

285.    On Monday, March 6, 2023, the Company announced a six-part plan to improve operational safety that included, *inter alia*, adding about 200 temperature sensors along its tracks where existing sensors are at least 15 miles apart, reviewing the temperature levels that set off alarms for train crews, and adding more acoustic sensors that analyze vibrations for potential problems.

286.    Specifically, the Company claimed that they are working with manufacturers to accelerate the deployment of multi-scan hot-bearing detectors. These scans, as Norfolk Southern explained, can scan a greater cross-section of a railcar's bearings and wheels. The Company also noted that it would conduct a comprehensive review of standards and practices for the use of hot-bearing detectors. One of the revisions proposed by Norfolk Southern in this regard is to reevaluate the temperature threshold at which an alarm is triggered.

287.    In addition, Norfolk Southern stated that the Company wants to speed up the deployment of acoustic bearing detectors. These detectors analyze the acoustic signature of vibration inside the axle and can identify potential problems that a visual inspection could not.

288.     The last point mentioned in Norfolk Southern's six-part plan was that the Company joined the Federal Railroad Administration's Confidential Close Call Reporting System. This system encourages workers to speak up when they see something that is unsafe.

       **2.**    **Testimony from Congressional and NTSB Hearings Confirm that Norfolk Southern's Safety Practices Were Deficient**

289.     Testimony before the U.S. Senate's Environment and Public Works Committee and the NTSB confirms that Norfolk Southern's operational safety was deficient as a result of cost cutting measures that led to cutting corners in order to complete safety related tasks with less employees prior to and/or during the offerings. For example, an official from the Transportation Communications Union (the "TCU") testified that Norfolk Southern was "one of the worst offenders" with respect to safety:

> In a nutshell, not great.  It's not great really across the industry, but Norfolk Southern, in particular, has been pretty bad for a while.  It's hard to really give them all a relative grade to each other, but I'd probably say Norfolk Southern is one of the worst offenders in some respects. . .

290.     Part 215 of the Railroad Freight Car Safety (RFCS) governs the mechanical standards for freight cars and further provides for the standards of frequency of the inspection thereof.  It also provides for the requisite qualifications of those permitted to conduct mechanical inspections, referred to in the industry as carmen. As explained by the TCU official, the inspection under the RFCS requires a 90-point of inspection per each side of a car, including inspection of safety appliances such as handbrakes, rails, and handholds for crew members.

291.     According to post-Offering statements from the TCU official, the pre-PSR standard inspection time per train car used to be an average inspection of three minutes per train car. However, as a result of the pre-Offering implementation of PSR, which dramatically increased train length and tightened travel schedules, inspectors must do these a full car inspection (both

sides) in one minute or less. To illustrate just how insufficient this timeframe is, the average train car is 100 feet, meaning the inspector must traverse 200 plus feet and to check the 90 points of interest on either side. This equates to three points of inspection and over three feet per second, repeated *ad seriatum* without pause, for each train car.

292.    After the Offerings, the TCU official explained that such negligence was reliant on the abuse of a loophole in Section 215 of the RFCS. Specifically, that only a minimum predeparture inspection is required when there is no qualified inspector on duty at the relevant location.[14]  This enabled Norfolk Southern to systematically replace their qualified carmen with utility workers or too even mandate overworked traincrews complete their own inspections.  Ultimately, such inspections amounted to nothing more than abbreviated spot checks and performative compliance.

293.    The thrust of this limited exception was intended to avoid "terminal dwell," which for a single car is the total time, in hours, that a car spent in a given terminal awaiting movement towards its destination. Cleary, however, the intent was such exception be invoked in rare circumstances, not to endorse perfunctory inspections as the norm.

294.    As a result of this manipulation, Norfolk Southern trains could run for tens of thousands of miles before receiving a mechanical inspection.

295.    Furthermore, the testimony of Defendant Shaw before the NTSB and the U.S. Senate confirms that Norfolk Southern's safety practices were deficient at the time of the

---

[14] Appendix D to Part 215 provides that: "At each location where a freight car is placed in a train and a person designated under § 215.11 is not on duty for the purpose of inspecting freight cars, the freight car shall, as a minimum, be inspected for the imminently hazardous conditions listed below that are likely to cause an accident or casualty before the train arrives at its destination. These conditions are readily discoverable by a train crew member in the course of a customary inspection."

Offerings. Specifically, on May 4, 2023, Defendant Shaw testified that he knew about safety concerns within Norfolk Southern's operations during a hearing before the NTSB, stating:

> Q. Yeah. And they're linking it to PSR and then, since that time they're not feeling the same commitment towards safety. So that's their perception. Are you aware of their concerns and what's your overall thinking?
>
> A. Yeah, I'm aware of their concerns because I'm with our employees. I don't necessarily link it to PSR because our safety stats actually improved during PSR. But I know that not having enough crew members and working during COVID and not having enough supervisors created -- and frankly, not getting a raise while we were negotiating the deal created a lot of stress for our employees and I'm really empathetic to that, right, I understand it completely.
>
> *      *      *
>
> Q. Well, when they do express their concerns, does it make it up to your level or is it filtered by others? And once it's communicated, what's the response, you know, what's the process for responding to their concerns?
>
> A. Well, a lot of them will express their concerns directly to me, right? I'm approachable, I'm authentic, I'm out in the field a lot, I'm wearing jeans, right? The only time you see me in a tie is like in a Senate hearing.
>
> Q. Um-hum.
>
> A. And I'm in the crew rooms. And so they've got direct feedback or they got direct input to me, they got my phone number.
>
> *      *      *
>
> Q. [regarding carmen not having enough time to inspect cars] Yeah, I appreciate that, but -- so you yourself have not heard concerns expressed from labor about the -- not having enough employees to do it safely or not having enough time, you have not heard that concern expressed?
>
> A. Well, you know, you see stuff in newspaper articles, but you know, in my time in the field no one has come up to me and said that.

296.   Five days later, on March 9, 2023, Defendant Shaw testified before the U.S. Senate's Environment and Public Works Committee. In his testimony, Shaw apologized for the East Palestine Incident, and admitted some of the Company's safety failures. "It is clear the safety mechanisms in place were not enough," he said. Shaw further admitted that the Company had previously been focused solely on profits, not safety: "[W]e are going to move away from a near-term focus solely on profits, and … take a longer-term view[.]"

### 3.      Norfolk Southern's Operating Ratio Balloons Following Derailment

297.   In addition, the East Palestine Incident exposed the unsustainability of Norfolk Southern's TOP Initiative that relied on cutting costs and corners at the expense of the safety of its operations, as the Company's Operating Ratio *increased by 23%*. Specifically, Norfolk Southern's quarterly report on Form 10-Q for the quarter ended March 31, 2023, as filed with the SEC on April 26, 2023 (the "Q1 2023 10-Q"), reported an Operating Ratio of *77.3%* for the first quarter of 2023, which signified a 23% increase year-over-year (YoY) in comparison to the 62.8% Operating Ratio reported Company's Q1 2022 10-Q.

298.   In an attempt to downplay the spike in the Company's Operating Ratio, Norfolk Southern's Q1 2023 10-Q provided a "non-GAAP Reconciliation" for its first quarter 2023 that attributed 12.4% of the reported 77.3% Operating Ratio to the Eastern Palestine Incident. However, Norfolk Southern's Adjusted 2023 (non-GAAP) Operating Ratio was 64.9%, which still demonstrated a 3% YoY increase. That aside, the 12.4% increase to Norfolk Southern's Operating Ratio that was attributed to the Eastern Palestine Incident demonstrated how the Company's TOP Initiative was unsustainable.

299.   A costly train accident such as the Eastern Palestine Incident was inevitable as the Company went out of its way to cut costs and corners in order to obtain short term profits. As a result, Norfolk Southern's Operating Ratio was a record high for over a decade.

300.    Not only did Norfolk Southern's Operating Ratio increase to record high levels in Q1 2023, but the Company continued to maintain this record high Operating Ratio for subsequent earnings quarters.

301.    On July 27, 2023, Norfolk Southern filed with the SEC a quarterly report on Form 10-Q for the quarter ended June 30, 2023 (the "Q2 2023 10-Q"), that reporting an Operating Ratio of **80.7%** for the second quarter of 2023, which signified a ***33% increase*** YoY in comparison to the 60.9% Operating Ratio reported Company's Q2 2022 10-Q.

302.    Similarly, on October 25, 2023 Norfolk Southern filed with the SEC a quarterly report on Form 10-Q for the quarter ended September 30, 2023 (the "Q3 2023 10-Q"), reporting an Operating Ratio of **74.6%** for the first quarter of 2023, which signified a ***20% increase*** YoY in comparison to the 62.0% Operating Ratio reported Company's Q3 2022 10-Q.

303.    As of the filing on the initial complaint in this Action, the market value of the Senior Notes declined as follows:

| Security | CUSIP | Maximum Offering Price | Par Value as of 05/16/2023 |
|---|---|---|---|
| 2.300% Senior Notes due 2031 | 655844CK2 | 99.849% | 83.62% |
| 4.100% Senior Notes due 2121 | 655844CJ5 | 99.737% | 68.05% |
| 2.900% Senior Notes due 2051 | 655844CL0 | 99.206% | 63.77% |
| 3.000% Senior Notes due 2032 | 655844CM8 | 99.999% | 96.84% |
| 3.700% Senior Notes due 2053 | 655844CN6 | 99.412% | 74.76% |
| 4.550% Senior Notes due 2053 | 655844CP1 | 99.985% | 86.93% |
| 4.450% Senior Notes due 2033 | 655844CQ9 | 99.650% | 96.84% |

304.    In dollar terms, damages pursuant to Section 11(e) of the Securities Act are greater than $800 million.

## VI.   CLASS ACTION ALLEGATIONS

305.    Lead Plaintiffs bring this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class consisting of all persons

and entities that purchased or otherwise acquired Norfolk Southern Senior Notes pursuant and/or traceable to the Offering Documents issued in connection with the Offerings, for violations of Sections 11 and 15 of the Securities Act, against all Defendants.

306.    Excluded from the Class are: (i) all Defendants; (ii) members of the immediate family of any defendant who is an individual; (iii) any person who was an officer, director, or control person of Norfolk Southern during the relevant period; (iv) any firm, trust, corporation, or other entity in which any defendant has or had a controlling interest; (v) Norfolk Southern's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person, in their capacities as such.

307.    The members of the Class are so numerous that joinder of all members is impracticable.  Norfolk Southern securities are actively traded.  While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there could be hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Norfolk Southern or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

308.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including:

     a)  Whether Defendants violated the Securities Act;

     b)  Whether Defendants omitted or misrepresented material facts, including whether the Offering Documents misrepresented and/or omitted material information in violation of the Securities Act; and

c)  The extent of damage sustained by Class members and the appropriate measure of damages.

309.    Lead Plaintiffs' claims are typical of those of the Class because Lead Plaintiffs and the Class sustained damages from Defendants' wrongful conduct.

310.    Lead Plaintiffs will adequately protect the Class's interests.  They have counsel experienced in securities class action litigation and its interests do not conflict with the Class's interests.

311.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## VII.    CLAIMS FOR RELIEF UNDER THE SECURITIES ACT

### COUNT I

**For Violation of Section 11 of the Securities Act Against Norfolk Southern, the Individual Defendants, and the Underwriter Defendants**

312.    Lead Plaintiffs repeat, incorporate, and realleges each and every allegation set forth above as if fully set forth herein.

313.    This cause of action is brought under §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against Norfolk Southern, each of the Individual Defendants, and each of the Underwriter Defendants.

314.    This cause of action does not sound in fraud. Lead Plaintiffs do not claim that any of the Defendants committed intentional or reckless misconduct or that any of the Defendants acted with scienter or fraudulent intent. This cause of action is based solely on strict liability as to

Norfolk Southern and negligence as to the remaining Defendants. Lead Plaintiffs expressly disclaim any allegations of scienter or fraudulent intent in these non-fraud claims except that any challenged statements of opinion or belief made in connection with the Offerings are alleged to have been materially misstated statements of opinion or belief when made.

315.    The Registration Statement, which includes the prospectus supplements for each of the Offerings, issued in connection with the Offerings was inaccurate and misleading, contained untrue statements of material fact, omitted facts necessary to render statements therein not misleading, and omitted to state material facts required to be stated therein.

316.    Norfolk Southern is the registrant and issuer of the Senior Notes pursuant to the Registration Statement. As such, in connection with each of the Offerings, Norfolk Southern is strictly liable for the materially inaccurate statements contained in the Offering Documents and the failure of the Offering Documents to be complete and accurate. By virtue of the Offering Documents containing material misrepresentations and omissions of material fact necessary to make the statements therein not false and misleading, Norfolk Southern is liable under Section 11 of the Securities Act to Lead Plaintiffs and the Class.

317.    None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were true and without omissions of any material facts and were not misleading.

318.    The Individual Defendants either signed the Registration Statement and caused its issuance and/or were a Director of Norfolk Southern at the time of one or more of the Offerings. The Individual Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Offering Documents. They each had a duty to ensure that such statements were true and accurate and that there were no omissions of

material fact that would make the statements misleading. By virtue of each of the Individual Defendants' failure to exercise reasonable care, the Offering Documents contained misrepresentations of material facts and omissions of material facts necessary to make the statements therein not misleading. As such, each of the Individual Defendants is liable under Section 11 of the Securities Act to Lead Plaintiffs and the Class for any Offering for which they signed the Registration Statement and/or for any Offering that occurred while they were a Director at Norfolk Southern.

319.    Each of the Underwriter Defendants served as the underwriters for one or more of the Offerings and qualify as such according to the definition contained in Section 2(a)(11) of the Securities Act, 15 U.S.C. § 77b(a)(11). As such, they participated in the solicitation, offering, and sale of the securities to the investing public pursuant to the Offering Documents. Each of the Underwriter Defendants, as an underwriter of the securities offered in one or more of the Offerings pursuant to the Registration Statement, had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement. They each had a duty to ensure that such statements were true and accurate and that there were no omissions of material fact that would make the statements misleading. By virtue of each of the Underwriter Defendants' failure to exercise reasonable care, the Registration Statement contained misrepresentations of material facts and omissions of material facts necessary to make the statements therein not misleading. As such, each of the Underwriter Defendants is liable under Section 11 of the Securities Act to Lead Plaintiffs and the Class for any Offering for which they served as an underwriter.

320.    None of the untrue statements or omissions of material fact in the Offering Documents alleged herein was a forward-looking statement. Rather, each such statement

concerned existing facts. Moreover, the Offering Documents did not properly identify any of the untrue statements as forward-looking statements and did not disclose information that undermined the putative validity of those statements.

321.     Each of the Defendants named in this cause of action issued, caused to be issued, and participated in the issuance of materially untrue and misleading written statements to the investing public that were contained in the Registration Statement, which misrepresented and failed to disclose, *inter alia*, the facts set forth above. By reasons of the conduct herein alleged, each such Defendant violated Section 11 of the Securities Act.

322.     Lead Plaintiffs and the Class have sustained damages. The value of Norfolk Southern Senior Notes has declined substantially subsequent to and due to violations by the Defendants named in this cause of action.

323.     At the time of their purchases of Norfolk Southern Senior Notes, Lead Plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures alleged herein. Less than one year has elapsed from the time that Lead Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based and the time that this action was commenced. Less than three years have elapsed between the time that the securities upon which this cause of action is brought were offered to the public and the time that this action was commenced.

## COUNT II

**For Violation of Section 15 of the Securities Act Against the Individual Defendants**

324.     Lead Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

325.    This cause of action is brought under §15 of the Securities Act, 15 U.S.C. §77o, on behalf of the Class, against the Individual Defendants.

326.    This cause of action does not sound in fraud.  Lead Plaintiffs do not allege that any of the Individual Defendants committed intentional or reckless misconduct or that any of the Individual Defendants acted with scienter or fraudulent intent, which are not elements of a Section 15 claim.  This cause of action is based solely on strict liability and/or negligence.  Lead Plaintiffs expressly disclaim any allegations of scienter or fraudulent intent in these non-fraud claims except that any challenged statements of opinion or belief made in connection with the Offerings are alleged to have been materially misstated statements of opinion or belief when made.

327.    The Individual Defendants were each control persons of Norfolk Southern by virtue of their positions as directors and/or senior officers of the Company.  They each had a series of direct and/or indirect business and/or personal relationships with other directors, officers, and/or major shareholders of the Company.

328.    Each of the Individual Defendants participated in the preparation and dissemination of the Offering Documents, and otherwise participated in the process necessary to conduct the Offerings.  Because of their positions of control and authority as senior officers and/or directors each of the Individual Defendants were able to, and did, control the contents of the Offering Documents, which contained materially untrue information or omitted material information required to be disclosed to prevent the statements made therein from being misleading.

329.    As control persons of Norfolk Southern, each of the Individual Defendants are liable jointly and severally with and to the same extent as Norfolk Southern for its violation of Section 11 of the Securities Act.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs, individually and on behalf of the proposed Class, respectfully pray for judgment against Defendants as follows:

A.      Determining that this action is a proper class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure;

B.      Awarding Lead Plaintiffs and the Class all damages and other remedies set forth in the Securities Act in favor of Lead Plaintiffs and other Class members against all Defendants, jointly and severally, in an amount to be proven at trial, including interest thereon;

C.      Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including, but not limited to, attorneys' fees, accountants' fees, and expert fees, and all other costs and disbursements; and

D.      Awarding Lead Plaintiffs and the Class such other relief as the Court deems just and proper.

## IX.   JURY DEMAND

Lead Plaintiffs demand a trial by jury.

DATED: December 4, 2023

**LABATON SUCHAROW LLP**

*/s/ Alfred L. Fatale III*

Alfred L. Fatale III
Guillaume Buell
Charles Wood
Charles J. Stiene
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
afatale@labaton.com
gbuell@labaton.com
cwood@labaton.com

cstiene@labaton.com

*Attorneys for Lead Plaintiffs*

**ASHERKELLY, ATTORNEYS AT LAW**

Cynthia Billings-Dunn (*pro hac vice* forthcoming)
25800 Northwestern Highway, Suite 1100
Southfield, Michigan 48075
Telephone: (248) 746-2747
cbdunn@asherkellylaw.com

*Additional Counsel for Lead Plaintiff City of Pontiac Reestablished General Employees' Retirement System*