UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE NORFOLK SOUTHERN CORPORATION
BOND/NOTE SECURITIES LITIGATION

CIVIL ACTION NO. 23 Civ. 4068 (LAK) (SLC)

**REPORT AND RECOMMENDATION**

**SARAH L. CAVE**, United States Magistrate Judge.

**TO THE HONORABLE LEWIS A. KAPLAN**, United States District Judge:

## I. INTRODUCTION

This putative class action concerns purchases of Defendant Norfolk Southern Corporation ("Norfolk Southern") senior notes, the market value of which allegedly declined following the February 2023 train derailment in East Palestine, Ohio. (ECF No. 105 (the "Amended Complaint")). Plaintiffs assert claims under Sections 11 and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77o (the "Act"). (ECF No. 105 ¶¶ 1–2, 16). Before the Court is the Norfolk Southern Defendants'[1] motion under Federal Rule of Civil Procedure 12(b)(6) to dismiss the Amended Complaint for failure to state a claim on which relief may be granted. (ECF No. 112 (the "Motion")).[2] For the reasons that follow, the Court respectfully recommends that the Motion be GRANTED IN PART and DENIED IN PART.

---

[1] See § II.A.1.b, infra.
[2] The Underwriter Defendants (see n.5, infra), join the Motion. (ECF Nos. 117; 128).

## II. <u>BACKGROUND</u>

### A. <u>Factual Background</u>

#### 1. <u>The Parties</u>

##### a. <u>Plaintiffs</u>

Ohio Carpenters' Pension Fund ("Ohio Carpenters") and City of Pontiac Reestablished General Employees' Retirement System ("Pontiac General," with Ohio Carpenters, "Plaintiffs") assert claims under Sections 11 and 15 of the Act on behalf of a putative class of purchasers (the "Class") of senior notes (the "Senior Notes") issued by Norfolk Southern pursuant to a February 4, 2021 shelf registration statement on SEC Form S-3 (the "Registration Statement") in seven offerings between May 3, 2021 and January 26, 2023 (the "Offerings").[3] (ECF No. 105 ¶ 1). Class members' purchases were traceable to a set of documents for each Offering, including the Registration Statement, related prospectus supplements, and the documents incorporated by reference (the "Offering Documents"). (<u>Id.</u> ¶ 2 & n.3).

---

[3] The Offerings were: (1) the May 3, 2021 offering of 2.300% senior notes due 2031 in the amount of $500 million; (2) the May 3, 2021 offering of 4.100% senior notes due 2121 in the amount of $600 million; (3) the August 16, 2021 offering of 2.900% senior notes due 2051 in the amount of $600 million; (4) the February 15, 2022 offering of 3.000% senior notes due 2032 in the amount of $600 million; (5) the February 15, 2022 offering of 3.700% senior notes due 2053 in the amount of $400 million; (6) the June 2, 2022 offering of 4.550% senior notes due 2053 in the amount of $750 million; and (7) the January 26, 2023 offering of 4.450% senior notes due 2033 in the amount of $500 million. (ECF No. 105 ¶ 1). Although the Amended Complaint does not propose a class period, from the dates of the Offerings the Court employs, for purposes of the Motion, an estimated class period of May 3, 2021 to January 26, 2023 (the "Class Period"), without prejudice to Plaintiffs' ability to propose, and Defendants' right to object to, a different period in connection with any motion for class certification.

### b.  **Defendants**

Norfolk Southern, a Virginia corporation headquartered in Georgia, is a Class I railroad[4] "and one of the largest freight railroad companies in the United States."  (ECF No. 105 ¶¶ 5, 22, 62).  Also named are several individuals who served as executives and/or directors of Norfolk Southern (the "Individual Defendants," with Norfolk Southern, the "Norfolk Southern Defendants")),[5] and several securities firms that underwrote one or more of the Offerings (the "Underwriter Defendants").[6]

### 2.  **Substantive Allegations**[7]

### a.  **Norfolk Southern's Operations**

Norfolk Southern and its subsidiaries engage "in the rail transportation of raw materials, intermediate products, and finished goods in the Southeast, East, and Midwest" regions of the

---

[4] As a Class I railroad, Norfolk Southern is one of the seven "largest in the industry and has an operating revenue of $490 million or more," adjusted annually for inflation.  (ECF No. 105 ¶ 62 n.6).

[5] The Individual Defendants are: Alan H. Shaw; James A. Squires; Mark R. George; Clyde H. Allison, Jr.; Thomas D. Bell, Jr.; Mitchell E. Daniels, Jr.; Marcela E. Donadio; John C. Huffard, Jr.; Christopher T. Jones; Thomas C. Kelleher; Steven F. Leer; Michael D. Lockhart; Amy E. Miles; Claude Mongeau; Jennifer F. Scanlon; and John R. Thompson.  (ECF No. 105 ¶¶ 23–38).

[6] The Underwriter Defendants are: BofA Securities, Inc.; Morgan Stanley & Co., LLC; Wells Fargo Securities, LLC; Capital One Securities, Inc.; Fifth Third Securities, Inc.; MUFG Securities Americas Inc.; PNC Capital Markets LLC; Siebert Williams Shank & Co., LLC; SMBC Nikko Securities America, Inc.; Citigroup Global Markets Inc.; Goldman Sachs & Co. LLC; and U.S. Bancorp Investments, Inc.  (ECF No. 105 ¶¶ 41–52).

[7] At Defendants' request and without objection from Plaintiffs, the Court's summary of substantive allegations is derived from the Amended Complaint, documents it incorporates by reference, and documents the existence of which the Court may take judicial notice, including SEC filings, public testimony before government entities, information published on government databases, and public reports.  (ECF Nos. 114; 121 at 34 n.19; 132 at 42).  See Muller-Paisner v. TIAA, 289 F. App'x 461, 466 n.5 (2d Cir. 2008) (summary order) (explaining that "congressional testimony is an appropriate subject for judicial notice as a public record for the fact that the statements were made"); Johnson v. Rockland Cnty. BOCES, No. 21 Civ. 3375 (KMK), 2022 WL 4538452, at *18 n.14 (S.D.N.Y. Sept. 28, 2022) (taking judicial notice of data on federal government website); In re Optionable Sec. Litig., 577 F. Supp. 2d 681, 688 (S.D.N.Y. 2008) (in deciding motion to dismiss, considering documents incorporated by reference in complaint or which were amenable to judicial notice); Fed. R. Evid. 201 (permitting judicial notice of statistics and information on official government website).

United States.  (ECF No. 105 ¶ 63).  Norfolk Southern operates on over 30,000 miles of track, 28,000 of which it is responsible for maintaining.  (Id. ¶ 64).  By law, Norfolk Southern may not refuse a reasonable request for transportation, including of hazardous materials. See 49 U.S.C. § 11101(a).

Norfolk Southern's public filings for the fiscal year ended December 31, 2020 and December 31, 2021 disclosed the risks of transporting hazardous materials:

> **As a common carrier by rail, we must offer to transport hazardous materials, regardless of risk.**  Transportation of certain hazardous materials could create catastrophic losses in terms of personal injury and property (including environmental) damage and compromise critical parts of our rail network.  The costs of a catastrophic rail accident involving hazardous materials could exceed our insurance coverage. . . .

(ECF No. 113-1 at 13; see id. at 14 ("A catastrophic rail accident, whether on our lines or another carrier's, involving any or all of [sic] release of hazardous materials, freight loss, property damage, personal injury, and environmental liability could compromise critical parts of our rail network" and related losses could "result[] in a material adverse effect on our liquidity."); ECF No. 113-2 at 11, 13 (including similar disclosures for year ended Dec. 31, 2021)).  Norfolk Southern explained that, as required by Congress, it had implemented a positive train control system ("PTC"), which was "designed to prevent train-to-train collisions, speed-related derailments, and certain other accidents caused by human error," on 8,000 of its 19,300 route miles, but noted that PTC "will not prevent all types of train accidents or incidents."  (ECF No. 113-1 at 12; see ECF No. 113-2 at 10 (same)).  Norfolk Southern also disclosed that it was:

> subject to extensive federal and state environmental laws and regulations concerning, among other things, . . . handling, storage, transportation, and disposal of waste and other materials; and, the cleanup of hazardous material or petroleum releases.  The risk of incurring environmental liability, for acts and omissions, past, present, and future, is inherent in the railroad business. . . .

[L]awsuits and claims involving other unidentified environmental sites and matters are likely to arise from time to time.

(ECF No. 113-1 at 12–13; see ECF No. 113-2 at 10–11 (same)).

### b.  The TOP Initiative

In 2019, Norfolk Southern announced a new business strategy called TOP21,[8] which involved the use of precision scheduled railroading ("PSR") to "materially reduce operating costs through purportedly hyper-efficient operational changes including" staff reductions, longer and heavier trains, and reductions in costly assets, e.g., locomotives. (ECF No. 105 ¶¶ 5, 65). In 2022, Norfolk Southern announced the "next generation" of an operating plan based on PSR, "TOP SPG[,]" which also "focus[ed] on customer service and growth." (Id. ¶¶ 5 & n.5, 67). The Amended Complaint refers to TOP21, TOP SPG, and Norfolk Southern's other PSR-based operating plans as the TOP Initiative. (Id. ¶ 5 & n.5). Norfolk Southern's "Operating Ratio" was a "key metric to gauge the progress of the implementation of the TOP Initiative[.]" (Id. ¶ 66). As part of the TOP Initiative, Norfolk Southern set a goal of reducing its Operating Ratio from 65% in 2019 to 60% in 2021. (Id. ¶ 66). In addition, Norfolk Southern modified its executive compensation structure to tie annual incentive awards to Operating Ratio. (Id. ¶¶ 79–81).

Staffing reductions were one element of the TOP Initiative. (ECF No. 105 ¶¶ 5, 65, 69). Norfolk Southern cut its employee headcount by 30%, from an average of 27,000 in 2017 to 19,000 in 2022. (Id. ¶ 69). For example, Norfolk Southern reduced the headcount on the Advanced Train Control Desk ("ATC Desk"), from multiple people "to a single employee." (Id. ¶¶ 70–71). The ATC Desk is responsible for monitoring and prioritizing hundreds of urgent

---

[8] TOP is an acronym for Thoroughbred Operation Plan. (ECF No. 105 ¶ 5 n.4).

alerts and conducting inspections and research.  (Id. ¶ 70).  Because the ATC Desk is "critical to the early detection of potential train derailments," these reductions "placed more responsibility on the Company's remaining employees who were forced to work longer hours with less rest." (Id. ¶¶ 70–71, 74).  These working conditions "resulted in larger turnover[,]" and Norfolk Southern's training programs for new employees, such as a "six-week cram course" for conductors, were "inadequate."  (Id. ¶ 75).  On September 9, 2021, the Federal Railroad Administration ("FRA") notified Norfolk Southern that its engineer and conductor training program "was not in conformance with 49 CFR Part 242."  (Id. ¶ 77).[9]  The FRA's 2022 audit did not, however, contain a similar finding.  (See ECF No. 113-7).

The Amended Complaint alleges that, although "TOP21 appeared strategically sound" to investors, it resulted in "miles long trains [] being run by a single hand-count's worth of over-levered, exhausted employees[,]" and led to Norfolk Southern "abus[ing] regulatory loopholes to avoid inspecting trains mid-journey and advanc[ing] a toxic culture of mandatory corner cutting and rug sweeping."  (ECF No. 105 ¶ 6).  Thus, the Amended Complaint maintains, "any lauded decrease in Norfolk Southern's Operating Ratio" in the Offering Documents failed to disclose the "increased risk of derailments and train accidents" as evidenced by the fact that its "rate of accidents per million train miles rose faster than any other Class I railroad[.]"  (Id. ¶¶ 6, 278).

---

[9] 49 CFR Part 242 "prescribes minimum Federal safety standards for the eligibility, training, testing, certification and monitoring of all conductors to whom it applies[,]" 49 C.F.R. § 242.1(b), and its "purpose . . . is to ensure that only those persons who meet minimum Federal safety standards serve as conductors, to reduce the rate and number of accidents and incidents and to improve railroad safety."  Id. § 242.1(a).

### c. Former Employees' Statements

The Amended Complaint relies on information from seven former Norfolk Southern employees (the "FEs"). (ECF No. 105 ¶¶ 82–188). FE-1, a locomotive engineer and conductor from September 2005 to February 2022 at Louisville, Danville, and Somerset, explained that safety issues "definitely got worse" after Norfolk Southern implemented the PSR strategy. (Id. ¶¶ 82–83, 92). He "recalled pressure to get things done and to meet deadlines even at the expense of safety." (Id. ¶ 89). He was told to depart a terminal "prematurely," i.e., before air pressure was adequate, which "can negatively impact a train's ability to stop" or indicate "another underlying problem." (Id. ¶¶ 92–93). FE-1 said that "being held at Away From Home Terminals ('AFHT') for more than 24 hours . . . was a common experience" that "contributed to fatigue and exhaustion." (Id. ¶ 95). He was aware of an instance when a new employee, "who had been trained by inexperienced employees, died during a routine event." (Id. ¶ 96).

FE-2 worked for Norfolk Southern in St. Louis for over a decade, until October 2021, in several roles including carman, terminal operations manager, and director of intermodal operations. (ECF No. 105 ¶ 99). During his tenure, the number of carmen decreased from over 100 to less than 20 after the introduction of PSR, the closing of three yards, injuries, and retirements. (Id. ¶¶ 100, 105). FE-2 observed "bad order tags"—which signified when a car needed to be sent for repair—being removed so that cars could be returned to service. (Id. ¶¶ 107–10). Although safety had previously been Norfolk Southern "number one" priority, FE-2 believed that the adoption of the "PSR program moved shareholders to the number one priority, while safety slipped to fifth or sixth." (Id. ¶¶ 111–13).

FE-3 was a terminal train master in Chattanooga from May 2008 to February 2022. (ECF No. 105 ¶ 114).  He found that "exhaustion was created on the 'management side[,]'" which offered "no structure" for off days.  (Id. ¶ 115).  He described not bringing "issues of exhaustion and suggestions for altering practices" as a "forbidden rule."  (Id. ¶ 118).  FE-3 described the training program as a "cram course."  (Id. ¶ 119).

FE-4 was a freight conductor in Allentown from June 2022 until January 2023. (ECF No. 105 ¶ 120).   He described the "covering up" of FRA violations as "corruption." (Id. ¶ 121).  During his tenure, former Canadian railroaders,[10] rather than Norfolk Southern employees, trained conductors and engineers as a "cost cutting measure."  (Id. ¶ 121). He observed two serious injuries in the Allentown Yard.  (Id. ¶ 124).  While trains once had five or six employees, "while he was there that number was only two, a Conductor and an Engineer[,]" with the Conductor now responsible for multiple jobs requiring him to walk the length of "a two-to-three mile-long train" to assess mechanical issues.  (Id. ¶¶ 125–27).  He described working long hours with little rest.   (Id. ¶¶ 127–30).   FE-4 was aware that Norfolk Southern took "advantage of a loophole in regulations" to avoid "a full inspection . . . if Carmen were not available."  (Id. ¶ 132).  He observed that employee turnover was high, leading to "loss of institutional knowledge at the yards and on the trains."  (Id. ¶ 137).  He described "a hostile work environment between management and the unions," which resulted in "compromises that did not improve the quality of life for the workers" and a "fear of retribution" from other union members.  (Id. ¶ 138).

---

[10] The Court infers that "Canadian" refers to either Canadian National Railway or Canadian Pacific, two other Class I railroads referenced in the Amended Complaint.  (See ECF No. 105 ¶ 62 n.6).

FE-5 was a track supervisor, most recently in Elkhart, from July 2018 to January 2022. (ECF No. 105 ¶ 139). He viewed PSR as "more about speed" than "doing things the right way," which took longer. (ECF No. 105 ¶¶ 140–41). Although hump yards were supposed to be inspected every month, "they were lucky to be able to complete a full round of inspections in three months . . . due to [Norfolk Southern's] desire to continue running trains." (Id. ¶ 144). He explained that Norfolk Southern "did not inspect cars unless [they were] due for an inspection." (Id. ¶ 146). The engineering department declined from 30 employees when he started to 15 employees after the implementation of PSR. (Id. ¶¶ 149–51). He believed that "the issues at Norfolk Southern came from the tone at the top and pressure on every department to keep moving trains[.]" (Id. ¶ 153). The transportation department, which handled the movement of trains, "bullied" other departments. (Id. ¶ 154). FE-5 used "components not in accordance with regulations to make fixes[.]" (Id. ¶ 156). He found "that as more steps were skipped, and corners were cut, the trains and tracks became more prone to breaking[,]" such that "derailments occurred in the yard 'every day or every week.'" (Id. ¶ 157).

FE-6 held several roles in the locomotive shop in Bellevue for four years, until January 2020. (ECF No. 105 ¶ 162). He explained that, once PSR was implemented, "money was no longer available" for repairs or improving safety. (Id. ¶ 166). He observed "frequent" instances of employees being "forced by a supervisor to sign off" on a locomotive to leave the yard, or the supervisor signing off, which increased over time. (Id. ¶ 167). At daily safety meetings before each shift, employees reviewed slides containing train performance metrics, which "the bosses of the bosses in Bellevue[,]" the area manager, or employees in Atlanta used to issue directives about "how many trains they needed to get out." (Id. ¶ 169). FE-6 described "band-aid

locomotives" and felt "pressure from above to meet quotas for the number of trains out[,]" which "trickled down to lower employees." (Id. ¶¶ 174–75). Norfolk Southern hired "college graduates with engineering degrees" who "lacked any practical knowledge" or "railroad experience[.]" (Id. ¶¶ 176–77).

FE-7 was employed from July 2019 to March 2021 in a variety of roles, most recently as senior operations road supervisor for safe and efficient train performance of the Macon to Savannah territory. (ECF No. 105 ¶ 178). He said that managers like himself were "very careful" about submitting complaints about safety, for fear of termination. (Id. ¶ 179). He said that PSR provided "short-term" returns to show investors "but carried risks in the long term." (Id. ¶ 180). The layoffs and reductions in personnel from PSR "caused trains to be backed up and the under-manned crew contributed to insufficient checks." (Id.) He stated that "rails were not being properly inspected because there were not enough people to do them thoroughly." (Id. ¶ 181). Supervisors were expected to meet "implied" quotas for writing up employees. (Id. ¶ 182). He observed that fixes were done depending on how they "impacted the train schedule[,]" leading to "a ton of derailments[.]" (Id. ¶¶ 183–84). FE-7 believed that Norfolk Southern was "grimy from the top down" and "did not care about the safety of the crews or derailments[,] only [] about trains running on time." (Id. ¶ 186).

### d. Alleged Material Misstatements and Omissions

The Amended Complaint alleges that Defendants negligently prepared the Offering Documents, which contained untrue statements of fact, omitted materials facts necessary to make other statements within them not misleading, and failed to make disclosures required under the Act and its accompanying regulations. (ECF No. 105 ¶ 202). In particular, the Amended

Complaint alleges that "the Offering Documents were materially false and misleading in that they omitted [and] failed to disclose material adverse facts about the Company's increased risk-taking at the expense of reasonable and/or required safety precautions due to the Company's near-term focus on profits." (Id.) Defendants group the alleged material misstatements and omissions into the following three categories (ECF No. 115 at 16–18):[11]

### i. Commitment to and programs to improve safety

Plaintiffs challenge statements in the Offering Materials relating to Norfolk Southern's commitment to and programs to improve safety, including the following statements:

- "[C]apital spending and replacement programs are and have been designed to assure the ability to provide safe, efficient, and reliable rail transportation services."
- "We are dedicated to providing employees with a safe workplace and the knowledge and tools they need to work safely and return home safely every day. Our commitment to an injury-free workplace is illustrated by our "I am Coming Home" safety message, which is featured prominently in our yards, shops, and facilities and further reinforces the importance of working safely."
- "We provide a range of developmental programs, opportunities, skills, and resources for our employees to work safely and be successful in their careers. We provide hands-on training and simulation training designed to improve training effectiveness and safety outcomes."
- "Safety is a way of life at Norfolk Southern, extending beyond our rail operations and into the communities where we live and work."
- "We remain committed to protecting our employees and providing excellent transportation service products for our customers."
- "Safety is part of who we are. Safety is core to our business strategy and essential to achieving operational excellence."

(ECF No. 105 ¶¶ 208, 210–11, 218, 222, 225, 230, 238, 241, 243 (together the "Safety Statements")).

---

[11] Plaintiffs do not dispute Defendants' categorization of the alleged material misstatements and omissions in this manner. (See ECF No. 121 at 23–32).

## ii.    Financial and operational metrics

The second category of allegedly misleading statements involve Norfolk Southern's financial and operational metrics, such as operating expenses and accident data:

- "Income from railway operations rose in 2019 compared to 2018 as a 3% reduction in railway operating expenses more than offset the impact of a 1% decline in railway operating revenues."
- In its 2021 Proxy Statement, Norfolk Southern reported an "operating ratio of 69.3 percent[,]" and a reduction in "operating expenses by 14 percent," with "[a]djusted 2020 results" reflecting an "adjusted operating ratio of 64.4 percent, a 30 basis point improvement over the prior year's record."
- In 2021, Norfolk Southern reported a "15% year-over-year decline in the number of train accidents."
- "Our operating ratio improved to 61.5%, a quarterly record[.]"
- In the second quarter of 2021, Norfolk Southern reported that its "second-quarter operating ratio (a measure of the amount of operating revenues consumed by operating expenses) was 58.3% and net income and diluted earnings per share more than doubled compared to one year ago."
- In its 2021 Annual Report, Norfolk Southern stated that "[i]ncome from railway operations increased in 2021 compared to 2020, the result of a 14% increase in railway operating revenues and a 1% reduction in railway operating expenses.  Revenue growth was driven by increased average revenue per unit and higher volumes, the result of improved customer demand.  The decline in railway operating expenses was largely due to the absence of two charges, as 2020 results were adversely impacted by a $385 million loss on asset disposal related to locomotives and a $99 million impairment charge related to an equity method investment."
- In its 2021 Annual Report, Norfolk Southern also reported that its "railway operating ratio (a measure of the amount of operating revenues consumed by operating expenses) decreased to 60.1 percent.  Income from railway operations declined in 2020 compared to 2019 as railway operating revenues fell 13% which exceeded a 7% reduction in operating expenses. . . . Railway operating expenses decreased due to declines in fuel price and consumption, reduced employment levels, lower volumes and operational efficiency improvements."
- Norfolk Southern reported "a 16% year-over-year decline in the number of FRA reportable train accidents" in 2021, and in 2022, a "7% reduction in [FRA] reportable train accidents and a 16% reduction in FRA reportable mainline train accidents."

(ECF No. 105 ¶¶ 213, 217, 219, 223, 226, 229, 231, 237 (together, the "Operational Statements")).

### iii.    Implementation of PSR and the TOP Initiative

The third category of allegedly misleading statements concern Norfolk Southern's statements about its implementation of PSR and the TOP Initiative and corresponding results:

- "In 2020, we continued the implementation of our strategic plan, including tactical changes to our operating plan, to generate operational efficiencies, improve customer service, and deliver strong financial results. . . . In the face of economic headwinds that resulted in a year-over-year volume decline of 12%, we improved productivity by driving year-over-year average headcount down by 18%, and we increased asset utilization through rationalization of our locomotive fleet."
- In a letter to shareholders in its 2021 Proxy Statement, Norfolk Southern stated that "[t]hroughout 2020, despite historic challenges, our management team pressed forward to adopt a precision scheduled railroad-based operating plan [PSR] to the changing business environment, while seizing efficiency opportunities that resulted in a record fourth quarter operating ratio."
- Also in the 2021 Proxy Statement, Norfolk Southern stated that "[i]n 2020, we continued the implementation of our strategic plan, including the transformation of our operations to generate efficiencies, improve customer service, and deliver strong financial results."
- In its Form 10-Q for the first quarter of 2021, Norfolk Southern stated that its "operating ratio improved to 61.5 percent, a quarterly record[,]" which "reflect[ed] [its] sustained focus on margin improvement through initiatives to drive organizational and operational efficiencies and grow [its] revenue base."
- Norfolk Southern's 2022 Proxy Statement stated that its "management team delivered upon [the] company's three-year strategic plan, producing industry-leading total shareholder return of 110% over the course of our plan, and an all-time record full year operating ratio of 60.1%[.]"
- "The results of our multi-year effort are highlighted by what we achieved in 2021: Record Operating Ratio of 60.1% . . ."
- The 2022 Proxy Statement also stated that "2021 does not stand on its own though; it represents the culmination of our ambitious multi-year strategic plan.  In the past three years, we've produced industry-leading total shareholder return.  We've grown earnings per share by 27%, reduced our

operating ratio by 530 basis points, and returned nearly $10 billion to our shareholders in the form of share repurchases and dividends."

(ECF No. 105 ¶¶ 212, 216–17, 223, 234–36 (together, the "Strategic Plan Statements")).

The Amended Complaint alleges that the statements in each of these three categories were materially false or misleading for failing to disclose that, by implementing the TOP Initiative, "the risk of derailments and other safety related accidents rose as trains grew longer, heavier, and operated at higher speeds" and as the Company had fewer "personnel to inspect, maintain, and operate each train—which only increased the risk of derailments and safety related accidents." (ECF No. 105 ¶ 68). In particular, Plaintiffs allege that: (i) Norfolk Southern's lower Operating Ratio was the result of "undisclosed, unsustainable business practices that involved cutting corners, violating relevant regulations, and sacrificing safety for short term profits"; (ii) "employees necessary to monitor issues with moving trains and conduct proper research into previous train accidents to avoid similar incidents" had been terminated; (iii) Norfolk Southern "violated or exposed and took advantage of loopholes within regulations in order to decrease dwelling time," which increased risks from uninspected trains and the rate of accidents; (iv) insufficiently trained and rested employees resulted in an increase in the rate of accidents, employee safety, and future derailments; (v) the TOP Initiative prioritized reducing expenses by reducing personnel, which increased the risk of accidents and undermined worker safety; and (vi) the TOP Initiative "incentivized increased, undisclosed risk taking at the expense of reasonable safety precautions." (ECF No. 105 ¶¶ 202(a)–(f); 214(a)–(f); 220 (a)–(f); 224(a)–(f); 227(a)–(f); 232 (a)–(f); 239 (a)–(f); 242(a)–(f); 244(a)–(f); 251(a)–(f)).

### e.  The Derailment and Its Aftermath

On February 3, 2023, 38 railcars, eleven of which were carrying hazardous chemicals, on a Norfolk Southern train derailed in East Palestine, Ohio, and exploded into a "toxic inferno" that required "a controlled detonation and burn [that] spewed massive volumes of chemicals into East Palestine and surrounding areas—resulting in substantial environmental damages to the air, water, and soil."  (ECF No. 105 ¶ 11 (the "Derailment")).  The cause of the Derailment was subsequently determined to have been an overheated wheel bearing on a hopper car carrying loose bulk commodities.  (Id. ¶ 256).

Following the Derailment, in each of the first three quarters of 2023, Norfolk Southern's Operating Ratio increased by 20% or more, which the Amended Complaint points to as evidence of "the unsustainability of the Company's 'hyper-efficient' cost-cutting measures."  (ECF No. 105 ¶ 14).  Plaintiffs also reference "at least two other derailments that were preventable." (ECF No. 132 at 33; see ECF No. 105 ¶¶ 270, 272, 276).

Regulatory investigations ensued.  The Environmental Protection Agency ("EPA") required Norfolk Southern to bear "all costs associated with the aftermath" of the Derailment. (ECF No. 105 ¶ 12).  The FRA conducted an inquiry into the TOP Initiative and "found that between 2018 and 2022, Norfolk Southern's rate of accidents per million train miles rose faster than any other Class I railroad[.]"  (Id. ¶¶ 12, 278).[12]  The FRA identified at least four "safety culture" deficiencies:

---

[12] The Amended Complaint references the FRA's August 2023 Norfolk Southern Safety Assessment from the FRA's website.  (ECF No. 105 ¶ 276).  See U.S. Dep't of Transp., Fed. R.R. Admin., Norfolk S. Safety Assessment (2023), https://railroads.dot.gov/sites/fra.dot.gov/files/2023-08/2023%20NS%20Safety%20Culture%20Assessment_08.09.23.pdf.

> (1) Norfolk Southern communications are not always open and effective and require improvement; (2) Norfolk Southern employees and the organization do not always work to foster mutual trust; (3) Norfolk Southern training and resources are not always effective at supporting safety efforts; and (4) Norfolk Southern is frequently focused on enforcing compliance with minimum safety standards.

(Id. ¶ 279).  As to Norfolk Southern's training, the FRA found that its "13-day conductor classroom training window is markedly insufficient," its on-the-job training was "deficient in structure, consistency, and oversight, leading to a heightened risk of trainees acquiring unsafe work practices[,]" and designated "qualified instructors" without the input of "designated employee representatives."  (Id. ¶ 280).  As to the ATC Desk, the FRA found a "risk of delays or disruptions due to having only a single employee working" there.  (Id. ¶ 282).  Among other findings, the FRA noted that, although it had identified "21 safety-related findings" and made 25 recommendations for improvement in its 2022 audit, Norfolk Southern had responded—coincidentally, two days before the Derailment—that it declined to take "further action" to the extent that the recommendations "exceeded the minimum regulatory requirements."  (Id. ¶ 281).  The FRA announced that it was "considering enforcement actions against" the Company for "non-compliance with safety regulations."  (Id. ¶ 279).

The National Transportation Safety Board ("NTSB") and United States Congress also conducted inquiries, during which Norfolk Southern's CEO testified that "[i]t is clear the safety mechanisms in place were not enough," and that the Company was "going to move away from a near-term focus solely on profits and take a long-term view."  (ECF No. 105 ¶ 13 (emphasis omitted)).

B. **Procedural Background**

On May 16, 2023, Plaintiffs filed the original complaint, asserting claims under Sections 11, 12(a)(2), and 15 of the Act against the Defendants. (ECF No. 1). On September 21, 2023, the Court granted the unopposed motion of Ohio Carpenters and Pontiac General for their appointment as lead Plaintiffs and for appointment of Labaton Sucharow LLP as lead counsel. See Ohio Carpenters Pension Fund v. Norfolk S. Corp., No 23 Civ. 4068 (LAK) (SLC), 2023 WL 6162829 (S.D.N.Y. Sept. 21, 2023). (See ECF Nos. 84–87; 95; 97).

With the Court's permission, on December 4, 2023, Plaintiffs filed the Amended Complaint, which asserts claims under Sections 11 and 15 (but no longer asserts a claim under Section 12(a)(2)). (Compare ECF No. 1 with ECF No. 105; see ECF No. 132 at 42 (confirming that Plaintiffs no longer assert a Section 12(a)(2) claim)). On February 2, 2024, the Norfolk Southern Defendants filed the Motion, in which the Underwriter Defendants joined. (ECF Nos. 112–17). On April 2, 2024, Plaintiffs filed their Opposition to the Motion. (ECF Nos. 121–22). On May 2, 2024, the Norfolk Southern Defendants filed a Reply in further support of the Motion, in which the Underwriter Defendants joined. (ECF Nos. 126–28). On May 29, 2024, the Court heard oral argument on the Motion, which the Honorable Lewis A. Kaplan has referred to the undersigned for this Report and Recommendation. (ECF Nos. 61; 123; 132).

### III. LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must allege sufficient facts "to state a claim for relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).[13] A claim is facially plausible if "the plaintiff pleads factual content that allows the

---

[13] Internal quotation marks and citations are omitted from case citations unless otherwise indicated.

court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  This pleading requirement is satisfied by "a short and

plain statement of the claim showing that the pleader is entitled to relief[.]"  Fed. R. Civ. P. 8(a)(2).

In deciding a motion to dismiss, the Court "accept[s] as true all factual allegations and

draw[s] from them all reasonable inferences" in the plaintiff's favor but is "not required to credit

conclusory allegations or legal conclusions couched as factual allegations."  Hernandez v. United

States, 939 F.3d 191, 198 (2d Cir. 2019).  The Court "may draw a reasonable inference of liability

when the facts are suggestive of, rather than merely consistent with, a finding of misconduct[,]"

and "the existence of other, competing inferences does not prevent the plaintiff's desired

inference from qualifying as reasonable unless at least one of those competing inferences rises

to the level of an 'obvious alternative explanation.'"  N.J. Carpenters Health Fund v. Royal Bank

of Scotland Grp. PLC, 709 F.3d 109, 121 (2d Cir. 2013) (quoting Iqbal, 556 U.S. at 682).  "[D]ismissal

is appropriate only where [plaintiffs] can prove no set of facts consistent with the complaint that

would entitle them to relief."  Meyer v. Kinkosolar Holdings Co., 761 F.3d 245, 249 (2d Cir. 2014).

"A complaint 'is deemed to include any written instrument attached to it as an exhibit or

any statements or documents incorporated in it by reference.'"  Nicosia v. Amazon.com, Inc., 834

F.3d 220, 230 (2d Cir. 2016) (quoting Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir.

2002); see ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) (in motion to

dismiss securities action, explaining that court may consider "any . . . legally required public

disclosure documents filed with the SEC").

### IV. DISCUSSION

**A. Section 11 Claims**

    **1. Elements**

"The Act requires that companies issuing securities make a 'full and fair disclosure of information'" in connection with the issuance of securities. New Eng. Carpenters Guar. Annuity & Pension Funds v. DeCarlo, 80 F.4th 158, 168 (2d Cir. 2023) (quoting Pinter v. Dahl, 486 U.S. 622, 646 (1988)). The Act seeks to protect investors and to "achieve a high standard of business ethics in the securities industry." Lorenzo v. S.E.C., 587 U.S. 71, 81 (2019).

Section 11 "prohibits materially misleading statements or omissions in registration statements filed with the SEC." In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d 347, 358 (2d Cir. 2010); see generally Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund, 575 U.S. 175, 178 (2015).[14] To state a cognizable claim under Section 11 against an issuer, underwriter, or other control persons, a purchaser of the securities must allege that: (i) it "purchased a registered security, either directly from the issuer or in the aftermarket following the offering;" (ii) defendants "participated in the offering in a manner sufficient to give rise to liability under [S]ection 11;" and (iii) the registration statement "'contained an untrue statement of a material fact or omitted to state a material fact . . . necessary to make the statements therein not misleading.'" Morgan Stanley, 592 F.3d at 358–59 (quoting 15 U.S.C. § 77k(a)); see Omnicare, 575 U.S. at 179 (same); In re Didi Glob. Inc. Sec. Litig., No. 21 Civ. 5807 (LAK), 2024 WL 1119483,

---

[14] Section 11 provides: "In case any part of the registration statement, when such part became effective, contained an untrue statement of material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security . . . [may] sue[.]" 15 U.S.C. § 77k(a).

at *4 (S.D.N.Y. Mar. 14, 2024) (same).  "Section 11 thus creates two ways to hold issuers liable for the contents of a registration statement—one focusing on what the statement says and the other on what it leaves out."  Omnicare, 575 U.S. at 179; see Macquarie Infrastructure Corp. v. Moab Ptrs., L.P., 601 U.S. 257, 260 (2024) (explaining that Section 11 both "proscrib[es] lies and half-truths" and "creates liability for failure to speak on a subject at all").

Section 11 plaintiffs "need not allege scienter, reliance, or loss causation" to state a viable claim.  Morgan Stanley, 592 F.3d at 359.  "A Section 11 claim need only satisfy the basic notice pleading requirements under Federal Rule of Civil Procedure 8(a)(2)."  Ohio Pub. Emps. Ret. Sys. v. Discovery, Inc., No. 22 Civ. 8171 (VEC), 2024 WL 446466, at *6 (S.D.N.Y. Feb. 5, 2024).  Under Section 11, "[i]ssuers are subject to 'virtually absolute' liability[,]" while other potential defendants "may be held liable for mere negligence."  Morgan Stanley, 592 F.3d at 359 (citing Herman & MacLean v. Huddleston, 459 U.S. 375, 382 (1983)).  A plaintiff may not, however, plead a Section 11 claim "with the benefit of 20/20 hindsight" or based on a "backward-looking assessment" of the misstatement or omission.  Charter Twp. of Clinton Police & Fire Ret. Sys. v. KKR Fin. Holdings LLC, No. 08 Civ. 7062 (PAC), 2010 WL 4642554, at *11 (S.D.N.Y. Nov. 17, 2010).

"[A] violation of [S]ection 11 will be found when material facts have been omitted or presented in such a way as to obscure or distort their significance."  I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co., 936 F.2d 759, 761 (2d Cir. 1991).  "When analyzing offering materials for compliance with the securities laws, [courts] review the documents holistically and in their entirety."  Morgan Stanley, 592 F.3d at 365–66.  To evaluate whether a statement is untrue or omits necessary material facts, "the veracity of a statement or omission is measured not by its

literal truth, but by its ability to accurately inform rather than mislead prospective buyers." Operating Loc. 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt., LLC, 595 F.3d 86, 92 (2d Cir. 2010). "The literal truth of an isolated statement is insufficient; the proper inquiry requires an examination of defendants' representations, taken together and in context." Morgan Stanley, 592 F.3d at 366. "[A] statement which is literally true, if susceptible to quite another interpretation by the reasonable investor . . . may properly . . . be considered a material misrepresentation." Beecher v. Able, 374 F. Supp. 341, 347 (S.D.N.Y. 1974); see McMahan & Co. v. Wherehouse Ent., Inc., 900 F.2d 576, 579 (2d Cir. 1990) (observing that "[s]ome statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors"). To determine whether the statements in a registration statement were true for purposes of Section 11 liability, the Court must "assess[] the facts as they existed when the statement became effective." Ladmen Ptrs., Inc. v. Globalstar, Inc., No. 07 Civ. 976 (LAP), 2008 WL 4449280, at *10 (S.D.N.Y. Sept. 30, 2008); accord In re Tufin Software Tech. Ltd. Sec. Litig., No. 20 Civ. 5646 (GHW), 2022 WL 596861, at *5 (S.D.N.Y. Feb. 25, 2022); Lin v. Interactive Brokers Grp., Inc., 574 F. Supp. 2d 408, 421 (S.D.N.Y. 2008).

In this case, as in most cases, "two issues are central" to the Section 11 claims: "(1) the existence of either a misstatement or an unlawful omission; and (2) materiality." Morgan Stanley, 592 F.3d at 360; accord Lin, 574 F. Supp. 2d at 415.

### a. Misstatements and Omissions

To plead an actionable misstatement under Section 11, a plaintiff must "plead facts that, if true, would be sufficient to show that" the issuer's statement was "inaccurate" at the time it was made. City of Westland Police & Fire Ret. Sys. v. MetLife Inc., 129 F. Supp. 3d 48, 89 (S.D.N.Y.

2015).[15]  The relevant inquiry "'is not whether . . . [the statement] later turned out to be correct, but rather whether the [defendant] knew or had reason to know, at the time the offering documents were filed, that the statement was untrue.'"  Scott v. Gen'l Motors Co., 46 F. Supp. 3d 387, 393–94 (S.D.N.Y. 2014) (quoting Zirkin v. Quanta Cap. Holdings Ltd., No. 07 Civ. 851 (RPP), 2009 WL 185940, at *10 (S.D.N.Y. Jan. 23, 2009)).

To plead an actionable omission under Section 11, a plaintiff may proceed in one of two ways.  Ohio Pub. Emps. Ret. Sys., 2024 WL 446466, at *6 ("Two types of omissions can give rise to liability under the [] Act.")  First, an omission is actionable "when the [defendant] is subject to a duty to disclose the omitted facts" under the federal securities laws.  In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 267 (2d Cir. 1993); accord Morgan Stanley, 592 F.3d at 360–61.  Second, Section 11 liability may arise from an omission that "fail[s] to disclose information that is necessary to keep the representations that [a defendant] does make from being misleading."  Ohio Pub. Emp. Ret. Sys., 2024 WL 446466, at *6; see In re Bristol Myers Squibb Co. Sec. Litig., 586 F. Supp. 2d 148, 160 (S.D.N.Y. 2008) ("[A]n entirely truthful statement may provide a basis for liability if material omissions related to the content of the statement make it . . . materially misleading."); Lau v. Opera Ltd., 527 F. Supp. 3d 537, 551 (S.D.N.Y. 2021) (explaining that if an issuer "chooses to speak, it has a 'duty to be both accurate and complete[]'") (quoting Caiola v. Citibank, N.A., 295 F.3d 312, 331 (2d Cir. 2002)).  Under either approach, a plaintiff must, "at a

---

[15] Because Section 11 "shares the relevant text concerning false and misleading statements" with Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and its corresponding Rule 10b-5, 15 C.F.R. § 240.10b-5, courts within the Second Circuit analyzing the existence of a false or misleading statement or omission often rely interchangeably on cases under Section 11 and Section 10(b).  Abramson v. Newlink Genetics Corp., 965 F.3d 165, 175 (2d Cir. 2020); see Meyer, 761 F.3d at 249–50 (noting that Sections 11 and 10(b) share a common basis of "liability for a material misstatement of fact or an omission to state a fact that renders a statement made materially misleading").

minimum, plead facts to demonstrate that allegedly omitted facts both existed, and were known or knowable, at the time of the offering." Lin, 574 F. Supp. 2d at 421.

An issuer is not required, however, "to disclose a fact merely because a reasonable investor would very much like to know that fact." Time Warner, 9 F.3d at 267; accord In re Vivendi, S.A. Sec. Litig., 838 F.3d 223, 239–40 (2d Cir. 2016); Meyer, 761 F.3d at 250; In re Bank of Am. AIG Disclosure Sec. Litig., 980 F. Supp. 2d 564, 575 (S.D.N.Y. 2013), aff'd, 566 F. App'x 93 (2d Cir. 2014) (summary order). Nor is an issuer required to disclose "that which is publicly known[.]" In re Lehman Bros. Sec. & ERISA Litig., 684 F. Supp. 2d 485, 492 (S.D.N.Y. 2010); see United Paperworkers Int'l Union v. Int'l Paper Co., 985 F.2d 1190, 1199 (2d Cir. 1993) (explaining that investors "may be deemed to have constructive notice" of information "widely reported in readily available media" and thus "part of the total mix of information that would clarify or place in proper context the company's representations"); Seibert v. Sperry Rand Corp., 586 F.2d 949, 952 (2d Cir. 1978) ("Although the underlying philosophy of federal securities regulations is that of full disclosure, there is no duty to disclose information to one who reasonably should already be aware of it."). "[O]nce a company speaks on an issue or topic," however, "there is a duty to tell the whole truth." Meyer, 761 F.3d at 250. As the Second Circuit has explained:

> [t]he literal truth of an isolated statement is insufficient; the proper inquiry requires an examination of defendants' representations, taken together and in context. Thus, when an offering participant makes a disclosure about a particular topic, whether voluntary or required, the representation must be complete and accurate.

Morgan Stanley, 592 F.3d at 366.

In addition, Section 11 "do[es] not impose an absolute bar to liability for statements of opinion or belief." City of Westland, 129 F. Supp. 3d at 68 (citing Va. Bankshares v. Sandberg, 501 U.S. 1083 (1991)). "[A] statement of opinion that is ultimately found incorrect" may give rise to Section 11 liability where (i) "the speaker did not hold the belief she professed" or (ii) "the supporting facts she supplied were untrue." Omnicare, 575 U.S. at 182–86; see New Eng. Carpenters, 80 F.4th at 171 ("Opinions are [] actionable . . . not only when 'the speaker did not hold the belief she professed' . . . but also if the statement of opinion contains embedded statements of fact that are untrue, or the statement omits information whose omission conveys false facts about the speaker's basis for holding that view and makes the opinion statement misleading to a reasonable investor[.]") (quoting Omnicare, 575 U.S. at 185–88). Thus, while an issuer's "honestly held" belief that it is obeying the law—even if incorrect—is an "inherently subjective and uncertain assessment[]" that does not give rise to Section 11 liability, when a registration statement "omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion," and "those facts conflict with what a reasonable investor would take from the statement itself," then Section 11's "omissions clause creates liability." Omnicare, 575 U.S. at 186–89; see New Eng. Carpenters, 80 F.4th at 169 (explaining that "Omnicare expanded the scope of issuer liability for statements of opinion" by clarifying that "a statement of opinion, even if believed, may nonetheless be actionable if it contains a factual misstatement or is rendered misleading by the omission of material facts"); Abramson, 965 F.3d at 175 (explaining that "plaintiffs can allege that a statement of opinion, without providing critical context, implied facts that can be proven false").

To plead, then, that an opinion that omitted material facts is actionable under Section 11, neither rote "recitation of the statutory language" nor a "conclusory allegation" that the issuer "lacked reasonable grounds for [its] belief[s]" are sufficient. <u>Omnicare</u>, 575 U.S. at 195–96. Rather, a plaintiff must allege that the opinion either (i) "contain[ed] an embedded statement of fact that is not true[,]" or (ii) "omit[ted] material facts about the issuer's inquiry into or knowledge concerning" the opinion that "'conflict with what a reasonable investor would'" infer from that opinion. <u>New Eng. Carpenters</u>, 80 F.4th at 171 (quoting <u>Omnicare</u>, 575 U.S. at 188); <u>see</u> <u>Abramson</u>, 965 F.3d at 177 ("When omitted contrary facts substantially undermine the conclusion a reasonable investor would reach from a statement of opinion, that statement is misleading and actionable."). "In assessing what a reasonable investor would expect," the Court must consider the context, including "'the customs and practices of the relevant industry' and whether the opinion was expressed in a formal statement such as an S.E.C. filing or instead was a 'baseless, off-the-cuff judgment[], of the kind that an individual might communicate in daily life.'" <u>Abramson</u>, 965 F.3d at 175 (quoting <u>Omnicare</u>, 575 U.S. at 190).

### b.  <u>Materiality</u>

To state a Section 11 claim, a plaintiff must also allege that the misstatement or omission was material. <u>In re Didi Glob.</u>, 2024 WL 1119483, at *4. A misrepresentation or omission is material "if there is a substantial likelihood that a reasonably prudent investor would consider it important in making a decision." <u>Lau</u>, 527 F. Supp. 3d at 551 (citing <u>Basic Inc. v. Levinson</u>, 485 U.S. 224, 231 (1988)); <u>see</u> <u>TSC Indus., Inc. v. Northway, Inc.</u>, 426 U.S. 438, 449 (1976) ("[T]here must be a substantial likelihood that disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made

available."); Rombach v. Chang, 355 F.3d 164, 172 n.7 (2d Cir. 2004) (explaining that statement or omission is material when "'the defendants' representations, taken together and in context, would have misled a reasonable investor'") (quoting I. Meyer Pincus, 936 F.2d at 761). "[T]he concepts of materiality and duty to disclose are different." Glazer v. Formica Corp., 964 F.2d 149, 156 (2d Cir. 1992). "Material facts are those that may affect the desire of investors to buy, sell, or hold securities." In re Lululemon Sec. Litig., 14 F. Supp. 3d 553, 572 (S.D.N.Y. 2014), aff'd, 604 F. App'x 62 (2d Cir. 2015) (summary order). But the Second Circuit has "consistently rejected a formulaic approach to assessing the materiality of an alleged misrepresentation." Ganino v. Citizens Utils. Co., 228 F.3d 154, 162 (2d Cir. 2000).

"[B]ecause the materiality element presents 'a mixed question of law and fact,' it will rarely be dispositive in a motion to dismiss[.]" Morgan Stanley, 592 F.3d at 360. A court may determine materiality as a matter of law on a motion to dismiss if the alleged misstatement or omission is "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of [its] importance." ECA v. JP Morgan Chase, 553 F.3d 187, 197 (2d Cir. 2009); accord Feinman v. Dean Witter Reynolds, Inc., 84 F.3d 539, 540–41 (2d Cir. 1996); In re Didi Glob., 2024 WL 1119483, at *7. Statements that are, however, "too vague or general or are merely reflections of corporate puffery are not actionable." Lopez v. Ctptrs. Exec. Search Inc., 173 F. Sup. 3d 12, 27–28 (S.D.N.Y. 2016). "It is well-established that general statements about reputation, integrity, and compliance with ethical norms are inactionable puffery, meaning that they are too general to cause a reasonable investor to rely upon them." City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG, 752 F.3d 173, 183 (2d Cir. 2014); see In re Vale S.A. Sec. Litig., No. 15 Civ. 9539 (GHW), 2017 WL 1102666, at *22 (S.D.N.Y. Mar. 23, 2017) (explaining

that "aspirational generalizations" such as what a company was "seeking" to do, "committed" to doing, "focused on," or "aiming" to do, and what its "priorities" are constituted inactionable puffery. As with opinion statements, however, "statements of optimism and puffery can be actionable where they contradict facts that are known to a defendant . . . or where they amount to misrepresentations of existing facts that were made even though the speaker knew that the contrary was true." Greco v. Qudian Inc., No. 20 Civ. 577 (GHW), 2022 WL 4226022, at *10 (S.D.N.Y. Sept. 13, 2022). "The central inquiry in determining whether a prospectus is materially misleading . . . is therefore whether defendants' representations, taken together and in context, would have [misled] a reasonable investor about the nature of the investment." I. Meyer Pincus, 936 F.2d at 761.

### 2. Reliance on FEs

As a threshold matter, Defendants contest the Amended Complaint's reliance on allegations from the FEs to support Plaintiffs' Section 11 Claims. (ECF No. 115 at 19–21). Specifically, Defendants argue that the FE "anecdotes": (i) fail to plead company-wide conduct or practices; (ii) lack specific timeframes; and (iii) fail to support the suggestion that Norfolk Southern violated regulatory requirements. (ECF Nos. 115 at 19–21; 126 at 8–9). Plaintiffs counter that the FEs worked in multiple regions, roles, and levels at Norfolk Southern, thereby corroborating "that there were widespread safety issues and increased risks[.]" (ECF No. 121 at 20–21). Plaintiffs add that the decisions the FEs recount came from management, and the circumstances the FEs describe arose during the period relevant to the Amended Complaint. (Id. at 21–22).

With respect to allegations from confidential sources, the Second Circuit has explained that securities plaintiffs:

> need not name their sources as long as the [other] facts provide an adequate basis for believing that the defendants' statements were false. Moreover, even if personal sources must be identified, there is no requirement that they be named, provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.

Novak v. Kasaks, 216 F.3d 300, 314 (2d Cir. 2000). Following Novak, "courts in this District 'will credit confidential source allegations, generally, in two situations.'" Long Miao v. Fanhua, Inc., 442 F. Supp. 3d 774, 798 (S.D.N.Y. 2020) (quoting Glaser v. The9 Ltd., 772 F. Supp. 2d 573, 590 (S.D.N.Y. 2011)).[16] "First, when a [confidential witness's ("CW")] statements are corroborated by independent, adequately pled facts, courts loosen their requirement of a CW's job." In re Hebron Tech. Co. Sec. Litig., No. 20 Civ. 4420 (PAE), 2021 WL 4341500, at *17 (S.D.N.Y. Sept. 22, 2021). "Second, in the absence of such well-pled corroborative facts, courts will credit confidential sources whose positions and/or job responsibilities are described sufficiently to indicate a high likelihood that they actually knew facts underlying their allegations." Long Miao, 442 F. Supp. 3d at 798. In contrast, courts are less likely to credit confidential source allegations of CWs: (i) "who are insufficiently described or whose descriptions do not suggest that they had been in position to know the facts attributed to them"; (ii) who "cannot situate in time relevant occurrences"; (iii)

---

[16] Although Novak involved claims under Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), which, unlike Section 11, contains a scienter element that must be pled with particularity, see 15 U.S.C. § 78u-4(b)(2), courts in this District have followed Novak's guidance for evaluating plaintiffs' reliance on confidential sources to support Section 11 claims. See, e.g., N.J. Carpenters, 709 F.3d at 123–24 (referencing Novak standard with respect to confidential witness allegations supporting Section 11 claims); Francisco v. Abengoa, S.A., 624 F. Supp. 3d 365, 394 (S.D.N.Y. 2022) (same).

whose allegations "are insufficiently particular"; and (iv) "who are sourced secondhand—with whom plaintiffs' counsel have not interacted." Id. at 799–800.

While the FEs' allegations in the Amended Complaint have varying degrees of specificity, the Court must, at this stage, draw all inferences in favor of Plaintiffs, and therefore will not disregard them entirely. See In re AppHarvest Sec. Litig., 684 F. Supp. 3d 201, 261 (S.D.N.Y. 2023) (noting that "[a]s a general matter, courts consider and take as true the statements of confidential witnesses" at the motion to dismiss stage). First, as Defendants do not meaningfully dispute, the Court finds that Plaintiffs have described each FE's position and job responsibilities with a sufficient level of particularity to indicate a high likelihood that they know the facts that they are asserting. (See, e.g., ECF No. 105 ¶¶ 83 (FE-1 was locomotive engineer and conductor at three locations; 99 (FE-2 was carman, terminal operations manager, and director of intermodal operations); see also id. ¶¶ 114, 120, 139, 162, 176–78). See, e.g., Greco, 2022 WL 4226022, at *12 (finding that description of CW as a former employee who regularly assisted and communicated with CEO and worked with company's funding partners provided "sufficient particularity to support that a person in the position would know" about banks' reliance on company's risk assessments); McKenna v. SMART Tech. Inc., No. 11 Civ. 7673 (KBF), 2012 WL 3589655, at *5 (S.D.N.Y. Aug. 21, 2012) (finding that "allegations of the CWs provide[d] sufficient plausible detail as to why the individuals who held those positions would have any knowledge regarding" the products at issue); c.f., Abengoa, 624 F. Supp. 3d at 394 (finding that plaintiffs sufficiently alleged CWs' job descriptions, but failed to provide sufficient details in other respects).

Second, the Court disagrees with Defendants' arguments that the FEs' allegations fail to plead company-wide conduct. (ECF No. 115 at 19). While it is true that none of the FEs were in executive or upper-level managerial positions, "[a] comprehensive survey of employees is not needed at the pleading stage." Freudenberg v. E*Trade Fin'l Corp., 712 F. Supp. 2d 171, 197 (S.D.N.Y. 2010). Instead, "courts have found at the pleading stage that the accounts of [CWs] support a [c]ompany-wide inference where, for example, they [(1)] emanate from several geographic areas; (2) span different levels of the Company hierarchy; and (3) remain consistent across different time period[s]." AppHarvest, 684 F. Supp. 3d at 262–63. Here, the FEs worked in varying roles in facilities "spread across the country[,]" N.J. Carpenters, 709 F.3d at 124, including the Northeast, Midwest, and Southeast. (ECF No. 105 ¶¶ 88–186). The FEs' descriptions of safety and operational issues also "provide no basis for believing that factors unique to the relevant [locations], rather than company-wide practices," resulted in the increased safety risks that the FEs experienced. N.J. Carpenters, 709 F.3d at 124.

Third, as to temporal relevance, FE-6 and FE-7 both left Norfolk Southern before the Class Period (ECF No. 105 ¶¶ 162, 178), such that their allegations "have little bearing on the issue of contemporaneous falsity during the Class Period." AppHarvest, 684 F. Supp. 3d at 262; see Francisco v. Abengoa, S.A., 481 F. Supp. 3d 179, 208 (S.D.N.Y. 2020) ("[C]ourts have rejected confidential witness allegations where the confidential witnesses left the company before the class period."). The Court therefore discounts the allegations of FE-6 and FE-7 with respect to Defendants' knowledge about the Company's alleged safety issues during the Class Period. (ECF No. 105 ¶¶ 166–77, 178–86). See Hebron, 2021 WL 4341500, at *18 n.20 (disregarding allegations by CWs who had left the company before the class period and collecting cases where

courts had done the same).  The Court may nevertheless place <u>some</u> reliance on the allegations of FE-6 and FE-7 concerning the negative effects of the implementation of the TOP Initiative, because "allegations concerning activity in one period can support an inference of similar circumstances in a subsequent period."  <u>Employees Ret. Sys. v. Blanford</u>, 794 F.3d 297, 307 (2d Cir. 2015); <u>see</u> <u>AppHarvest</u>, 684 F. Supp. 3d at 262 (placing partial reliance on CW who was employed before class period but whose allegations nevertheless provided support for inference that company "prepared similar projections during the Class Period"); <u>Greco</u>, 2022 WL 4226022, at *13 ("Although CW 4 left Qudian at least a few months prior to the Class Period, the fact that banks were not conducting independent credit assessments in the summer of 2018 supports the inference that the banks continued that practice into the Class Period.").  The remaining FEs— FE-1, FE-2, FE-3, FE-4, and FE-5—all worked at Norfolk Southern before and during the Class Period, and thus provide a foundation on which to compare the Company's operations pre- and post-implementation of the TOP Initiative.  (ECF No. 105 ¶¶ 83, 92, 99, 114, 120, 139).  Their experiences, combined with the partial relevance of the allegations of FE-6 and FE-7, "collectively support an inference concerning company-wide" safety issues arising in conjunction with the implementation of the TOP Initiative.  <u>AppHarvest</u>, 684 F. Supp. 3d at 262.

Finally, Defendants' argument that "no FE offers well-pleaded facts that establish" a violation of regulatory requirements does not provide a reason to disregard the FEs' allegations altogether.  (ECF No. 115 at 21).  The question—which the Court evaluates below (<u>see</u> § IV.A.3, <u>infra</u>)—is whether Plaintiffs' allegations in the Amended Complaint, in combination, support a plausible inference that the Offering Materials contain material omissions, and Defendants point to no authority requiring that Plaintiffs must do so based <u>only</u> on the FEs' allegations.

Cf. AppHarvest, 684 F. Supp. 3d at 263 (concluding that CWs' "individual knowledge" of company's problems "in conjunction with other evidence . . . support[ed] an inference of company-wide problems at the pleading stage"); McKenna, 2012 WL 3589655, at *5 (finding that "the totality of the allegations" including those by CWs indicated that "there was knowledge inside" the company regarding the changed demand for a key product impacting operations).

### 3. **False or Misleading Statements or Omissions**

There is no dispute that the Amended Complaint adequately pleads the first two elements of a Section 11 claim, i.e., that Plaintiffs purchased Senior Notes in the Offerings and that Defendants participated in the Offerings in a manner sufficient to give rise to liability. (See ECF No. 126 n. 1; see generally ECF No. 132). See In re Hexo Corp. Sec. Litig. 524 F. Supp. 3d 283, 300 (S.D.N.Y. 2021) (noting that first two elements of Section 11 were undisputed). Defendants focus on the third element—the existence of material misleading statements or omissions—arguing first that none of their statements are actionable under Section 11, and, in the alternative, that none of their statements were materially false or misleading. (ECF Nos. 115; 126; 132 at 1–19, 36–44).

Plaintiffs' theory of Defendants' Section 11 liability can favorably be construed as suggesting that, contrary to the Offering Materials, Norfolk Southern's "efficiency initiatives" were not "sustainable" because the Company "was engaging in illegal or improper conduct, [] cutting corners, and [] disregarding safety for profits," resulting in an increased number of accidents, including the Derailment. (ECF No. 132 at 20; see ECF No. 105 ¶¶ 14 (alleging that the Derailment "unmask[ed] the unsustainability of the Company's 'hyper-efficient' cost cutting measures"); 212 (describing implementation of TOP Initiative as "sustainable cost structure

improvements [that] will provide greater benefits as the economy recovers."); 223 (describing "sustained focus on margin improvement through initiatives to drive organizational and operational efficiencies and grow [the] revenue base"); 278 (alleging that Norfolk Southern's "rate of accidents per million train miles rose faster than any other Class I railroad"); 297 (alleging that the Derailment "exposed the unsustainability of [the] TOP Initiative")). In other words, the Court interprets the Amended Complaint to advance a Section 11 <u>omission</u> claim premised on the theory that once Norfolk Southern "decided to tout" its "operational results," it had "a duty to disclose the full and complete truth" but failed to do so. (ECF No. 132 at 21). The Court thus turns to whether the facts alleged in the Amended Complaint, including those based on the FEs' statements to the extent set forth above, allow us to draw the "reasonable inference" that the three categories of statements in the Offering Materials contained material omissions sufficient to give rise to liability under Section 11. <u>Iqbal</u>, 556 U.S. at 678.

### a.  The Safety Statements

Defendants argue that the Safety Statements (<u>see</u> § II.A.2.d.i, <u>supra</u>) are "too general to cause a reasonable investor to rely on them" and are therefore "not actionable as a matter of law." (ECF No. 115 at 16; <u>see</u> ECF No. 126 at 6). Plaintiffs respond that the Amended Complaint adequately alleges that the Company failed to disclose that its improved Operating Ratio resulted from "unsustainable business practices associated with the TOP Initiative," which "sacrificed safety for short term profits[.]" (ECF No. 121 at 19). Plaintiffs point to the testimony of Norfolk Southern executives, the FE statements, and regulatory findings in support of their allegations. (<u>Id.</u> at 19–20).

As set forth above (see § II.A.2.d.i, supra), the Safety Statements referenced Norfolk Southern's commitment and programs "to ensure the ability to provide safe, efficient and reliable rail transportation services." (ECF No. 105 ¶ 208; see id. ¶¶ 210–11, 218, 222, 225, 230, 238, 241, 243). In addition, the Offering Materials informed investors that Norfolk Southern's business—which included transporting hazardous materials—was inherently risky and could result in a "catastrophic rail accident" the damages for which "could exceed [its] insurance coverage. . . ." (ECF No. 113-1 at 12–14; see ECF No. 113-2 at 10–11, 13).

All these statements "may technically be true" and no doubt "gave comfort to investors that reasonably effective steps were being taken" to operate safely. Meyer, 761 F.3d at 251. While Defendants' statements were not a "guarantee" that no accidents would occur—a likely unobtainable standard of which "reasonable investors may be deemed to" understand—these statements could still have misled investors if Defendants' implementation of the TOP Initiative was in fact making the Company's operations less safe and more risky. Id. Here, the Amended Complaint alleges that, at the same time Norfolk Southern was touting its safety commitments, it was cutting its headcount by 30%, placing more responsibility on fewer employees "who were forced to work longer hours with less rest," and resulting in "larger turnover." (ECF No. 105 ¶¶ 69–75). New employees were provided shorter, "inadequate" training, the deficiencies of which the FRA pointed out to the Company following a 2021 audit. (ECF No. 105 ¶¶ 75; 77). The experiences of the FEs corroborate the Amended Complaint's allegations about the deleterious effects of the staffing reductions and training deficiencies. Id. ¶¶ 86–186). Defendant Shaw also testified before the NTSB in May 2023 that he was aware, during the time of the Offerings, that the Company did not "hav[e] enough crew members" and "created a lot of stress for []

employees." (Id. ¶ 295).[17]  These allegations combined, "describe problems of a nature that is sufficient, if proven, to allow a trier of fact, absent contrary evidence, to draw an inference" that the problems existed at the time of the Offerings, and "[t]he failure to disclose these problems in the [Offering Materials] could be found by a trier of fact that renders misleading the comforting statements" about the Company's safety and operations.  Meyer, 761 F.3d at 251.

In addition, given Norfolk Southern's repeated emphasis on safety, which was fundamental to its continued viability, a "substantial likelihood" exists that a reasonable investor would want to know that the implementation of the TOP Initiative was making the Company's operations less, not more, safe, thereby exposing investors to greater financial risk in the event of a significant accident.  Basic Inc., 485 U.S. at 231.  While reasonable investors could not read Norfolk Southern's statements in the Offering Materials about its safety, operations, and implementation of the TOP Initiative "as a guarantee" that accidents, including disastrous accidents like the Derailment, would not occur, Zirkin, 2009 WL 185940, at *13, Plaintiffs have plausibly alleged that information that implementing the TOP Initiative was making operations riskier would make a reasonable investor more, rather than less, interested in whether PSR was a sustainable approach.  See Meyer, 761 F.3d at 252 (dismissal was not appropriate where "a trier of fact could find that . . . the omitted facts [were] of substantial importance to investors"); In re Didi Glob., 2024 WL 1119483, at *8 (finding that company's "disclosures were not sufficiently specific to support its claim that no reasonable investor could have found the [omitted

---

[17] The Amended Complaint also references statements by "an official from the Transportation Communications Union" before a United States Senate Environment and Public Works Committee hearing, but this official is not identified nor is the date of the hearing provided, so the Court places no weight on these statements.  (ECF No. 105 ¶¶ 289–93).

information] well worth knowing"). Given the "apparent importance of this information," the Court concludes that, at the pleading stage, the alleged omissions "are not immaterial as a matter of law." N.J. Carpenters, 709 F.3d at 126.

Defendants rely on several cases in which courts have rejected securities claims based on "general statements that merely describe corporate goals related to safety." (ECF No. 115 at 17). In Defendants' cases, however, unlike here, the plaintiffs failed to allege that reality was any different than the "broad, non-specific statements regarding [the companies'] commitment to safety generally." Vale, 2017 WL 1102666, at *22 (finding that general statements of commitment to safety were non-actionable puffery where plaintiffs failed to allege that defendants knew the contrary was true); see also In re FuboTV Inc. Sec. Litig., No. 21 Civ. 1412 (ALC), 2023 WL 2711826, at *14–15 (S.D.N.Y. Mar. 30, 2023) (finding that general statements about "competitive strength" were non-actionable puffery in the absence of undisclosed objective contradictory facts); Ong v. Chipotle Mexican Grill, Inc., 294 F. Supp. 3d 199, 232 (S.D.N.Y. 2018) (finding that statements about commitment to safety were "either not demonstrably false or inactionable puffery" where plaintiffs failed to allege that defendants were aware of and failed to disclose contradictory facts). (See ECF No. 115 at 17). Indeed, one of Defendants' cases, Kusnier v. Virgin Galactic Holdings, Inc., 639 F. Supp. 3d 350 (E.D.N.Y. 2022), highlights the distinction and demonstrates why Plaintiffs have plausibly alleged that Defendants' omissions are actionable. In Kusnier, the court found that, while statements that the company was "light years ahead of the competition" and had an "uncompromising commitment to safety and customer satisfaction" were "pure puffery," other statements that discussed the success of the company's safety program were "materially misleading" and therefore actionable in light of

undisclosed safety issues that garnered regulatory attention.  Id. at 375 (declining to conclude that "statements conveying positive news following such a critical corporate event are immaterial to investors as a matter of law"); see also id. at 378 (finding that company's failure to disclose that safety upgrades "were required in order to fulfill the company's central business function" were materially misleading and therefore actionable).[18]

Accordingly, the Court finds that Plaintiffs have stated a plausible Section 11 claim that the Safety Statements contained material omissions regarding operational safety.

### b. Operational Statements

Defendants argue that the Operational Statements (see § II.A.2.d.ii, supra), were not materially misleading for four reasons:  (i) Norfolk Southern disclosed the risk of derailment; (ii) the FRA accident data was publicly available at the time of the Offerings; (iii) Norfolk Southern was not required to disclose accident rate data in per-million-mile format; and (iv) Plaintiffs' reliance on the Derailment's occurrence is impermissible hindsight pleading.  (ECF No. 115 at 23–27; see ECF No. 126 at 12–14).  Plaintiffs counter that Norfolk Southern's risk disclosures were inadequate, and the public availability of the per-million-mile accident data is a reliance-based argument unresolvable on the pleadings.  (ECF No. 121 at 27–28 & n.16, 31).

---

[18] For the proposition that general statements about training are inactionable, Defendants similarly misplace their reliance on two out-of-Circuit cases.  (ECF No. 115 at 17–18).  In Sanders v. RealReal, Inc., No. 19 Civ. 7737 (EJD), 2021 WL 1222625 (N.D. Cal. Mar. 31, 2021), because the company—unlike Norfolk Southern here—did not operate in a dangerous industry subject to extensive safety regulatory oversight, its statements about "deep training" in the area of luxury-good authentication were "incapable of objective verification" and therefore not actionable. Id. at *9.  In Derr v. Ra Medical Systems, Inc., No. 19 Civ. 1079 (LAB) (AHG), 2021 WL 1117309, (S.D. Cal. Mar. 24, 2021), the non-actionable statements about training were similarly in a non-safety related area (medical device sales), and the court otherwise found that the company's "fail[ure] to mention that manufacturing issues had arisen and a recall was already underway" did render the company's risk disclosures materially misleading and therefore actionable, similar to the Court's conclusion here. Id. at *6.

Taking Defendants' arguments in reverse order, the Court agrees with Defendants' fourth argument that, to the extent Plaintiffs seek to turn the occurrence of the Derailment and other accidents into a Section 11 claim, that represents "paradigmatic hindsight pleading and [is] therefore insufficient on its own to withstand a motion to dismiss."  Holbrook v. Trivago N.V., No. 17 Civ. 8348 (NRB), 2019 WL 948809, at *13 (S.D.N.Y. Feb. 26, 2019), aff'd sub nom., Shetty v. Trivago N.V., 796 F. App'x 31 (2d Cir. 2019) (summary order); see Greco, 2022 WL 4226022, at *22 (explaining that "[t]he mere fact that Qudian's development of Open Platform may have ultimately hurt the core loan book's ability to grow in the third quarter of 2019 [was] insufficient to establish that Defendants' statements were false when made"); In re Coty Inc. Sec. Litig., No. 14 Civ. 919 (RJS), 2016 WL 1271065, at *8 (S.D.N.Y. Mar. 29, 2016) (explaining that "post-IPO financial results cannot be used to support Plaintiff's Section 11 claim"); In re TVIX Sec. Litig., 25 F. Supp. 3d 444, 450 (S.D.N.Y. 2014) (explaining that "plaintiffs are not allowed to plead Section 11 claims with the benefit of 20/20 hindsight because Section 11 claims cannot be based on a backward-looking assessment of the registration statement.")).

Defendants' second and third arguments, regarding accident data, similarly have merit. Although Plaintiffs complain that Norfolk Southern should have set forth in the Offering Materials the accident data in per-million-mile format, Plaintiffs do not, and cannot, meaningfully dispute that Norfolk Southern regularly reported its accident data to the FRA, which published the data on its website.[19]  Section 11 does "not require the disclosure of publicly available information." In re Merrill Lynch & Co. Res. Rpts. Sec. Litig., 272 F. Supp. 2d 243, 249–50 (S.D.N.Y. 2003).

---

[19]  See Accident Data, Reporting, and Investigations, U.S. DEPT. OF TRANSP., FED. R.R. ADMIN., https://railroads.dot.gov/railroad-safety/accident-data-reporting-and-investigations (last visited July 26, 2024).

Indeed, elsewhere in the Amended Complaint, Plaintiffs quote from other materials on the FRA's website, and therefore cannot plausibly disclaim awareness of the types of publicly available safety information.   (ECF No. 105 ¶¶ 276–84 (quoting from 2023 Safety Assessment)). See Rubenstein v. Credit Suisse Grp. AG, 457 F. Supp. 3d 289, 299 (S.D.N.Y. 2020) (finding no Section 11 liability where "information concerning many of the risks associated with [investments], about which Plaintiffs now complain[ed . . .] was publicly available to investors"); Merrill Lynch, 272 F. Supp. 2d at 250 (finding no Section 11 liability where complaint demonstrated that allegedly omitted information was "publicly available").[20]   Furthermore, Plaintiffs cite no authority requiring Norfolk Southern to disclose in the Offering Materials its accident data in a per-million-mile format.  See Merrill Lynch, 272 F. Supp. 2d at 249 (finding no Section 11 liability where plaintiffs failed to allege regulation or other legal authority requiring disclosure of allegedly omitted information).  In other words, Defendants were not required to "do the math" to provide the accident data in Plaintiffs' preferred calculation.  (ECF No. 132 at 28).  See Scott v. Gen'l Motors Co., 46 F. Supp. 3d 387, 397–98 (S.D.N.Y. 2014) (rejecting plaintiffs' assertion that defendant "ought to have expressed its inventory disclosures in terms of 'days supply'" where defendant "had disclosed all of the information necessary to determine days supply at the time of the IPO"); see also In re Eros Int'l Sec. Litig., No. 15 Civ. 8956 (AJN), 2017 WL

---

[20] Plaintiffs' indisputable familiarity with the FRA website thus discredits their argument that Defendants have not "actually proved that investors would have had access to certain monthly or yearly train accident rate data at the time of each offering."  (ECF No. 132 at 29).  Contrary to Plaintiffs' assertions (id. at 31), there is no requirement that, to be deemed "publicly available," the information must have appeared elsewhere in the Offering Materials or the Amended Complaint.  See Siebert v. Sperry Rand Corp., 586 F.2d 949, 952 (2d Cir. 1978) (finding that investors were on constructive notice of labor difficulties that were reported in the media and elsewhere); In re Lehman Bros., 684 F. Supp. 2d at 492 (citing publicly available reports disclosing facts that plaintiffs claimed were omitted from offering materials).

6405846, at *6 (S.D.N.Y. Sept. 22, 2017) (finding that although "Defendants <u>could</u> <u>have</u> defined and reported 'users' in an alternate way that took into account the specifics of their use, [] that [did] not amount to misrepresentation").  Finally, Plaintiffs do not allege that the accident data Norfolk Southern <u>did</u> disclose in the Offering Materials was itself erroneous or inaccurate.  <u>See</u> <u>Ohio Pub. Emps. Ret. Sys.</u>, 2024 WL 446466, at *7–8 (finding no actionable omission under Section 11 where plaintiffs did "not argue that the numbers reported were inaccurate"); <u>Lau</u>, 527 F. Supp. 3d at 552 (finding no material omission where plaintiffs did not contest accuracy of company's reported annual revenue figures); <u>Rudman v. CHC Grp. Ltd.</u>, 217 F. Supp. 3d 718, 728 (S.D.N.Y. 2016) (Kaplan, J.) (finding no actionable omission under Section 11 where plaintiffs did not allege inaccuracy of revenue figures that were disclosed); <u>see</u> <u>also</u> <u>Boca Raton Firefighters &</u> <u>Police Pension Fund v. Bahash</u>, 506 F. App'x 32, 38–39 (2d Cir. 2012) (summary order) (observing that "[i]t is clear that a violation of federal securities law cannot be premised upon a company's disclosure of accurate historical data").  Accordingly, the fact that the Offering Materials did not set forth publicly available accident data in a per-million-mile format is not an actionable material omission.

As to their first argument—that the Offering Materials adequately disclosed any risks—however, Defendants lose ground.  True, the Offering Materials contained statements about the inherent risks of transporting hazardous materials.  (ECF Nos. 113-1 at 13–14; 113-2 at 11, 14).  Despite the warnings of the financial and other risks in the event of a catastrophic accident, however, the failure to disclose the then-ongoing and serious safety and operational deficiencies—which were known to the Company—"would cause a reasonable investor to make an overly optimistic assessment of the risk" of investing in the Senior Notes.  <u>Meyer</u>, 761 F.3d at

251.  In this Circuit, it is well-settled that "[a] generic warning of a risk will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of liability."  Id.; see Rombach, 355 F.3d at 173 ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired."); In re Didi Glob., 2024 WL 1119483, at *8 (deeming inadequate disclosures that "warned only of the general risk that its failure to comply with applicable laws and regulations jeopardized its future operations" and did not disclose more specific risk of consequences from existing noncompliance).  As the Second Circuit explained in Meyer, "[o]ne cannot, for example, disclose in a securities offering a business's particular risk of fire, the installation of a comprehensive sprinkler system to reduce fire danger, and omit the fact that the system has been found to be inoperable, without misleading investors."  761 F.3d at 251.  Similarly here, the allegations in the Amended Complaint, including the statements from the FEs, plausibly suggest that Norfolk Southern did not disclose to investors that, in an effort to improve its Operating Ratio, it had cut corners on safety and employee training throughout the relevant time period and at different locations across its territory, at the expense of safety and the Company's broader financial condition in the event of a catastrophic accident like the one that occurred here.  (ECF No. 105 ¶¶ 214, 220, 224, 227, 232, 239, 242, 244, 251).  "These allegations are suggestive of, rather than merely consistent with, a finding of liability" for an omission under Section 11.  N.J. Carpenters, 709 F.3d at 123.

Accordingly, to the extent that the Operational Statements omitted information necessary to make the risk disclosures about derailments and other accidents not misleading to investors, Plaintiffs have plausibly alleged Defendants' Section 11 liability.

### c. **Strategic Plan Statements**

Plaintiffs allege that the Strategic Plan Statements omitted information that (i) the risk of accidents increased following implementation of the TOP Initiative, (ii) the Company was engaged in illegal conduct, and (iii) the Company's improved Operating Ratio was not sustainable. (ECF Nos. 105 ¶¶ 212, 216, 217, 223, 234, 235, 236; 121 at 23–27; see § II.A.2.d.iii, supra). Defendants argue that their disclosures regarding the implementation of the TOP Initiative were sufficient, and that they had no obligation to disclose "purported uncharged, unadjudicated conduct." (ECF Nos. 115 at 21–22, 27–33). The Court considers together Plaintiffs' allegations about the TOP Initiative and Operating Ratio, before turning to their allegations that Norfolk Southern failed to disclose illegal conduct.

### i. **TOP Initiative and Operating Ratio**

Defendants argue that their disclosures about the TOP Initiative were sufficient because the Offering Materials included information about reductions in the Company's headcount on both an annual and quarterly basis and explained its use of "forecasting tools designed to ensure the optimal level of staffing to meet business demands while controlling costs." (ECF No. 115 at 22 (quoting ECF No. 113-1) (Defendants' emphasis)). Thus, Defendants argue, "Norfolk Southern had no duty to disclose to investors the position-by-position or role-by-role minutiae of its headcount reduction." (Id.) Plaintiffs counter that they are not contending that they needed or were entitled to know such "minutiae"; rather, Plaintiffs complain that Defendants failed to disclose the unsustainable and negative impact of the headcount reduction, i.e., the imposition of "unfair time constraints on an overworked skeleton crew that had the impossible task of maintaining the Company's operations in a safe manner." (ECF No. 121 at 24 (citing ECF No. 105

¶ 214(a)–(f)).  Plaintiffs thus allege that "any lauded decrease in Norfolk Southern's Operating Ratio, which was plastered throughout the Offering Documents, came with an equal, yet undisclosed increased risk of derailments and train accidents."  (ECF No. 105 ¶ 6; see id. ¶ 9 (alleging that "the Offering Documents misleadingly painted the picture of sustainable cost savings under the watch of vigilant management")).  As set forth above, Plaintiffs support this allegation with reliance on the FEs' statements as well as Defendant Shaw's testimony that he was aware of the strain on employees and the FRA's Safety Assessments.  (See §§ II.A.2.c–e, supra).

In analyzing Plaintiffs' allegations about the unsustainability of the TOP Initiative's positive impact on the Company's Operating Ratio, the Court begins with the common dictionary usage of "sustainable."  See In re Synchrony Fin. Sec. Litig., 988 F.3d 157, 168 (2d Cir. 2021) (beginning with dictionary definition to analyze term on which plaintiffs' allegations relied). "Sustainable" refers to something that is "capable of being sustained," that is, capable of being "maintained at length without interruption or weakening; lasting; prolonged."  Merriam-Webster.com  Dictionary,  https://www.merriam-webster.com/dictionary/sustainable  & https://www.merriam-webster.com/dictionary/sustained (last visited July 26, 2024).  Using this definition, the Court interprets Plaintiffs to be alleging that Defendants omitted information that the improved Operating Ratio they were touting as the result of implementing the TOP Initiative could not be "maintained at length without . . . weakening[,]" and would not be "lasting" given the existing—but undisclosed—operational and safety deficiencies about which Defendants were aware.

The Court finds that Plaintiffs' allegation that the positive impact of the TOP Initiative was unsustainable is "specific enough to survive the pleadings stage." Synchrony, 988 F.3d at 168. Norfolk Southern's assertions about the sustainability of its Operating Ratio were not vague expressions about the Company's "overall business model" or "general optimism." Synchrony, 988 F.3d at 173. Rather, they were "concrete" descriptions and "factual representation[s]" that purported to describe the state of the Company's operations, In re IBM, 163 F.3d at 110, but misleadingly omitted information showing that those operations had become riskier and less safe. (See § II.A.2.d.iii, supra). See In re Tech. Grp., Inc. Sec. Litig., 251 F. Supp. 3d 596, 611 (S.D.N.Y. 2017) (explaining that "more definite statements about a company's business practices may invoke reasonable reliance by investors"); see also Synchrony, 988 F.3d at 168 (finding actionable misrepresentation where plaintiffs alleged that company failed to disclose information that "directly undermined" company's positive statements about the status of its business relationships). In addition, Plaintiffs plausibly allege that Norfolk Southern was touting its improved Operating Ratio, one of its core metrics, despite the existence of numerous personnel, operational, and safety deficiencies that undermined its claims of improved "efficiencies," "customer service," and "strong financial results." (ECF No. 105 ¶¶ 212, 217).

Furthermore, Defendants do not, and cannot, meaningfully dispute that a reasonable investor would not consider it "obviously unimportant," ECA, Loc. 134, 553 F.3d at 197, that employees were being "pressure[d] . . . to meet deadlines even at the expense of safety," which had "slipped" to the Company's "fifth or sixth" priority. (ECF No. 105 ¶¶ 89, 111–13; see § IV.A.3.a, supra). See Winter v. Stronghold Digital Mining, Inc., 686 F. Supp. 3d 295, 309 (S.D.N.Y. 2023) (rejecting argument that alleged misstatements and omissions were immaterial);

Tufin, 2022 WL 596861, at *7 (finding that plaintiff sufficiently alleged that omitted information about length of company's sales cycle "would be material to investors").

Accordingly, the Court finds that Plaintiffs have plausibly alleged actionable omissions with respect to the Strategic Plan Statements concerning the sustainability of the TOP Initiative and the Company's Operating Ratio.

### ii.    Duty to Disclose Illegal or Improper Conduct

Plaintiffs allege that the Strategic Plan Statements were materially misleading because Norfolk Southern failed to disclose (i) the FRA's 2021 finding that its training program for engineers and conductors "was not in conformance with 49 CFR Part 242" and (ii) that the Company was "[taking] advantage of loopholes within regulations."  (ECF No. 105 ¶¶ 77, 202(a) & (c), 214(a) & (c), 220(a) & (c), 227(a) & (c)).  Defendants argue that Norfolk Southern had no "general duty 'to disclose uncharged, unadjudicated wrongdoing[,]'" and, in any event, Plaintiffs have failed to allege any legal or regulatory violation.  (ECF No. 115 at 27–28 (quoting Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S, 11 F.4th 90, 98 (2d Cir. 2021)).

The Court agrees with Defendants that Norfolk Southern "did not have a freestanding legal duty to disclose" the alleged regulatory noncompliance described in the Amended Complaint.  In re DraftKings, Inc. Sec. Litig., 650 F. Supp. 3d 120, 168 (S.D.N.Y. 2023).  The Second Circuit has repeatedly explained that the "nondisclosure of 'uncharged, unadjudicated wrongdoing'" does not give rise to Section 11 liability.  Plumber & Steamfitters, 11 F.4th at 95 (quoting City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG, 752 F.3d 173, 184 (2d Cir. 2014)).  Rather, to plausibly allege a Section 11 violation for failure to disclose of such wrongdoing, Plaintiffs were required to allege both that Norfolk Southern violated a law or

regulation <u>and</u> that disclosure "was necessary to prevent the company's <u>other</u> statements from being misleading."  <u>In re Braskem S.A. Sec. Litig.</u>, 246 F. Supp. 3d 731, 752 (S.D.N.Y. 2017); <u>accord</u> <u>DraftKings</u>, 650 F. Supp. 3d at 168.  Plaintiffs' present allegations falter on both elements.

First, the Amended Complaint does not plausibly allege that Norfolk Southern violated any law or regulation.  The sum and substance of Plaintiffs' allegations about regulatory violations during the period of the Offerings are as follows: (i) FE-5 "recalled using components not in accordance with regulations"; (ii) the repeated conclusory assertion that the Company was "violating relevant regulations" and "exposed and took advantage of loopholes within regulations" without citation to any particular regulation; (iii) that the FRA was "<u>considering</u> enforcement actions . . . for non-compliance with safety regulations"; and (iv) the FRA found in 2021 that the training program for engineers and conductors "was not in compliance with 49 CFR Part 242."  (ECF No. 105 ¶¶ 77, 156, 202(a) & (c), 214(a) & (c), 220(a) & (c), 224(a) & (c), 232(a) & (c), 239(a) & (c), 242(a) & (c), 244(a) & (c), 251(a) & (c), 279 (emphasis added)).[21]  The Court discounts the first three of these as too general and lacking in any reference to a specific law or regulation to give rise to a plausible inference that Norfolk Southern had in fact violated any law or regulation to which it was subject.  <u>See</u> <u>Gray v. Alpha & Omega Semiconductor Ltd.</u>, No. 20 Civ. 2414 (RA), 2021 WL 442499, at *9 (S.D.N.Y. Sept. 27, 2021) (finding that "bald assertions that [company] engaged in illegal conduct" absent "analysis of the applicable regulations and why

---

[21] Although Plaintiffs allege that the United States Department of Labor Occupational Health and Safety Administration found, on August 2, 2023, "four violations and imposed $49,111 in penalties after conducting enforcement inspections" that began in March 2023, this post-dates the Offerings and does not specify that any violations existed at the time of the Offerings.  (<u>See</u> ECF No. 105 ¶¶ 1, 274).  Similarly, Plaintiffs' allegations about post-Offering statements that Norfolk Southern, at an unspecified time, "abuse[d] a loophole in Section 215" of the Railroad Freight Car Safety standards, do not support a finding of violations at the time of the Offerings.  (ECF No. 105 ¶¶ 290–93).

[company] violated them" plaintiffs failed to allege actionable omission).  As to the third and fourth, that the FRA was "considering" bringing an enforcement action or had found an example of noncompliance did not rise to the level of a regulatory matter that Norfolk Southern was obligated to disclose.  See Schaeffer v. Nabriva Therapeutics plc, No. 19 Civ. 4183 (VM), 2020 WL 7701463, at *10 (S.D.N.Y. Apr. 28, 2020) (finding that company's failure to disclose regulatory agency's "observations" about potential regulatory violations was insufficient to render company's other public statements misleading); In re Lions Gate Ent. Corp. Sec. Litig., 165 F. Supp. 3d 1, 19 (S.D.N.Y. 2016) (finding that company was not required to disclose that regulator was "considering recommending" enforcement action).  Even if the FRA's notice of deficiency in 2021 security assessment could be deemed a "government investigation"—which Plaintiffs do not allege that it was—it is well-settled that "a government investigation, without more, does not trigger a generalized duty to disclose."  In re Inv. Tech. Grp., 251 F. Supp. 3d at 615; see In re XP Inc. Sec. Litig., 524 F. Supp. 3d 23, 37 (E.D.N.Y. 2021) (same); In re Glob. Brokerage, Inc., No. 17 Civ. 916 (RA), et al., 2019 WL 1428395, at *13 (S.D.N.Y. Mar. 28, 2019) (explaining that "there is no independent duty for a company to disclose that it is being investigated by a regulatory agency"); In re Lions Gate Ent., 165 F. Supp. 3d at 12.  Here, under the applicable regulations, the FRA's notice of deficiency invited Norfolk Southern to "reassess and reconfigure" its training program to bring it into compliance to permit the FRA to reassess its compliance, see 49 C.F.R. § 242.103(h), which represents the kind of interim remedial process that does not give rise to a duty to disclose.  See Acito v. IMCERA Grp., Inc., 47 F.3d 47, 52 (2d Cir. 1995) (holding that company was not required to disclose results of two inspections where FDA took "no materially adverse action" and company committed to correct deficiencies); In re Sanofi Sec. Litig.,

87 F. Supp. 3d 510, 533 (S.D.N.Y. 2015) (finding that, where FDA commented on company's clinical trials but allowed them to proceed, plaintiffs failed to allege any objectively false actionable misstatement); In re EDAP TMS S.A. Sec. Litig., No. 14 Civ.6069 (LGS), 2015 WL 5326166, at *12 (S.D.N.Y. Sept. 14, 2015) (collecting cases holding that companies were not required to disclose substance of FDA inquiries during pendency of drug or device application).

Second, Plaintiffs do not allege that Norfolk Southern made an "express prior disclosure" about being—or not being—under regulatory investigation that would trigger an obligation to "speak truthfully about" that issue.  In re Glob. Brokerage, 2019 WL 1428395, at *13; In re Inv. Tech. Grp., 251 F. Supp. 3d at 616 (finding that company's statements could not "have given a reasonable investor the impression that [the company] was not actively involved in investigations"); In re Lions Gate Ent., 165 F. Supp. 3d at 13 (finding no actionable omission where company had not made any statements about transactions that were the subject of regulatory investigation or about the investigation itself); In re UBS AG Sec. Litig., No. 07 Civ. 11225 (RJS), 2012 WL 4471265, at *31 (S.D.N.Y. Sept. 28, 2012) (explaining that "absent an express prior disclosure, a corporation has no affirmative duty to speculate or disclose uncharged, unadjudicated wrongdoings or mismanagement, . . . illegal internal policies, . . . or violations of a company's internal codes of conduct and legal policies"), aff'd sub nom., City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG, 752 F.3d 173 (2d Cir. 2014).

Finally, Plaintiffs falter in their attempt to bring themselves within a line of cases in which courts have held that a company violates Section 11 when it fails to disclose that "the reasons for [its] success [] are illegal or improper."  (ECF No. 121 at 24)  Plaintiffs invoke cases in which courts have found "a duty to disclose uncharged wrongdoing . . . when a corporation puts the

reasons for its success at issue, but fails to disclose that a material source of its success is the use of improper or illegal business practices."  In re Virtus Inv. Ptrs., Inc. Sec. Litig., 195 F. Supp. 3d 528, 536 (S.D.N.Y. 2016) (quoting Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC, 164 F. Supp. 3d 568, 581 (S.D.N.Y. 2016)); see, e.g., In re Van der Moolen Holding N.V. Sec. Litig., 405 F. Supp. 2d 388, 400–01 (S.D.N.Y. 2005) (finding requisite connection between statements and undisclosed improper activity where company discussed sources of revenue but omitted that the "true source" of that revenue was illegal trading).

This line of cases is inapposite here for two reasons.  First, as noted above, the Amended Complaint does not adequately allege that any regulatory violation was the source of Norfolk Southern's improved Operating Ratio, let alone any undisclosed illegal activity, as was the case with each of the companies in the cases on which Plaintiffs rely.  See Rosi v. Aclaris Therapeutics, Inc., No. 19 Civ. 7118 (LJL), 2021 WL 1177505 (S.D.N.Y. Mar. 29, 2021) (finding that company's failure to disclose that its marketing campaign for its sole drug violated the Federal Food, Drug, and Cosmetic Act adequately "pled actionable misstatements"); DoubleLine Cap. LP v. Odebrecht Fin., Ltd., 323 F. Supp. 3d 393, 444 (S.D.N.Y. 2018) (finding that "an ordinary investor would be misled by the company's failure to disclose that an additional reason for its success was its illegal bribery scheme"); In re VEON Sec. Litig., No. 15 Civ. 4162342, at *6–7 (S.D.N.Y. Sept. 19, 2017) (finding that company's failure to disclose that its growth was "due to" foreign bribes it had paid was an actionable omission); In re Van der Moolen, 405 F. Supp. 2d at 400–01 (finding that company's failure to disclose that "revenue had been generated, at least in part, by" illegal trading practices was "false and misleading"); In re Par Pharm., Inc. Sec. Litig., 733 F. Supp. 668, 677–78 (S.D.N.Y. 1990) (finding that company's failure to disclose that its continued success and

competitive advantage were the result of illegal scheme of bribes could "have been misleading to a reasonable investor, in light of the circumstances under which they were made"); see also In re Braskem S.A. Sec. Litig., 246 F. Supp. 3d 731, 759–60 (S.D.N.Y. 2017) (finding that company's failure to disclose "bribery scheme" that was "a major factor" in company's "paying a below-market price" for commodity was an actionable omission).  As one other district court has noted, the rule that Plaintiffs invoke "does not stem from cases addressing regulatory investigations but from those addressing 'corporate mismanagement or uncharged criminal conduct.'"  In re XP Inc., 524 F. Supp. 3d at 38 (quoting Virtus, 195 F. Supp. 3d at 536).  While regulatory and other investigations into the Derailment appear to be ongoing, at least as of the filing of the Amended Complaint (see ECF No. 105 ¶¶ 271, 279), Plaintiffs have not alleged, as of the time of the Offerings, the existence of undisclosed regulatory violations, let alone illegal activity comparable to that in the cases on which they rely.  (See n.II.A.2.d.iii, supra).

Second, to the extent that Plaintiffs invoke Van der Moolen for the broad proposition that "accurate financial reporting may be an actionable misstatement if some of the revenue derived from illegal activity," this Court "agrees with the district courts that have read Van der Moolen more narrowly."  In re VEON, 2017 WL 4162342, at *6 (collecting cases); see DoubleLine Cap., 323 F. Supp. 3d at 442 n.8 (agreeing "with those courts that have read Van der Moolen more narrowly").  Those courts have generally agreed that "a company's misleading statements about the sources of its revenue do not make the company's statements about the revenue figures misleading; rather, liability is limited to the misleading statements themselves."  In re Marsh & Mclennan Cos. Sec. Litig., 501 F. Supp. 2d 452, 470–71 (S.D.N.Y. 2006) (finding that plaintiffs' allegation that company misstated earnings by failing to disclose the existence of steering and

bid manipulation was not actionable).  In other words, "accurately reported income derived from illegal sources is non-actionable despite the failure to disclose the illegality[,]" while "statements 'putting the source of those revenues at issue' may be actionable."  In re VEON Ltd., 2017 WL 4162342, at *6 (quoting In re Marsh & Mclennan Cos., 501 F. Supp. 2d at 470).

Accordingly, the Court finds that Plaintiffs have not plausibly alleged that the Strategic Plan Statements regarding alleged regulatory violations were actionable material omissions.

*    *    *

In summary, the Court finds that Plaintiffs have plausibly alleged actionable omissions under Section 11 as to:  (i) the Safety Statements; (ii) the Operational Statements; and (iii) the Strategic Plan Statements only as to the TOP Initiative and Operating Ratio.  The Court further finds that Plaintiffs have not plausibly alleged an actionable omission based on the failure to disclose in the Strategic Plan Statements alleged regulatory violations or illegal activity.

### 4.  Duty to Disclose Under Regulation S-K

Plaintiffs allege that "the undisclosed adverse facts and circumstances detailed" elsewhere in the Amended Complaint were "known trends, uncertainties and risks that required disclosure in the Offering Documents" pursuant to Items 105 and 303 of SEC Regulation S-K, 17 C.F.R. §§ 229.105, 229.303.  (ECF No. 105 ¶¶ 205–06, 252).  Specifically, the Amended Complaint contends that Norfolk Southern's failure to disclose "the fact that [the] TOP Initiative caused an increase in the Company's rate of accidents [] and created serious undisclosed safety risks" violated Items 105 and 303.  (Id. ¶¶ 253, 276–78).  Defendants respond that the Amended Complaint "does not quantify, or even allege qualitatively, the incremental risk that Plaintiffs claim the implementation of PSR brought about" and does not "adequately allege[] that the

51

purported increase in the Company's rate of accidents was a material trend that needed to be disclosed." (ECF No. 115 at 34–35; see ECF No. 126 at 15–16).

### a. Regulation S-K

Item 105 of Regulation S-K requires an issuer to provide "a discussion of the material factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. § 229.105(a). If the omitted information concerns a contingent or speculative event, "the materiality of those events depends on a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity." Casellano v. Young & Rubicam, Inc., 257 F.3d 171, 180 (2d Cir. 2001).

Item 303 of Regulation S-K, in relevant part, requires an issuer to disclose "known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(b)(2)(ii) ("Item 303"); see Macquarie, 601 U.S. at 260 (quoting Item 303). This rule "imposes a disclosure duty where a trend, demand, commitment, event or uncertainty is both (1) presently known to management and (2) reasonably likely to have material effects on the registrant's financial condition or results of operations." Panther Ptrs. Inc. v. Ikanos Commc'ns, Inc., 681 F.3d 114, 120 (2d Cir. 2012); accord Litwin v. Blackstone Grp., L.P., 634 F.3d 706, 716 (2d Cir. 2011). The SEC has issued guidance instructing issuers to disclose a "known trend . . . or uncertainty" unless they determine that the trend or uncertainty "is not reasonably likely to occur" or that, if the trend or uncertainty arises, it is "not reasonably likely" to have a material effect on the issuer. In re Didi Glob., 2024 WL 1119483, at *9 (quoting Management's Discussion and Analysis of Financial Condition and Results of Operations, Exchange Act Rel. No. 6835, 43 SEC

Dkt. 1330, 1989 WL 1092885, at *6 (May 18, 1989)).  The Second Circuit has cautioned that "a narrow focus" on Item 303's disclosure obligations, which "do not turn on restrictive mechanical or qualitative inquiries[,]" is "inappropriate."  Panther Ptrs., 681 F.3d at 122.

### b.  Application

As an initial matter, to the extent that Plaintiffs contend that Regulation S-K required Norfolk Southern to disclose its rate of accidents in a different format, this argument lacks merit for the reasons explained above.  (See § IV.A.3.a, supra).  See Scott v. Gen'l Motors Co., 46 F. Supp. 3d 387, 397–98 (S.D.N.Y. 2014) (rejecting argument that Regulation S-K required company to "express[] its inventory disclosures in terms of 'days supply'").  Plaintiffs have, however, plausibly alleged that Norfolk Southern was aware that the implementation of the TOP Initiative had made the Company's operations less safe, that as a result significant accidents were reasonably likely to occur, and that such accidents were likely to subject the Company to significant liabilities having a material impact on its financial condition.  (See § IV.A.3.a, supra). The Offering Materials were therefore deficient under Item 303.  See Panther Ptrs., 681 F.3d at 121–22 (holding that plaintiffs plausibly alleged that Item 303 required disclosure of known defects in company's semiconductor chips, which had "potential impact" on company's business, "constituted a known trend or uncertainty that [company] reasonably expected would have a material unfavorable impact on revenues or income from continuing operations"); Litwin, 634 F.3d at 716 (holding that plaintiffs plausibly alleged that Item 303 required disclosure of "known and existing" downward trend that was "reasonably likely to have a material impact on [company's] financial condition"); In re Didi Glob., 2024 WL 1119483, at *9–10 (finding that,

where company was aware of adverse facts and reasonable likelihood of adverse events with material impact, Item 303 required additional disclosure).

"Substantially for the same reasons," Plaintiffs have plausibly alleged that these were "material factors that ma[d]e an investment in" Norfolk Southern's Offerings "speculative or risky" and therefore Item 105 required their disclosure.  In re Didi Glob., 2024 WL 1119483, at *11.

### B.  Section 15 Claim

Section 15 of the Act "imposes joint and several liability on control persons for underlying violations of the [] Act." City of Westland, 129 F. Supp. 3d at 89.  To plead a Section 15 claim, "a plaintiff must show a primary violation by the controlled person and control of the primary violator by the targeted defendant . . . ." SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1472 (2d Cir. 1996); accord City of Westland, 129 F. Supp. 3d at 89.

Here, Plaintiffs have adequately pleaded a Section 11 violation.  At present, Defendants do not contest that they are control persons under Section 15.  (See generally ECF Nos. 121; 126; 132).  Accordingly, Plaintiffs have adequately alleged a violation of Section 15.  See In re Tufin Software Techs., 2022 WL 596861, at *11 (finding Section 15 claims were adequately pleaded where defendants did not contest control person status of individual defendants and Section 11 claim had been stated); see Owen v. Elastos Found., No. 19 Civ. 5462 (GHW), 2021 WL 5868171, at *16 (S.D.N.Y. Dec. 9, 2021) (same); City of Westland, 129 F. Supp. 3d at 89 (denying motion to dismiss Section 15 claims to the extent plaintiffs plausibly alleged Section 11 claims); In re Lehman Bros., 684 F. Supp. 2d at 495–96 (denying motion to dismiss Section 15 claims as to

defendants whom plaintiffs sufficiently alleged were control persons and where Section 11 claims were adequately stated).

<strong>V.<u>CONCLUSION</u></strong>

For the reasons set forth above, although Plaintiffs have failed to plausibly allege that the Strategic Plan Statements contained omissions concerning undisclosed illegal activity or regulatory violations, the Court has concluded that the Amended Complaint otherwise plausibly alleges Section 11 and Section 15 violations, and therefore respectfully recommends that the Motion be GRANTED IN PART and DENIED IN PART.

Dated:      New York, New York
            July 26, 2024

_____
**SARAH L. CAVE**
**United States Magistrate Judge**

*              *              *

**NOTICE OF PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION**

The parties shall have fourteen (14) days (including weekends and holidays) from service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure.  See also Fed. R. Civ. P. 6(a), (d) (adding three additional days when service is made under Fed. R. Civ. P. 5(b)(2)(C), (D) or (F)).   A party may respond to another party's objections within fourteen (14) days after being served with a copy.  Fed. R. Civ. P. 72(b)(2).  Such objections, and any response to objections, shall be filed with the Clerk of the Court.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), (d), 72(b).  Any request for an extension of time for filing objections must be addressed to Judge Kaplan.

**FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.**  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), (d), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).