UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IN RE NORFOLK SOUTHERN CORPORATION
BOND/NOTE SECURITIES LITIGATION                    23-cv-4068 (LAK)
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION

Appearances:

Alfred Louis Fatale, III
Charles Steine
Charles Wood
Francis Paul McConville
Guillaume Buell
LABATON KELLER SUCHAROW LLP

Cynthia Billings-Dunn
ASHERKELLY, PLLC

*Attorneys for Lead Plaintiff City of Pontiac
Reestablished General Employees Retirement
System*

Jeremy Todd Adler
Michael G. Bongiorno
Ripley Shiarella
Samuel E. Frizell
Tamar Batya Kaplan-Marans
WILMER CUTLER PICKERING HALE AND DORR
LLP

*Attorneys for Defendants Norfolk Southern
Corp., Alan Shaw, James Squires, Mark
George, Clyde Allison, Jr., Mitchell Daniels,
Jr., Marcela Donadio, John Huffard,
Christopher Jones, Thomas Kelleher, Steven
Leer, Michael Lockhart, Amy Miles, Claude
Mongeua, Jennifer Scanlon, and John
Thompson*

Adam Selim Hakki
Agnes Dunogue

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _02/27/25_

Benjamin Klebanoff
Richard Thaddeus Behrens
ALLEN OVERY SHEARMAN STERLING US LLP

*Attorneys for Defendants BofA Securities, Inc., Morgan Stanley & Co. LLC, Wells Fargo Securities LLC, Capital One Securities, Inc., Fifth Third Securities, Inc., MUFG Securities America, Inc., PNC Capital Markets LLC, Siebert Williams Shank & Co., LLC, SMBC Nikko Securities America, Inc., Citigroup Global Markets, Inc., Goldman Sachs & Co. LLC, and U.S. Bancorp Investments, Inc.*

LEWIS A. KAPLAN, *District Judge.*

   This is a putative class action against Norfolk Southern Corporation ("Norfolk Southern"), individual Norfolk Southern officers and directors, and Norfolk Southern's underwriters concerning securities issued by Norfolk Southern.[1]  The Amended Complaint alleges violations of Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act").[2]  All defendants have moved to dismiss the amended complaint.[3]  In a thorough report and recommendation ("R&R"), Magistrate Judge Sarah Cave recommended that the motion be granted in part and denied in part.[4]  Defendants object to so much of the R&R as recommended denial of a portion of their motion.  For the reasons

---

[1]

   Am. Compl. ¶ 1.

[2]

   *Id.*¶¶ 312–329.

[3]

   Dkt 112.  The underwriter defendants joined the motion.  Dkt 117; Dkt 128.

[4]

   Dkt 134 at 55.

3

that follow, the Court sustains the objections in substantial part and grants the motion to dismiss in its entirety.

*Facts*[5]

I.    *Norfolk Southern and the TOP Initiative*

Norfolk Southern is one of the largest freight railroad companies in the United States.[6] It operates Norfolk Southern Railway, a freight railroad that spans over 19,000 route miles, and is a major transporter of industrial products.[7]

In February 2019, Norfolk Southern unveiled a new business strategy, "TOP21," which aimed to reduce operating costs through precision scheduled railroading ("PSR").[8]  In June 2022, Norfolk Southern announced "TOP SPG," a continuation of TOP21 aimed at improving efficiency and productivity.[9]   The Amended Complaint refers to TOP21, TOP SPG, and Norfolk Southern's other PSR-based operating plans collectively as the "TOP Initiative."[10]  In connection

---

[5]    The Court assumes familiarity with the underlying facts and the procedural history and thus provides the minimal background necessary to decide the motion.  For the purpose of this motion, the Court assumes the truth of Amended Complaint's allegations and draws all inferences favorable to plaintiff to which the allegations reasonably are susceptible.

[6]    Am. Compl. ¶ 62.

[7]    *Id.*

[8]    *Id.* ¶ 65.

[9]    *Id.* ¶ 67.

[10]    *Id.* ¶ 5 & n.5.

4

with the TOP Initiative, Norfolk Southern set a goal of reducing its operation expenses as a percentage of revenue ("Operating Ratio").[11]  To accomplish this goal, the TOP Initiative made operational changes including reductions in staff, longer and heavier trains, and reductions in costly assets such as locomotives.[12]  The Amended Complaint alleges that these changes increased the risk of derailments and other safety related accidents.[13]

## II.    Alleged Misleading Statement and Omissions

In February 2021, Norfolk Southern filed with the U.S. Securities and Exchange Commission ("SEC") a shelf registration statement on Form S-3 ASR (the "Registration Statement") authorizing it to sell certain securities to public investors.[14]  Norfolk Southern issued seven offerings of senior notes pursuant to the Registration Statement.[15]

The Amended Complaint alleges that the Registration Statement, related prospectus supplements, and documents incorporated by inclusion or reference therein (collectively, the "Offering Documents")[16] contained untrue statements of fact, omitted material facts, omitted material facts necessary to make the statements contained therein not misleading, and failed to make

---

[11]     *Id.* ¶ 66.

[12]     *Id.* ¶ 65.

[13]     *Id.* ¶¶ 68–78.

[14]     *Id.* ¶ 189.

[15]     *Id.* ¶¶ 1, 189.

[16]     *Id.* ¶¶ 2 & n.3, 189.

disclosures required under the rules and regulations governing their preparation.[17]  The alleged material misstatements and omissions fall into three categories: (1) statements relating to Norfolk Southern's commitment to and programs to improve safety ("Safety Statements"), (2) statements involving Norfolk Southern's financial and operations metrics ("Operational Statements"), and (3) statements about the implement of PSR and the TOP Initiative ("Strategic Plan Statements").[18]

III.    *Post-Offering Events*

In February 2023, a Norfolk Southern train carrying hazardous chemicals derailed in East Palestine, Ohio.[19]  The derailment was caused by an overheated wheel bearing on a hopper car, which was on fire for several miles before the derailment occurred.[20]  The derailment started a large fire, forced evacuations of the surrounding area, and caused substantial environmental damage.[21] In the ensuing fallout, Norfolk Southern's Operating Ratio rose and the value of its stock fell precipitously.[22]

---

[17] *Id.* ¶ 202.

[18] Dkt 134 at 11–14.

[19] Am. Compl. ¶¶ 254–255.

[20] *Id.* ¶ 256.

[21] *Id.* ¶¶ 257–263.

[22] *Id.* ¶¶ 12, 14–15, 297–304.

### Discussion

1.    *Legal Standard*

To survive a Rule 12(b)(6) motion, a complaint must plead facts that "state a claim to relief that is plausible on its face."[23]  A claim is facially plausible if "the plaintiff pleads factual content that permit the reasonable inference that the defendant is liable for the misconduct alleged."[24] This requirement is satisfied by "a short and plain statement of the claim showing that the pleader is entitled to relief."[25]  A court in deciding a motion to dismiss "accept[s] as true all factual allegations and draw[s] from them all reasonable inferences" in the plaintiff's favor.[26] But it is "not required to credit conclusory allegations or legal conclusions couched as factual allegations."[27]  "A complaint 'is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.'"[28]

---

[23]    *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

[24]    *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

[25]    Fed. R. Civ. P. 8(a)(2).  "Because claims under [Section 11] need not include allegations of fraud, 'this is an ordinary notice pleading case, subject only to the "short and plain statement" requirements of Federal Rule of Civil Procedure 8(a).'" *N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 120 (2d Cir. 2013) (quoting *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715 (2d Cir.2011)).

[26]    *Hernandez v. United States*, 939 F.3d 191, 198 (2d Cir. 2019) (quoting *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014)).

[27]    *Id*.

[28]    *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)); *see also ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (in securities action, court may consider "legally required public disclosure documents filed with the SEC").

2.      *Section 11 Claims*

        Section 11 "prohibits materially misleading statements or omissions in registration statements filed with the SEC."[29]  To state a claim under Section 11, a plaintiff must allege that: "(1) she purchased a registered security . . . ; (2) the defendant participated in the offering . . . ; and (3) the registration statement 'contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.'"[30]  The first two elements are not disputed here.

        Two issues therefore are central to plaintiffs' Section 11 claims: "(1) the existence of either a misstatement or an unlawful omission; and (2) materiality."[31]  On the first issue, Section 11 "creates three potential bases for liability based on registration statements and prospectuses filed with the SEC: (1) a misrepresentation; (2) an omission in contravention of an affirmative legal disclosure obligation; and (3) an omission of information that is necessary to prevent existing disclosures from being misleading."[32]  Materiality exists "if there is a substantial likelihood that a

---

[29]
        *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358 (2d Cir. 2010).

[30]
        *Id.* at 358–59 (quoting 15 U.S.C. § 77k(a)).  Section 11 plaintiffs need not allege scienter, reliance, or loss causation in order to state a cognizable claim.  *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 129 F. Supp. 3d 48, 88 (S.D.N.Y. 2015).

[31]
        *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d at 360.

[32]
        *Id.*

8

reasonably prudent investor would consider it important in making a decision."[33]

Plaintiffs here allege that the Offering Documents omitted information necessary to prevent certain statements therein from being misleading and that a reasonably prudent investor would find the omitted information important to making investment decisions related to Norfolk Southern.

A.    *Safety Statements*

The first category of allegedly misleading statements is Safety Statements, which include:

(1)    "[C]apital spending and replacement programs are and have been designed to assure the ability to provide safe, efficient, and reliable rail transportation services."[34]

(2)    "We are dedicated to providing employees with a safe workplace and the knowledge and tools they need to work safely and return home safely every day. Our commitment to an injury-free workplace is illustrated by our 'I am Coming Home' safety message, which is featured prominently in our yards, shops, and facilities and further reinforces the importance of working safely."[35]

(3)    "We provide a range of developmental programs, opportunities, skills, and resources for our employees to work safely and be successful in their careers. We provide

---

[33]    *Lau v. Opera Ltd.*, 527 F. Supp. 3d 537, 551 (S.D.N.Y. 2021) (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988); *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

[34]    Am. Compl. ¶ 208.

[35]    *Id.* ¶ 210.

9

hands-on training and simulation training designed to improve training effectiveness and safety outcomes."[36]

(4)    "Safety is a way of life at Norfolk Southern, extending beyond our rail operations and into the communities where we live and work."[37]

(5)    "We remain committed to protecting our employees and providing excellent transportation service products for our customers."[38]

(6)    "Safety is part of who we are. Safety is core to our business strategy and essential to achieving operational excellence."[39]

(7)    "Given the importance of safety among our workforce and business, in 2020, our Board of Directors established a standing Safety Committee that, among other duties, reviews, monitors, and evaluates our compliance with our safety programs and practices."[40]

Plaintiffs argue that these statements were materially misleading in light of Norfolk Southern's allegedly undisclosed and unsustainable business practices.[41]

Statements that are "too general to cause a reasonable investor to rely upon them" are

---

[36]    *Id.* ¶ 211.

[37]    *Id.* ¶ 218.

[38]    *Id.* ¶ 222.

[39]    *Id.* ¶ 238.

[40]    *Id.* ¶ 210.

[41]    Am. Compl. ¶¶ 202(a)–(f).

not actionable.[42]  Safety Statements (1), (4), (5), and (6) were puffery.  Representations that safety is a "way of life" or "part of who we are" were "general, airy statement[s] of commitment routinely found to constitute non-actionable puffery."[43]  Plaintiffs contend that the Safety Statements were misleading because "unbeknownst to investors, Norfolk Southern decreased spending associated with" safety.[44]  But Safety Statement (1) made no representations about *spending* on safety.  It was merely a general statement that Norfolk Southern's programs aimed to achieve multiple goals, including safety.

To the extent the remaining Safety Statements were sufficiently specific, plaintiffs do not allege that they were false.  Safety Statements (2), (3), and (7) were sufficiently specific to the extent they stated that Norfolk Southern had a safety message featured prominently at its facilities,  provided hands-on training and simulation, and established a standing Safety Committee of its Board of Directors.  If any of these statements was false, then it would have been actionable.[45]  But the Amended Complaint does not so allege.  Instead, plaintiffs argue that Safety Statements (2) and (7) were misleading because they touted Norfolk Southern's dedication and commitment to safety — archetypical puffery.  Plaintiffs argue that Safety Statement (3) was "verifiably false

---

[42]

   *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009).

[43]

   *In re Vale S.A. Sec. Litig.*, No. 1:15-cv-9539, 2017 WL 1102666, at *22 (S.D.N.Y. Mar. 23, 2017).

[44]

   Dkt 139 at 11.

[45]

   *Cf. Bricklayers and Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 243–44 (S.D.N.Y. 2012) (statement that company conducted "extensive" training was not puffery).

because the Company's trainings were designed without regard for safety."[46]  But the Amended

Complaint does not allege any facts supporting this assertion.   While the Amended Complaint

alleges that training was inadequate and inappropriately outsourced to contractors,[47] it does not allege

any facts demonstrating that the training was not designed to improve training effectiveness and

safety outcomes.

The R&R contends that "[a]s with opinion statements, . . . 'statements of optimism

and puffery can be actionable where they contradict facts that are known to a defendant . . . or where

they amount to misrepresentations of existing facts that were made even though the speaker knew

that the contrary was true.'"[48]  The case cited by the R&R, however, for this proposition cites to

decisions that in turn refer to *Novak v. Kasaks*.[49]  There, the Second Circuit held that characterizing

a defendant's inventory as "in good shape" or "under control" was actionable because defendants

knew the contrary was true.[50]  But the underlying statements in *Novak* were not puffery; they were

opinion statements that misrepresented existing facts.[51]  Unlike for opinion statements, the Second

Circuit has rejected the argument that puffery statements is actionable where the defendant was

---

[46]

Dkt 139 at 11.

[47]

Am. Compl. ¶¶ 75–78, 121–122.

[48]

Dkt 134 at 27 (second alteration in original) (quoting *Greco v. Qudian Inc.*, No. 20 Civ. 577
(GHW), 2022 WL 4226022, at *10 (S.D.N.Y. Sept. 13, 2022)).

[49]

216 F.3d 300 (2d Cir. 2000).

[50]

*Id.* at 315.

[51]

*See id.* (distinguishing "misrepresentations of existing facts" from "simple economic
projections, expressions of optimism, and other puffery").

"aware of facts undermining the positive statements about [the defendant's] commitment to ethics and integrity."[52] Here too, the fact that defendants allegedly were aware of facts undermining their puffery did not make those statements actionable. Plaintiffs' claim that the statements were false or misleading by omission "does not cure their generality, which is what prevents them from rising to the level of materiality required to form the basis for assessing a potential investment."[53]

The R&R contends also that the Safety Statements were actionable because Norfolk Southern's repeated emphasis on safety put the topic at issue and that investors therefore would have relied on its representations.[54] But the Second Circuit consistently has held that puffery is not actionable even where a defendant has made myriad statements on the same topic.[55] Here, the Amended Complaint contains seven statements regarding Norfolk Southern's commitment to safety. Even if statements that otherwise were puffery could be made actionable via repeated emphasis, plaintiffs have not alleged that is the case here.

Accordingly, the Safety Statements were not actionable misrepresentations.

---

[52]

*Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 97 (2d Cir. 2016).

[53]

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014).

[54]

Dkt 134 at 35.

[55]

*Bos. Ret. Sys. v. Telefonaktiebolaget LM Ericsson*, No. 23-940-CV, 2024 WL 4023842, at *3 (2d Cir. Sept. 3, 2024) (multiple puffery statements on same topic non-actionable)*; In Re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th 408, 417 (2d Cir. 2023) (dozens of puffery statements on same topic non-actionable); *ECA*, 553 F.3d at 205–06 ("numerous" puffery statements on same topic non-actionable).

B.    *Operational Statements*

The second category of allegedly misleading statements is Operational Statements. These include statements about (1) Norfolk Southern's accident data,[56] and (2) reductions in Norfolk Southern's Operating Ratio.[57]  Plaintiffs contend that (1) the accident data was misleading because Norfolk Southern should have provided accident data in a per-million-mile format, and (2) the Operating Ratio statements were misleading by omission because Norfolk Southern's "declining Operating Ratio was, in truth, the result of undisclosed, unsustainable business practices . . . ."[58]

The Operational Statements regarding accident data were not misleading by omission. First, as the R&R correctly concluded, defendants "were not required to 'do the math' to provide the accident data in Plaintiffs' preferred calculation."[59]  Second, Norfolk Southern's per-million-mile accident data was publicly available on the Federal Railroad Administration ("FRA") website.[60] Section 11 does "not require the disclosure of publicly available information."[61]  Third, it is far from clear that accident rate data — as opposed to total accident data — is a more informative metric,

---

[56]

Am. Compl. ¶¶ 219, 237.

[57]

*Id.* ¶¶ 213, 217, 223, 226, 229, 231.  Statements about the *causes* of Norfolk Southern's improved Operating Ratio are addressed separately in the ensuing sub-section.

[58]

Dkt 139 at 16.

[59]

Dkt 134 at 39 (citing *Scott v. Gen'l Motors Co.*, 46 F. Supp. 3d 387, 397–98 (S.D.N.Y. 2014); *In re Eros Int'l Sec. Litig.*, No. 15 Civ. 8956 (AJN), 2017 WL 6405846, at *6 (S.D.N.Y. Sept. 22, 2017)).

[60]

*Id.* at 38 n.19.

[61]

 *In re Merrill Lynch & Co. Res. Rpts. Sec. Litig.*, 272 F. Supp. 2d 243, 249–50 (S.D.N.Y. 2003).

since Norfolk Southern's potential exposure presumably was a product of its total number of accidents, not the rate at which accidents occur.

The R&R faults Norfolk Southern for failing to "disclose to investors that, in an effort to improve its Operating Ratio, it had cut corners on safety and employee training throughout the relevant time period and at different locations across its territory, at the expense of safety and the Company's broader financial condition in the event of a catastrophic accident like the [derailment]."[62] Per this view, Norfolk Southern speaking about its Operating Ratio created a duty "to tell the whole truth"[63] on that topic and thus obligated Norfolk Southern to disclose its allegedly unsustainable business practices.

When an issuer makes a disclosure about a particular topic, "the representation must be 'complete and accurate.'"[64] "Plaintiffs' argument, however, stretches these principles past their logical breaking point."[65] To prevail on an omission theory, "plaintiffs must establish a sufficiently close nexus between the affirmative statement and the alleged omission."[66] The mere reporting of accurate financial metrics — like the Operating Ratio — did not trigger a duty to disclose the

---

[62] Dkt 134 at 41.

[63] *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014).

[64] *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d at 366 (2d Cir. 2010) (quoting *Glazer v. Formica Corp.*, 964 F.2d 149, 157 (2d Cir.1992)).

[65] *Id.*

[66] *In re Omega Healthcare Invs., Inc. Sec. Litig.*, 563 F. Supp. 3d 259, 272 (S.D.N.Y. 2021).

purported "long-term unsustainability of [a defendant's] business model,"[67] whatever that characterization may mean. A defendant does not put specific issues underlying its performance "in play" simply by providing accurate information about its financial performance.[68]

The R&R argues also that the statements about Norfolk Southern's Operating Ratio were misleading because the Offering Materials's risk disclosures were insufficient.[69] The sufficiency of the risk disclosures is relevant to the Operational Statements only to the extent that the Operational Statements would be misleading if a certain risk were not disclosed. Here, the Operational Statements were not misleading by omission. The sufficiency of Norfolk Southern's risk disclosures therefore is not relevant.

Accordingly, the Operational Statements were not actionable misrepresentations.

C.    *Strategic Plan Statements*

The third category of allegedly misleading statements is Strategic Plan Statements, which include:

(1)    "In 2020, we continued the implementation of our strategic plan, including tactical changes to our operating plan, to generate operational efficiencies, improve customer service, and deliver strong financial results. . . . In the face of economic headwinds

---

[67]  *Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 38 (2d Cir. 2012) ("Whatever the scope of the responsibility not to make statements that constitute 'half-truths,' that surely does not apply to the reporting of unmanipulated corporate earnings.").

[68]  *In re Omega Healthcare Inv'rs, Inc. Sec. Litig.*, 563 F. Supp. 3d at 272–73.

[69]  Dkt 134 at 40–41.

that resulted in a year-over-year volume decline of 12%, we improved productivity by driving year-over year average headcount down by 18%, and we increased asset utilization through rationalization of our locomotive fleet. These sustainable cost structure improvements will provide greater benefits as the economy recovers."[70]

(2)    "Throughout 2020, despite historic challenges, our management team pressed forward to adopt a precision scheduled railroad-based operating plan to the changing business environment, while seizing efficiency opportunities that resulted in a record fourth quarter operating ratio."[71]

(3)    "In 2020, we continued the implementation of our strategic plan, including the transformation of our operations to generate efficiencies, improve customer service, and deliver strong financial results."[72]

(4)    Norfolk Southern's "operating ratio improved to 61.5 percent, a quarterly record[,]" which "reflect[ed] [its] sustained focus on margin improvement through initiatives to drive organizational and operational efficiencies and grow [its] revenue base."[73]

(5)    "Our management team delivered upon [the] company's three-year strategic plan, producing industry-leading total shareholder return of 110% over the course of our

---

[70]    Am. Compl. ¶ 212.

[71]    *Id.* ¶ 216.

[72]    *Id.* ¶ 217.

[73]    *Id.* ¶ 223.

plan, and an all-time record full year operating ratio of 60.1%[.]"[74]

(6)    "The results of our multi-year effort are highlighted by what we achieved in 2021: Record Operating Ratio of 60.1% . . ."[75]

(7)    "2021 does not stand on its own though; it represents the culmination of our ambitious multi-year strategic plan. In the past three years, we've produced industry-leading total shareholder return. We've grown earnings per share by 27%, reduced our operating ratio by 530 basis points, and returned nearly $10 billion to our shareholders in the form of share repurchases and dividends."[76]

Plaintiffs contend that these statements misleadingly omitted information that (1) the TOP Initiative increased accident risk, (2) the improved Operating Ratio was not sustainable, and (3) Norfolk Southern engaged in illegal conduct.

### i.    *TOP Initiative and Accident Risk*

The Strategic Plan Statements did not trigger a duty to disclose a purported increase in accident risk. First, there was not a sufficiently close nexus between the Strategic Plan Statements and accident risk. For example, in *In re Omega Healthcare Investors, Inc. Securities Litigation*, the court held that quantitative and qualitative statements about a company's fourth quarter financial

---

[74]    *Id.* ¶ 234.

[75]    *Id.* ¶ 235.

[76]    *Id.* ¶ 236.

18

results did not require disclosing specific information about its deteriorating financial condition.[77] And in *In re ITT Educational Services, Inc. Securities and Shareholder Derivatives Litigation*, the court held that statements attributing the defendant's financial success to increased consumer demand and effective recruiting and advertising did not require disclosure of its allegedly "predatory business model," including its recruitment and marketing practices.[78] Here, the connection between the Strategic Plan Statements and a purported, non-specific increase in accident risk is no less tenuous than in those cases.

Even if there were a sufficient connection between the TOP Initiative and accident risk, "[i]t cannot be that every time a risk increases or decreases, a company must precisely quantify the increase or decrease in its disclosures identifying that risk."[79] In *Ong v. Chipotle Mexican Grill, Inc.*, after the defendant changed its food safety practices, the court held that "[a]ny heightened risk posed by that transition . . . was only potential, and the Company's disclosure of its probable, imminent risks was both accurate and candid."[80] Here, the Offering Documents disclosed the risk of a "catastrophic rail accident involving hazardous materials" that "could compromise critical parts of [Norfolk Southern's] rail network" and "result[] in a material adverse effect on [its] liquidity."[81]

---

[77]     563 F.Supp.3d 259, 272–73 (S.D.N.Y. 2021).

[78]     859 F. Supp. 2d 572, 579–80 (S.D.N.Y. 2012).

[79]     *Constr. Laborers Pension Tr. For S. Cal. v. CBS Corp.*, 433 F. Supp. 3d 515, 538 (S.D.N.Y. 2020).

[80]     294 F. Supp. 3d 199, 229 (S.D.N.Y. 2018).

[81]     Dkt 113-1 at K12–13.

Norfolk Southern was not obliged to disclose an undefined increase in that risk, especially where the Amended Complaint does not allege that the number of accidents actually had increased by the time the Strategic Plan Statements were made.

### ii.    *Sustainability of Operating Ratio*

Statements regarding Norfolk Southern's Operating Ratio were not misleading for omitting information about the purported unsustainability of Norfolk Southern's performance.  The Second Circuit has "easily rejected" the argument that statements about a company's performance are actionable "because they did not acknowledge the long-term unsustainability of its business model."[82]  "As a matter of law, no statements regarding [a defendant's] accurately reported revenue and income have been rendered materially misleading by failing to disclose that such income was 'unsustainable.'"[83]

Plaintiffs argue that this case law is distinguishable because Norfolk Southern's 2020 Annual Report referenced "sustainable cost structure improvements."[84]  Importantly, this statement did not reference the Operating Ratio or the TOP Initiative as a whole; it referred to a discrete set of expense reductions.

The use of the adjective "sustainable" was inactionable puffery.  Courts have

---

[82]

    *Boca Raton Firefighters & Police Pension Fund*, 506 F. App'x at 38 (citing *In re Int'l Bus. Machs. Corp. Sec. Litig.*, 163 F.3d 102, 108 (2d Cir.1998)).

[83]

    *In re Axis Cap. Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 587 (S.D.N.Y. 2006).

[84]

    Dkt 139 at 7 (citing Am. Compl. ¶ 212).

dismissed statements that a company is "positioned for sustainable growth,"[85] is "well positioned to maintain [its] growth,"[86] or "will continue to execute sustainable and improving margins"[87] as puffery. Here too, Norfolk Southern's reference to "sustainable cost structure improvements" was too general for a reasonable investor to rely upon. This statement expressed confidence in Norfolk Southern's future performance, but it was not a "long-term guarantee or assurance"[88] of the company's continued success. While characterizing a company's strategy as sustainable might be actionable in some cases, it was not in the circumstances alleged here — the one-time use of the adjective "sustainable" to describe a category of strategic initiatives.[89]

   The R&R asserts that "Norfolk Southern's assertions about the sustainability of its Operating Ratio were . . . 'concrete' descriptions and 'factual representation[s]' that purported to describe the state of the Company's operations."[90] The Court respectfully disagrees. First, Norfolk Southern did not make any assertions about the sustainability of its Operating Ratio; it made one

---

85   *Villare v. Abiomed, Inc.*, No. 19 CIV. 7319 (ER), 2021 WL 4311749, at *12–14 (S.D.N.Y. Sept. 21, 2021).

86   *Steamfitters Loc. 449 Pension Plan v. Skechers U.S.A., Inc.*, 412 F.Supp.3d 353, 363 (S.D.N.Y. 2019).

87   *In re Grab Holdings Ltd. Sec. Litig.*, 2024 WL 1076277, at *23 (S.D.N.Y. Mar. 12, 2024).

88   *In re Int'l Bus. Machs. Corp. Sec. Litig.*, 163 F.3d 102, 108 (2d Cir.1998).

89   *Cf. In re Vale S.A. Sec. Litig.*, No. 19 CV 526 (RJD) (SJB), 2020 WL 2610979, at *12 (E.D.N.Y. May 20, 2020) (defendant's statements about safety and sustainability actionable "because it repeatedly emphasized its commitment to such priorities").

90   Dkt 134 at 44 (quoting *In re Int'l Bus. Machines Corp. Sec. Litig.*, 163 F.3d 102, 110 (2d Cir. 1998)).

statement about the sustainability of certain cost structure improvements.  Second, the decisions cited in the R&R involved concrete factual representations about business practices wholly dissimilar from Norfolk Southern's use of the word sustainable.[91]  For example, in *In re Synchrony Financial Securities Litigation*, the Second Circuit held that a CEO's statement that his company was "not getting any pushback" was a concrete factual representation.[92]  The court held also that the company's statement about "stable asset quality" *was* inactionable puffery.[93]  The "sustainable cost reductions" statement bears no resemblance to the pushback statement and is closely analogous to the stable asset quality statement.

Even if the use of "sustainable" were not puffery, it at most conveyed an actionable opinion.[94]  To state a Section 11 claim, a plaintiff "must identify particular (and material) facts going to the basis for the issuer's opinion . . . whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context."[95]  The cost structure improvements referenced in the 2020 Annual Report — the only practices referred to as "sustainable" in the Offering Documents — were (1) an 18 percent year-over-year average headcount

---

[91]

       *See, e.g., In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 611 (S.D.N.Y. 2017) (statements about company's "independent agency status" and specific features of company's leading product were not puffery).

[92]

       988 F.3d 157, 168 (2d Cir. 2021)

[93]

       *Id.* at 170.

[94]

       *See City of Westland*, 129 F. Supp. 3d at 77–78 (company's representations of its practices as "solid" and "disciplined" "were characterizations or statements of opinion or belief").

[95]

       *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 194 (2015).

22

reduction, and (2) "increased asset utilization through rationalization of our locomotive fleet."[96]  The Amended Complaint must therefore identify particular and material facts whose omission make the characterization of those changes as sustainable misleading.

Regarding headcount, the Amended Complaint cites statements from former non-managerial employees that safety issues arose from (1) departments being "cut to the bare bones,"[97] (2) a lack of experienced employees,[98] (3) fewer carmen employed to inspect trains,[99] (4) exhaustion of overworked employees,[100] (5) fewer crew members aboard trains,[101] (6) a lack of inspectors,[102] and (7) a lack of engineers.[103]  The Amended Complaint alleges also that the reduction in headcount on the Advanced Train Control ("ATC") Desk increased the risk of future derailments and other safety related incidents.[104]  The Amended Complaint does not make any specific allegations regarding fleet rationalization.

---

[96]

Am. Compl. ¶ 212.

[97]

*Id.* ¶ 92.

[98]

*Id.* ¶¶ 95–96, 137.

[99]

*Id.* ¶¶ 99–113, 130, 132–133.

[100]

*Id.* ¶¶ 115–116, 128.

[101]

*Id.* ¶¶ 125–126 159–160, 180.

[102]

*Id.* ¶¶ 149–151, 180–181, 184.

[103]

*Id.* ¶ 158.

[104]

Am. Compl. ¶¶70–73.

Accepting these allegations as true, plaintiffs have not alleged any particular omitted facts Norfolk Southern should have disclosed.  Plaintiffs argue that defendants omitted "the fact that the Company was cutting corners at the expense of safety, violating safety regulations, and sacrificing safety for short term profits."[105]  This is a conclusory assertion, not a particular and material fact.  Even if this statement were one of fact, it would not be clear that it would have rendered the 2020 headcount reduction and fleet rationalization "unsustainable."  The Amended Complaint does not allege that these changes made the risk of accidents so high that they could not have been continued indefinitely.  The Amended Complaint alleges that "[a] costly train accident such as the Eastern Palestine Incident was inevitable as the Company went out of its way to cut costs and corners in order to obtain short term profits."[106]  This allegation is impermissible hindsight pleading.[107]  The Amended Complaint does not allege facts raising a reasonable inference that such an accident was the inevitable result of the TOP Initiative as a whole, much less the specific changes referred to as sustainable.

The only specific facts plaintiffs argue should have been disclosed are (1) an increase in train accidents per million train miles, and (2) alleged illegal or improper conduct.[108]  For the

---

[105]

Dkt 139 at 14; *see also id.* at 17–18.

[106]

Am. Compl. ¶ 299.

[107]

*In Re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th 408, 429 (2d Cir. 2023); *In re TVIX Sec. Litig.*, 25 F. Supp. 3d 444, 450 (S.D.N.Y.), *aff'd sub nom. Elite Aviation LLC v. Credit Suisse AG*, 588 F. App'x 37 (2d Cir. 2014).

[108]

Plaintiffs do not argue that Norfolk Southern had a duty to provide more detail about the disclosed headcount reductions, such as a role-by-role breakdown.  Indeed, Norfolk Southern did not have any such duty.  *See, e.g.*, *Brasher v. Broadwind Energy, Inc.*, 2012 WL 1357699, at *14 (N.D. Ill. Apr. 19, 2012).

24

reasons stated above, Norfolk Southern was not required to disclose accident data in a different format.  And as discussed in greater detail below, Norfolk Southern was not required to disclose alleged illegal or improper conduct.

### iii.    Allegedly Illegal Conduct

Plaintiffs allege that defendants were obliged to disclose (1) a 2021 FRA finding that Norfolk Southern's training  program for engineers and conductors "was not in conformance with 49 CFR Part 242"[109] and (2) that the Company was "violating relevant regulations" and "[taking] advantage of loopholes within regulations."[110]

As the R&R correctly explains:[111]

> Norfolk Southern "did not have a freestanding legal duty to disclose" the alleged regulatory noncompliance described in the Amended Complaint.[112]  The Second Circuit has repeatedly explained that the "nondisclosure of 'uncharged, unadjudicated wrongdoing'" does not give rise to Section 11 liability.[113]  Rather, to plausibly allege a Section 11 violation for failure to disclose of such wrongdoing, Plaintiffs were required to allege both that Norfolk Southern violated a law or regulation and that disclosure "was necessary to prevent the company's other statements from being

---

[109]    Am. Compl. ¶ 77.

[110]     Am. Compl. ¶¶ 202(a) & (c), 214(a) & (c), 220(a) & (c), 227(a) & (c)

[111]    Dkt 134 at 45–46.

[112]    *In re DraftKings, Inc. Sec. Litig.*, 650 F. Supp. 3d 120, 168 (S.D.N.Y. 2023).

[113]    *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 95 (2d Cir. 2021) (quoting *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014)).

misleading."[114]  Plaintiffs' present allegations falter on both elements.

For the reasons stated in the R&R, the Court agrees that the Amended Complaint does not allege

plausibly that Norfolk Southern violated any law or regulation or made any prior statement that

triggered an obligation to disclose allegedly illegal or improper conduct.[115]  Therefore, defendants

had no duty to disclose uncharged, purportedly illegal conduct.


D.    *Regulation S-K*

The Amended Complaint alleges that defendants did not disclose "known trends,

uncertainties, and risks that required disclosure in the Offering Documents."[116]  Plaintiffs contend

that these omissions violated Items 303 and 105 of SEC Regulation S-K.[117]


i.    *Item 303*

Item 303 requires registration statements to include a "discussion and analysis" of

"material information relevant to an assessment of the financial condition and results of operations

of the registrant."[118]  This discussion "must focus specifically on material events and uncertainties

---

[114]

    *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 752 (S.D.N.Y. 2017); *accord DraftKings*, 650 F. Supp. 3d at 168.

[115]

    Dkt 134 at 46–51.

[116]

    Am. Compl. ¶ 252.

[117]

    *Id.*; *see also* 17 C.F.R. §§ 229.303, 229.105.

[118]

    17 C.F.R § 229.303(a).

known to management that are reasonably likely to cause reported financial information not to be necessarily indicative of future operating results or of future financial condition."[119]  The Second Circuit has noted approvingly SEC guidance that Item 303 imposes a disclosure duty "where a trend, demand, commitment, event or uncertainty is both (1) presently known to management and (2) reasonably likely to have material effects on the registrant's financial condition or results of operations."[120]

The Second Circuit's opinion in *Panther Partners Inc. v. Ikanos Communications, Inc.*[121] is illustrative.  There, the Second Circuit held that a plaintiff stated an Item 303 claim based on the nondisclosure of a defect in a semiconductor chip it produced.[122]  In a previous unpublished opinion in the same case, the court held that the plaintiff had *not* stated a legally sufficient claim that the defendant "knew or should have known the scope or magnitude of the defect problem."[123]  The court further held that a proposed amended complaint did not cure that defect where it alleged that (1) the defendant's director of quality and reliability learned of the quality issues with the chips

---

[119]     *Id.*

[120]     *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012) (quoting Management's Discussion and Analysis of Financial Condition and Results of Operations, Securities Act Release No. 6835, Exchange Act Release No. 26,831, Investment Company Act Release No. 16,961, 43 SEC Docket 1330 (May 18, 1989)).

[121]     681 F.3d 114 (2d Cir. 2012).

[122]     *Id.* at 121.

[123]     *Panther Partners Inc. v. Ikanos Communications,* 347 F. App'x 617, 619–20 (2d Cir. 2009).

months before the public offering at issue,[124] (2) the defendant received "an increasing number of calls" from customers about defective chips before the offering,[125] and (3) the defendant's board of directors discussed the issue.[126]  However, in its subsequent published opinion, the court held that a second proposed amended complaint stated an Item 303 claim where it alleged that (1) the customers reporting issues accounted for 72 percent of the defendant's revenues, and (2) the defendant knew it could not determine which chip sets contained defective chips, making the return of the chips it sold those companies a known risk.[127]  The key difference between the first and second proposed amended complaints therefore was the specificity of the facts alleged showing the likelihood and magnitude of the risk known to the defendants at the time a statement was made.

Here, the Amended Complaint cites complaints from non-managerial employees about perceived increases in safety risks.  It does not allege that anyone in senior management was aware of a particular increase in risk,[128] that Norfolk Southern received increased reports of safety issues, or that Norfolk Southern's board of directors discussed a purported increase in safety risk.  Even if it did, the Second Circuit has held that analogous allegations are not sufficient to allege an

---

[124]

    *Id.* at 620–22.

[125]

    681 F.3d at 118.

[126]

    *Id.*

[127]

    *Id.* at 121.

[128]

    The Amended Complaint includes post-derailment testimony from Norfolk Southern's then-CEO Alan Shaw that he was "aware of" employee concerns about safety generally, Am. Compl. ¶ 252, but it does not allege that he was aware of any specific increase in safety risk arising from the TOP Initiative, *see id.* ("I'm aware of their concerns because I'm with our employees. I don't necessarily link it to PSR because our safety stats actually improved during PSR.").

28

Item 303 violation.[129]  To do so, the Amended Complaint would have to allege that Norfolk Southern knew of a risk approaching the likelihood and magnitude present in *Panther Partners* — losing most if not all revenue from customers accounting for 72 percent of its business.  The Amended Complaint does not allege that such a risk then existed, much less that Norfolk Southern was aware of that risk.

The R&R asserts that the Amended Complaint "plausibly alleged that Norfolk Southern was aware that the implementation of the TOP Initiative had made the Company's operations less safe, that as a result significant accidents were reasonably likely to occur, and that such accidents were likely to subject the Company to significant liabilities having a material impact on its financial condition."[130]  The Court respectfully disagrees.  The only data indicating that the TOP Initiative had made the Company's operations less safe was the accident rate data.  For the reasons stated above, Norfolk Southern was not obligated to disclose accident data in the format preferred by plaintiffs.  The omission of this data did not run afoul of Item 303 for the additional reason that the Amended Complaint does not allege that the reasonably likely effect of this increased risk on Norfolk Southern's business was akin to that in *Panther Partners*.

ii.      *Item 105*

Item 105 mandates the disclosure of "the material factors that make an investment

---

[129]    *Panther Partners*, 681 F.3d at 121.

[130]    Dkt 134 at 53.

29

in the registrant or offering speculative or risky."[131]  The Offering Documents disclosed the risk of

a "catastrophic rail accident involving hazardous materials" that "could compromise critical parts

of [Norfolk Southern's] rail network" and "result[] in a material adverse effect on [its] liquidity."[132]

Plaintiffs argue that defendants were obligated to warn of the increased risk allegedly resulting from

the TOP Initiative.  Substantially for the reasons stated in the foregoing subsection, defendants were

not so obligated.


3.    *Section 15 Claims*

Section 15 imposes derivative liability on any person who "controls any person liable

under Sections [11] or [12]  . . . unless the controlling person had no knowledge of or reasonable

ground to believe in the existence of the facts by reason of which the liability of the controlled

person is alleged to exist."[133]  The Section 15 claims against individual defendants here must be

dismissed because the Amended Complaint does not allege a Section 11 violation.

---

[131]
    17 C.F.R. § 229.105.

[132]
    Dkt 113-1 at K12–13.

[133]
    15 U.S.C.A. § 77o.

30

*Conclusion*

For the foregoing reasons, defendants' motion to dismiss (Dkt 112) is granted.


SO ORDERED.

Dated:        February 27, 2025

_____
Lewis A. Kaplan
United States District Judge